1
2
3
4
5
6
7

Patrick R. Leverty
**LEVERTY & ASSOCIATES LAW CHTD.**
Reno Gould House
832 Willow Street
Reno, NV 89502
Telephone: (775) 322-6636
Facsimile: (775) 322-3953
Email: pat@levertylaw.com

[Additional counsel on signature block]

*Counsel for Plaintiff*

8
9

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

10
11
12
13
14
15
16
17
18
19
20
21
22

STEVE HOOD, derivatively on behalf of MARATHON DIGITAL HOLDINGS, INC.,

    Plaintiff,

    vs.

FREDERICK G. THIEL, MERRICK OKAMOTO, SIMEON SALZMAN, HUGH J. GALLAGHER, GEORGES ANTOUN, KEVIN A. DENUCCIO, SARITA JAMES, JAY LEUPP, SAID OUISSAL, and DOUG MELLINGER,

    Defendants,

    and

MARATHON DIGITAL HOLDINGS, INC.,

    Nominal Defendant.

Case No.:  2:23-cv-01055

23

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

24

## INTRODUCTION

25
26
27
28

    Plaintiff Steve Hood ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Marathon Digital Holdings, Inc. ("Marathon" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Frederick G. Thiel ("Thiel"),

Merrick Okamoto ("Okamoto"), Simeon Salzman ("Salzman"), Hugh J. Gallagher ("Gallagher"), Georges Antoun ("Antoun"), Kevin A. DeNuccio ("DeNuccio"), Sarita James ("James"), Jay Leupp ("Leupp"), Said Ouissal ("Ouissal"), and Doug Mellinger ("Mellinger") (collectively, the "Individual Defendants" and together with Marathon, the "Defendants") for breaches of their fiduciary duties as directors and officers of Marathon, unjust enrichment, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Marathon, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Marathon's directors and officers from May 10, 2021, through February 23, 2023 (the "Relevant Period").

2.     Marathon is a bitcoin digital mining company incorporated in Nevada that maintains offices in Fort Lauderdale, Florida and Irvine, California.

3.     The Company began in 2010 under the name "Verve Ventures, Inc." On December 7, 2011, the Company changed its name to the "American Strategic Minerals Corporation" and entered the uranium and vanadium exploration business. In June 2012, the Company changed course by dropping the minerals business model and transitioned to real estate investments in Southern

California. By October of that year, the Company again shifted course and tried its hand with intellectual property ("IP") licensing by changing its name to "Marathon Patent Group, Inc."

4.     In 2017, the Company found its current business model when it purchased digital asset mining machines and established a data center in Canada to mine digital assets. Three years later, the Company ended operations in Canada, relocated all mining rigs from Canada to the United States, and began mining bitcoin across the United States. On March 1, 2021, the Company changed its name to Marathon. Marathon centered its business on mining bitcoin and ancillary opportunities within the bitcoin industry.

5.     During the Relevant Period, Marathon focused on mining digital assets with a special emphasis on the blockchain ecosystem and bitcoin.

6.     Throughout the Relevant Period, the Individual Defendants repeatedly and consistently obfuscated the truth to investors about Marathon's business, operations, and prospects. Specifically, the Individual Defendants held-back the Company's true revenue figures from investors while simultaneously claiming that materially misstated, publicly reported revenues were accurate and promoting an image of Marathon that differed from reality. Such falsities were included in the Company's proxy solicitations filed with the SEC during the Relevant Period, one of which solicited and received shareholder approval to amend a lucrative incentive plan that materially benefited the Individual Defendants, among others, at the Company, based on false pretenses, including Marathon's actual financial performance and standing.

7.     The Individual Defendants concealed the existence of these control failures from the investing public, instead affirmatively representing throughout the Relevant Period that the Company maintained effective disclosure controls and internal controls over its financial reporting.

8.     The Company's improperly reported financial statements would ultimately cause Marathon to restate over a year's worth of its financial statements, resulting in significant losses for the Company.

9.    The truth emerged on February 28, 2023, when Marathon "announc[ed] . . . that it has cancelled its webcast and conference call for the fourth quarter and fiscal year 2022, initially scheduled for today, February 28, 2023, at 4:30 p.m. Eastern time, and will postpone the publication of its corresponding financial results."

10.    On the same day, Marathon filed a Form 8-K with the SEC that acknowledged the Company was in receipt of a letter from the SEC pertaining to accounting issues in Marathon's prior financial statements.

11.    Moreover, and also on February 28, 2023, *Seeking Alpha* observed that since Marathon would need to restate its financial statements, the Company would be unable to timely file its 2022 annual report on Form 10-K. The Company filed a notification of inability to timely file its annual report the same day.

12.    On this news, the price of the Company's stock dropped from $7.10 per share at the close of trading on February 28, 2023, the prior trading day, to $6.51 per share at the close of trading on March 1, 2023, representing a loss in value of 8.31%, or $0.59 per share.

13.    On March 16, 2023, Marathon filed its annual report on Form 10-K for the fiscal year ended December 31, 2022, which included a restatement of, *inter alia*, the Company's reported Revenue Recognition, Impairment of Digital Assets, NYDIG Digital Assets Fund, III, LP, and other adjustments, including adjustments to income tax reports (the "Restatement"). The Restatement also included restated consolidated balance sheets as of December 31, 2021, related consolidated statements of operations, and consolidated statements of cash flows for the same year; restated unaudited condensed consolidated financial statements for the interim periods in 2022 and 2021 as reported in Marathon's quarterly reports filed on Forms 10-Q for the fiscal periods ended March, 31, 2021 and 2022, June 30, 2021 and 2022, and September 2021 and 2022; and an amended management's discussion and analysis of financial condition and results of operations related to the year ended December 31, 2021.

14.     The Restatement admitted that the Company identified additional material weaknesses in its internal controls over financial reporting during its review of the above-mentioned financial statements and admitted that Marathon still had unresolved SEC Staff Comments from 2022.

15.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company materially misstated its revenue, cost of revenue, and other financial information in its 2021 and 2022 SEC filings; (2) the Company continuously downplayed its serious problems with internal controls; and (3) because of this, Marathon would face scrutiny by the SEC,  need to restate several financial statements, and was reasonably likely to suffer significant damage, including reputational harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

16.     Moreover, one of the Individual Defendants breached their fiduciary duties by engaging in a lucrative insider sale of Company common stock at artificially inflated prices, obtaining proceeds of over $3 million.

17.     In light of the Individual Defendants' misconduct, which has subjected the Company, its former Chief Executive Officer ("CEO"), its former Chief Financial Officer ("CFO"), and its current CEO to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the District of Nevada (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, the substantial likelihood of the CEO's, CFO's, and Company's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

20.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Consolidated Securities Class Action based on violations of the Exchange Act.

21.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

23.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Nevada or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

25.     Venue is proper in this District because Marathon is incorporated in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiff**

26.     Plaintiff is a current shareholder of Marathon. Plaintiff has continuously held Marathon common stock at all relevant times. Plaintiff is a citizen of Georgia.

**Nominal Defendant Marathon**

27.     Marathon is a Nevada corporation with its principal executive offices at 1010 SE 3rd Avenue, Suite 1200, Fort Lauderdale, Florida 33301. Marathon's shares trade on the NASDAQ under the ticker symbol "MARA."

**Defendant Thiel**

28.     Defendant Thiel served as the Company's CEO since April 26, 2021, and as Chairman of the Board since January 1, 2022. Before serving as CEO, Defendant Thiel served as a Company director since April 24, 2018. According to the Company's Schedule 14A filed with the SEC on June 23, 2023 (the "2023 Proxy Statement"), as of June 16, 2023, Defendant Thiel beneficially owned 239,876 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 16, 2023 was $9.98, Defendant Thiel owned over $2.3 million worth of Marathon stock as of that date.

29.     For the fiscal year ended December 31, 2021, Defendant Thiel received $2,726,853 in compensation from the Company. This included $500,000 in salary, $500,000 in bonuses, and $1,726,853 in stock awards. For the fiscal year ended December 31, 2022, Defendant Thiel received $1,240,249 in compensation from the Company. This included $677,749 in salary, and $562,500 in bonuses.

30.     The Company's 2023 Proxy Statement stated the following about Defendant Thiel:

Mr. Thiel was named our CEO on April 26, 2021. He was the Chairman of SPROCKET, INC. from June 2017 through 2020, a Blockchain/Cryptocurrency technology and financial services company whose mission is to reduce the risk and friction of cryptocurrency trading across marketplaces, regions and exchanges by establishing a federation of exchanges that together create a single aggregated global trading marketplace with large scale liquidity, rapid execution, minimal counter-party risk, and price transparency. From January 2013 until November 2015, Mr. Thiel served as a director of Local Corporation, which was a NASDAQ listed entity which was a leader in on-line local search and digital media, mobile search monetization and programmatic retargeting markets. He served as Chairman of the Board of LOCAL from January 2014 to November 2015 and as its Chief Executive Officer from May 2014 to November 2015. Mr. Thiel has been the principal of Thiel Advisors Inc. since 2013. Thiel Advisors is a boutique advisory firm providing PE and VC firms, as well as public and private company boards of director, with deep technology industry operating expertise and strategic advisory services.

Effective April 26, 2021, the Company entered into an Executive Employment Agreement with Mr. Thiel. The Agreement has a term of three years and automatically renews for successive one year terms unless either party provides notice of nonrenewal at least 90 days prior to the end of the initial term or any renewal term. Mr. Thiel's annual base salary is $500,000 (increased to $750,000 for 2022) with bonuses at the discretion of the Company's Board of Directors. Mr. Thiel may also receive a grant of restricted stock units, and any such grant shall vest in four equal amounts on the date of grant and the three successive three month anniversaries thereof. In the event of a change in control, all RSUs vest immediately. Mr. Thiel is entitled to 25 paid vacation days per year and is entitled to participate in all Company benefit plans per standard Company policy.

Upon any termination of the Agreement, Mr. Thiel is entitled to compensation and reimbursement of expenses through the date of termination as well as payment for any accrued and unpaid vacation days. If the termination is other than for cause, Mr. Thiel's outstanding RSUs shall immediately vest. Upon a termination not for cause by the Company or by Mr. Thiel with good reason or within 180 days of a change in control, he shall receive the greater of his remaining base salary for the remaining term of the Agreement and 12 months base salary plus benefits. The Agreement contains customary and usual definitions of termination for cause and good reason.

31.     Upon information and belief, Defendant Thiel is a citizen of Florida.

**Defendant Okamoto**

32.     Defendant Okamoto served as the Company's CEO from December 2017 until his retirement on April 26, 2021. He began as a Company director on August 11, 2017, and later became the Executive Chairman on February 28, 2018. He resigned as Executive Chairman on December 31, 2021. According to the Schedule 14A filed with the SEC on June 16, 2021 (the "2021 Proxy Statement"), as of

June 14, 2021, Defendant Okamoto beneficially owned 4,163,859 shares of the Company's common stock, constituting 4.19% of the total outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on June 14, 2021 was $29.94, Defendant Okamoto owned approximately $124.6 million worth of Marathon stock as of that date.

33.   For the fiscal year ended December 31, 2021, Defendant Okamoto received $143,781,988 in compensation from the Company. This included $371,315 in salary and $143,410,673 in stock awards.

34.   During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Okamoto made the following sale of company stock at artificially inflated prices:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| December 28, 2021 | 83,333 | $37.02 | $3,084,987 |

Thus, in total, before the fraud was exposed, he sold 83,333 shares of Company common stock at artificially inflated prices on inside information, for which he received approximately $3 million. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

35.   The 2021 Proxy Statement stated the following about Defendant Okamoto:

Mr. Merrick D. Okamoto, age 60, serves as the President at Viking Asset Management which he co-founded in 2002. Mr. Okamoto is responsible for research, due diligence, and structuring potential investment opportunities. He has been instrumental in providing capital to over 200 private and public companies. He is also responsible for the firm's trading operations. Prior to Viking, Mr. Okamoto co-founded TradePortal.com, Inc. in 1999 and served as its President until 2001. He was instrumental in developing the proprietary Trade Matrix software platform offered by TradePortal Securities. Mr. Okamoto's negotiations were key in selling a minority stake in TradePortal.com Inc. to Thomson Financial. Prior to that, he held Vice President positions with Shearson Lehman Brothers, Prudential Securities, and Paine Webber.

36.   Upon information and belief, Defendant Okamoto is a citizen of Florida.

**Defendant Salzman**

37.     Defendant Salzman served as the Company's Chief Accounting Officer from March 31, 2022, until November 2022. Previously, he served as CFO from October 19, 2020, until March 31, 2022. According to the Company's Schedule 14A filed with the SEC on September 12, 2022 (the "2022 Proxy Statement"), Defendant Salzman beneficially owned 84,366 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 12, 2022 was $14.43, Defendant Salzman owned over $1.2 million worth of Marathon stock as of that date.

38.     For the fiscal year ended December 31, 2021, Defendant Salzman received $700,000 in compensation from the Company. This included $250,000 in salary, $200,00 in stock awards, and $250,000 in bonuses.

39.     The Company's 2022 Proxy Statement stated the following about Defendant Salzman:

Mr. Simeon Salzman was named to our newly created Chief Accounting Officer Position on March 31, 2022. He served as the Chief Financial Officer and Senior Vice President of the Las Vegas Monorail Company, a private non-profit 501c(4) entity, since July 2018. The Las Vegas Monorail Company operates a driverless monorail transit system that carries approximately 4,600,000 passengers annually over a 3.9 mile elevated track. There Mr. Salzman was responsible for overseeing all financial functions including audit, treasury and corporate finance. In addition, he was responsible for internal control compliance and management strategy.

Prior to the Las Vegas Monorail Company and from May 2015 to July 2018, Mr. Salzman served as the Chief Financial Officer for Wendoh Media and Corner Bar Management for over three years. Wendoh Media operated a weekly publication, a video editing entity, and a digital advertising entity. Corner Bar Management operates four different bars and restaurants in Downtown Las Vegas. Using his previous experience as the Corporate Controller for various managed nightlife, lounges and restaurants at the most prestigious Resort & Casinos on the Las Vegas Strip, Mr. Salzman was able to parlay his skill set revitalizing the various food and beverage establishments operated by Corner Bar Management in Downtown Las Vegas. Through enhanced analytical reviews, budgeting, internal control implementation and reducing overhead, Mr. Salzman was able to save over $1.4 million in aggregate costs and generate EBITDA of over 25% for eight consecutive quarters.

Mr. Salzman previously served as the Vice President of Programs and Secretary on the Board of Director's for Financial Executives International (FEI). Financial Executives International connects senior-level financial executives by defining the profession, exchanging ideas about best practices, educating members and others while working with

the government to improve the general economy. He also currently serves as the Treasurer on the Board of Directors of his local neighborhood HOA. Mr. Salzman holds a Bachelor of Science in Accounting and a Bachelor of Arts in Criminal Justice & Criminology from the University of Maryland, College Park. He is a Certified Public Accountant.

40.     Upon information and belief, Defendant Salzman is a citizen of Florida.

**Defendant Gallagher**

41.     Defendant Gallagher served as the Company's CFO from March 31, 2022, until his resignation on May 12, 2023.

42.     For the fiscal year ended December 31, 2022, Defendant Gallagher received $4,797,517 in compensation from the Company. This included $337,829 in salary, $72,500 in bonus awards, and $4,192,500 in stock awards.[1]

43.     The Company's 2022 Proxy Statement stated the following about Defendant Gallagher:

Mr. Gallagher is a seasoned C-level executive and board member who brings to Marathon over 30 years of experience in capital markets, investment analysis, treasury, investor relations, and financial and operational execution. Prior to joining Marathon, Mr. Gallagher held several senior positions at UGI Corporation and AmeriGas Propane, including chief strategy officer - Global LPG (2021-2022); president and CEO of AmeriGas Propane (2018-2021); vice president finance and CFO of AmeriGas Propane (2013-2018); treasurer (2011-2014) and director of investor relations and treasury (2007-2011) at UGI Corporation; director of corporate development (2004-2007); and director of financial planning (2000-2004) at AmeriGas Propane. Mr. Gallagher also served in various roles of increasing responsibility at both UGI and AmeriGas from 1990-2000. Mr. Gallagher holds a CPA certification in the State of Pennsylvania and a bachelor of science in accounting from Drexel University.

44.     Upon information and belief, Defendant Gallagher is a citizen of Pennsylvania.

**Defendant Antoun**

45.     Defendant Antoun has served as a Company director since May 20, 2021. He also serves as the chair of the Compensation Committee, as a member of the Nominating and Corporate Governance Committee, and as a member of the Audit Committee. According to the 2023 Proxy Statement, as of June 16, 2023, Defendant Antoun beneficially owned 55,384 shares of the Company's common stock. Given

---

[1] Defendant Gallagher's 2021 compensation is not listed in Marathon's public filings.

Verified Shareholder Derivative Complaint

that the price per share of the Company's common stock at the close of trading on June 16, 2023 was $9.98, Defendant Antoun owned over $552,732 worth of Marathon stock as of that date.

46.    For the fiscal year ended December 31, 2021, Defendant Antoun received $625,504 in compensation from the Company. This included $27,198 in fees earned, and $598,306 in stock awards. For the fiscal year ended December 31, 2022, Defendant Antoun received $404,527 in compensation from the Company. This included $138,750 in fees earned, and $265,777 in stock awards.

47.    The Company's 2023 Proxy Statement stated the following about Defendant Antoun:

Mr. Antoun brings to Marathon over 30 years of operational and technical experience, having served in various leadership positions at several global technology companies, including as a member of the board of directors of two publicly traded companies: Ruckus Wireless, Inc. and Violin Memory, Inc. He currently serves as the president of First Solar where he was chief operating officer before being appointed to president, U.S. in July 2015. Prior to joining First Solar, Mr. Antoun served as a venture partner at Technology Crossover Ventures ("TCV"), a private equity and venture firm, which he joined in July 2011. Before joining TCV, he was the head of product area IP & broadband networks for Ericsson. Mr. Antoun joined Ericsson in 2007, when Ericsson acquired Redback Networks, a telecommunications equipment company, where Mr. Antoun served as the senior vice president of worldwide sales & operations. After the acquisition, Mr. Antoun was promoted to chief executive officer of the Redback Networks subsidiary. Prior to Redback Networks, Mr. Antoun spent five years at Cisco Systems, where he served as vice president of worldwide systems engineering and field marketing, vice president of worldwide optical operations, and vice president of carrier sales. Prior to Cisco, he was the director of systems engineering at Newbridge Networks, a data and voice networking company. Mr. Antoun started his career as a member of the technical staff at NYNEX (now Verizon Communications), where he was part of the company's science and technology division. Mr. Antoun earned a Bachelor of Science degree in engineering from the University of Louisiana at Lafayette and a master's in information systems engineering from NYU Poly. The Company has determined he is well suited to serve as a director due to his longstanding technical and operational expertise with global technology companies.

48.    Upon information and belief, Defendant Antoun is a resident of Arizona.

**Defendant DeNuccio**

49.    Defendant DeNuccio has served as a Company director since January 19, 2021. According to the 2023 Proxy Statement, as of June 16, 2023, Defendant DeNuccio beneficially owned 207,552 shares of the Company's common stock. Given that the price per share of the Company's common stock at the

close of trading on June 16, 2023 was $9.98, Defendant DeNuccio owned over $2 million worth of Marathon stock as of that date.

50.     For the fiscal year ended December 31, 2021, Defendant DeNuccio received $759,572 in compensation from the Company. This included $56,250 in fees earned and $703,322 in stock awards. For the fiscal year ended December 31, 2022, Defendant DeNuccio received $342,235 in compensation from the Company. This included $76,458 in fees earned and $265,777 in stock awards.

51.     The Company's 2023 Proxy Statement stated the following about Defendant DeNuccio:

Mr. DeNuccio is the Founder and General Partner of Wild West Capital LLC since 2012 where he focused on angel investments, primarily in SAAS software start-ups. He brings to Marathon more than 25 years of experience as a chief executive, global sales leader, public and private board member, and more than a dozen angel investments, managing and growing leading technology businesses. He served in senior executive positions with Verizon, Cisco Systems, Ericsson, Redback Networks, Wang Laboratories and Unisys Corporation. The Company has determined that Mr. DeNuccio is suited to serve on the Board due to his long standing public company, finance and "high tech" experience.

52.     Upon information and belief, Defendant DeNuccio is a resident of California.

**Defendant James**

53.     Defendant James has served as a Company director since August 6, 2021. She also serves as the chair of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of June 16, 2023, Defendant James beneficially owned 37,519 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 16, 2023 was $9.98, Defendant James owned over $374,439 worth of Marathon stock as of that date.

54.     For the fiscal year ended December 31, 2021, Defendant James received $535,487 in compensation from the Company. This included $9,194 in fees earned and $526,293 in stock awards. For the fiscal year ended December 31, 2022, Defendant James received $373,069 in compensation from the Company. This included $107,292 in fees earned and $265,777 in stock awards.

55.     The Company's 2023 Proxy Statement stated the following about Defendant James:

Sarita James has been the Chief Executive Officer of Embark since 2014, responsible for management of the company with a focus on growth. Prior to Embark, she held executive roles at Citigroup, including Chief Operating Officer of Citi Ventures. She has experience building software at Microsoft Corporation where she received two patents and advising technology companies as a consultant at McKinsey & Company. Ms. James has a passion for education and the public sector. Under the Obama administration, she served as a White House Fellow and Acting Branch Chief of the Small Business Administration's Microloan program. During Mayor Bloomberg's second term, she ran the Strategy and Policy division for New York City Economic Development Corporation. She received a B.A. in Computer Science from Harvard College and her M.B.A. from Oxford University's Said Business School. The Company believes Ms. James is well suited to serve as a director due to her deep expertise in software and technology.

56.     Upon information and belief, Defendant James is a resident of New York.

**Defendant Leupp**

57.     Defendant Leupp has served as a Company director since May 20, 2021. He also serves as the chair of the Audit Committee, as a member of the Compensation Committee, and as a member of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of June 16, 2023, Defendant Leupp beneficially owned 62,552 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 16, 2023 was $9.98, Defendant Leupp owned nearly $624,268 worth of Marathon stock as of that date.

58.     For the fiscal year ended December 31, 2021, Defendant Leupp received $625,504 in compensation from the Company. This included $27,198 in fees earned and $598,306 in stock awards. For the fiscal year ended December 31, 2022, Defendant Leupp received $404,527 in compensation from the Company. This included $138,750 in fees earned and $265,777 in stock awards.

59.     The Company's 2023 Proxy Statement stated the following about Defendant Leupp:

Mr. Leupp is the managing partner of Terra Firma Asset Management, LLC. Prior to co-founding Terra Firma, Mr. Leupp served as a managing director in various roles at Lazard Asset Management, Grubb & Ellis Alesco Global Advisors, RBC Capital Markets and Robertson Stephens & Co. During his career, he has also held positions at The Staubach Company, Trammell Crow Company, and KPMG Peat Marwick. Mr. Leupp is also a member of the American Institute of Certified Public Accountants (AICPA) and serves on the boards of both non-profit and corporate organizations. Mr. Leupp earned a Bachelor of Science in business administration from Santa Clara University, and an MBA from Harvard

Business School. The Company has determined he is well suited to serve on its Board of Directors due to his extensive audit and finance expertise.

60.     Upon information and belief, Defendant Leupp is a resident of California.

**Defendant Ouissal**

61.     Defendant Ouissal has served as a Company director since August 6, 2021. He also serves as a member of the Nominating and Corporate Governance Committee, as a member of the Audit Committee, and as a member of the Compensation Committee. According to the 2023 Proxy Statement, as of June 16, 2023, Defendant Ouissal beneficially owned 30,217 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 16, 2023 was $9.98, Defendant Ouissal owned over $301,565 worth of Marathon stock.

62.     For the fiscal year ended December 31, 2021, Defendant Ouissal received $535,487 in compensation from the Company. This included $9,194 in fees earned and $526,293 in stock awards. For the fiscal year ended December 31, 2022, Defendant Ouissal received $385,777 in compensation from the Company. This included $120,000 in fees earned and $265,777 in stock awards.

63.     The Company's 2023 Proxy Statement stated the following about Defendant Ouissal:

Mr. Ouissal has been the Founder & Chief Executive Officer of Zededa since 2016, a next-generation edge software infrastructure start-up for which he raised $28.5M of VC funding, defined product and built company from inception. He is a seasoned business and product executive with extensive go-to-market experience in high-growth and dynamic turn-around environments, public and private; and a visionary product management and technology leader with deep technical background in various IT/technology domains and inventor of multiple patents. Prior roles include with Violin Memory, where he was the Senior Vice-President of Global Field Operations, Product Management & Business Development, Juniper Networks, where he was Vice-President of Product Management, Ericsson, where he was Vice-President of Strategy & Global Customer Engagement and Redback Networks, where he was the Vice-President of Global Systems Engineering. He is the inventor of two patents in the broadband access and IP networking technology area. He received a Bachelor of Science degree in Computer Science from Saxion Hogescholen in the Netherlands. The Company believes Mr. Ouissal is well suited to serve on its Board due to his technology background and expertise.

On September 23, 2022, the Company made an incremental $30 million investment in Auradine, Inc., bringing its total holdings in Auradine to $35.5 million based upon a previously issued and disclosed SAFE instrument. Said Ouissal owns approximately 5%

of the issued and outstanding shares of Auradine, and Fred Thiel, the Company's Chairman and CEO, sits on Auradine's Board of Directors. On November 3, 2022, the Company's Board met and determined that Said Ouissal is no longer deemed to be an independent director of the Company. As a result, Mr. Ouissal stepped down from the Company's Board Committees.

64.     Upon information and belief, Defendant Ouissal is a resident of California.

**Defendant Mellinger**

65.     Defendant Mellinger has served as a Company director since March 31, 2022. According to the 2023 Proxy Statement, as of June 16, 2023, Defendant Mellinger beneficially owned 62,486 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 16, 2023 was $9.98, Defendant Mellinger owned over $623,610 worth of Marathon stock as of that date.

66.     For the fiscal year ended December 31, 2022, Defendant Mellinger received $285,663 in compensation from the Company. This included $40,000 in fees earned and $245,663 in stock awards.

67.     The Company's 2023 Proxy Statement stated the following about Defendant Mellinger:

Doug Mellinger is an active entrepreneur, philanthropist, impact investor, and board member, with extensive experience building and leading public and private companies in the technology and financial industries. Mellinger is a managing director at Clarion Capital Partners, a lower middle market private equity and structured credit asset management company, which he joined in January 2013. He currently serves on the board of directors of Foundation Source, a leading provider of outsourced services and technology for private foundations which he co-founded in 2000; the board of directors of Campden Wealth and IPI (Institute for Private Investors), the largest global membership organization for wealthy families and their family offices; and the board of directors of International Education Corporation (IEC), one of the nation's largest career education colleges. Prior to Clarion Capital Partners, Mellinger was a partner at Palm Ventures and a managing partner at Zeno Ventures. He founded and served as the chairman and CEO of enherent Corp (NASDAQ: ENHT), a global software development and services company that was listed as an Inc. 500 company twice and was featured on Deloitte & Touche's Technology Fast 500 and Fast 50 lists. Throughout his career, Mellinger has served on the boards of numerous companies and organizations, including Edgar Online (NASDAQ: EDGR), Sequest Technologies, Producteev, Schiller International, Young Entrepreneur's Organization (YEO), and Young President's Organization (YPO), among others. He has also served on several advisory boards and boards to government agencies, universities, and non-profit organizations over the past 40 years. Mellinger holds a degree in entrepreneurial science from Syracuse University. The Board feels Mr. Mellinger is well suited to serve on its Board due to his extensive finance experience.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

68.     By reason of their positions as officers, directors, and/or fiduciaries of Marathon and because of their ability to control the business and corporate affairs of Marathon, the Individual Defendants owed Marathon and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Marathon in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Marathon and its shareholders so as to benefit all shareholders equally.

69.     Each director and officer of the Company owes to Marathon and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

70.     The Individual Defendants, because of their positions of control and authority as directors and officers of Marathon, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

71.     To discharge their duties, the officers and directors of Marathon were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

72.     Each Individual Defendant, by virtue of his, her, or its position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Marathon, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers

and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Marathon's Board at all relevant times.

73.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

74.     To discharge their duties, the officers and directors of Marathon were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Marathon were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada and the United States, and pursuant to Marathon's own Code of Business Conduct and Ethics ("Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Marathon conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Marathon and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Marathon's operations would comply with all applicable laws and Marathon's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

75.     Each of the Individual Defendants further owed to Marathon and the shareholders the duty of loyalty requiring that each favor Marathon's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

76.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Marathon and were at all times acting within the course and scope of such agency.

77.     Because of their advisory, executive, managerial, and directorial positions with Marathon, each of the Individual Defendants had access to adverse, non-public information about the Company.

78.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Marathon.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

79.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

80.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act and (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls.

81.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Marathon was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

82.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive

knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

83.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Marathon and was at all times acting within the course and scope of such agency.

## MARATHON'S CODE OF ETHICS

### Code of Ethics

84.     Marathon's Code of Ethics states that it was adopted "for directors, executive officers and employees of the Company." The Code of Ethics is specifically "intended to focus the directors, executive officers and employees on areas of ethical risk, provide guidance to directors, executive officers and employees to help them recognize and deal with ethical issues, provide mechanisms to report unethical conduct, and help foster a culture of honesty and accountability." Further, the Code of Ethics requires that "each director, executive officer, and employee must comply with the letter and spirit of [the Code of Ethics.]"

85.     In a section titled, "Maintain Fiduciary Duties," the Code of Ethics states the following, in relevant part:

> Directors and executive officers must be loyal to the Company and must act at all times in the best interest of the Company and its shareholders and subordinate self-interest to the corporate and shareholder good. Directors and executive officers should never use their position to make a personal profit. Directors and executive officers must perform their duties in good faith, with sound business judgment and with the care of a prudent person.

86.     In a section titled, "Protection and Proper Use of Company Assets," the Code of Ethics states the following:

> Directors, executive officers and employees must protect the Company's assets and ensure their efficient use. Theft, loss, misuse, carelessness and waste of assets have a direct impact on the Company's profitability. Directors, executive officers and employees must not use Company time, employees, supplies, equipment, tools, buildings or other assets for

personal benefit without prior authorization from the Chairman of the Audit Committee or as part of a compensation or expense reimbursement program available to all directors or executive officers.

87.     In a section titled, "Fair Dealing," the Code of Ethics states the following:

Directors, executive officers and employees shall deal fairly and directors and executive officers shall oversee fair dealing by employees and officers with the Company's directors, officers, employees, customers, suppliers and competitors. ***No one should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of' material facts or any other unfair dealing practices***.

(Emphasis added.)

88.     In a section titled, "Compliance with Laws, Rules and Regulations," the Code of Ethics states the following:

Directors and executive officers shall comply, and oversee compliance by employees, officers and other directors, with all laws, rules and regulations applicable to the Company, including insider-trading laws. Transactions in Company securities are to be governed by any Company policy relating to insider trading that may be in place.

89.     In a section titled, "Accuracy of Records," the Code of Ethics states the following:

***The integrity, reliability and accuracy in all material respects of the Company's books, records and financial statements is fundamental to the Company's continued and future business success.*** No director, executive officer or employee may cause the Company to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner. In addition, no director, executive officer, or employee may create any false or artificial documentation or book entry for any transaction entered into by the Company. Similarly, executive officers and employees who have responsibility for accounting and financial reporting matters have a responsibility to accurately record all funds, assets and transactions on the Company's books and records.

(Emphasis added.)

90.     In a section titled, "Quality of Public Disclosures," the Code of Ethics provides the following:

***The Company is committed to providing its shareholders with information about its financial condition and results of operations as required by the securities laws of' the United States. It is the Company's policy that the reports and documents it files with or submits to the Securities and Exchange Commission, and its earnings releases and similar public communications made by the Company, include fair, timely and understandable disclosure. Executive officers and employees who are responsible for these filings and disclosures, including the Company's principal executive, financial and***

22

*accounting officers, must use reasonable judgment and perform their responsibilities honestly, ethically and objectively in order to ensure that this disclosure policy is fulfilled. The Company's senior management is primarily responsible for monitoring the Company's public disclosure.*

(Emphasis added.)

91.     In a section titled, "Failure to Comply; Compliance Procedures," the Code of Ethics states the following:

A failure by any director or executive officer to comply with the laws or regulations governing the Company's business, this Code or any other Company policy or requirement may result in disciplinary action, and, if warranted, legal proceedings.

**The Insider Trading Policy**

92.     Marathon's Insider Trading Policy states that if a director, officer, or employee possesses material non-public information relating to Marathon, it is the Company's policy "neither that person nor any related person may buy or sell securities of the Company or engage in any other action to take advantage of, or pass on to others, that information."

93.     In a section titled, "Prohibitions of Officers Directors and 5% Stockholders," the Insider Trading Policy states the following, in relevant part:

Officers, Directors and holders of 5% or more of the Company's securities ("Insiders") have a special fiduciary responsibility to other holders of the Company's securities who cannot exert influence over the day to day operations of the Company. Therefore, persons or entities that fall within one of these categories should refrain from certain activity and adhere to certain procedures so as to avoid any appearance of impropriety.

**Audit Committee Charter**

94.     Marathon's Audit Committee Charter states that the Audit Committee's purpose is to "provide assistance to the Board of Directors in fulfilling their responsibility to the shareholders, potential shareholders and investment community relating to corporate accounting, reporting practices of the Corporation, the quality and integrity of the financial reports of the Corporation and the Corporation's compliance with legal and regulatory requirements."

95.     In a section titled, "Responsibilities," the Audit Committee is charged with the following responsibilities:

- Serve as an independent and objective party to monitor the Corporation's financial reporting process and internal control system and complaints or concerns relating thereto;

- To recommend, for shareholder approval, the independent auditor to examine the Corporation's accounts, controls and financial statements. The Committee shall have the sole authority and responsibility to select, evaluate and if necessary replace the independent auditor. The Committee shall have the sole authority to approve all audit engagement fees and terms and the Committee, or a member of the Committee, must pre-approve any non-audit service provided to the Corporation by the Corporation's independent auditor;

- Obtain and review at least annually, a formal written report from the independent auditor setting forth its internal quality-control procedures; material issues raised in the prior five years by its internal quality-control reviews and their resolution;

- Review and appraise the audit efforts of independent auditors of the Corporation and, where appropriate, recommend the replacement of the independent accountants;

- Consider and approve, if appropriate, major changes to the Corporation's accounting principles and practices as suggested by the independent auditors or management;

- Establish regular and separate systems of reporting to the Committee by management and the independent auditors regarding any significant judgments made in management's preparation of the financial statements and the view of each as to appropriateness of such . judgments and additional items as required under the Sarbanes-Oxley Act including critical accounting policies;

- Review with the independent auditors and financial accounting personnel, the adequacy and effectiveness of the accounting and financial controls of the Corporation, and elicit any recommendations for the improvement of such internal control procedures or particular areas where new or more detailed controls or procedures are desirable. Particular emphasis should be given to the adequacy of such internal controls to assess and manage financial risk exposure and to expose any payments, transactions or procedures that might be deemed illegal or otherwise improper;

- Review the financial statements contained in the annual report and quarterly report to shareholders with management and the independent auditors to determine that the independent auditors are satisfied with the disclosure and content of the

financial statements to be presented to the shareholders. Any changes in accounting principles should be reviewed;

- Review with management of the Corporation any financial information, earnings press releases and earnings guidance filed with the Securities and Exchange Commission or disseminated to the public, including any certification, report, opinion or review rendered by the independent auditors;

- Establish procedures for receiving and treating complaints received by the Corporation regarding accounting, internal accounting controls and auditing matters, and the confidential anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

96.   In violation of the Code of Ethics, the Insider Trading Policy, and the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. Moreover, at least one of the Individual Defendants violated the Insider Trading Policy by engaging in insider trading. Also, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

97.   Marathon is a bitcoin digital mining company incorporated in Nevada that maintains offices in Fort Lauderdale, Florida and Irvine, California.

98.   The Company began in 2010 under the name "Verve Ventures, Inc." On December 7, 2011, the Company changed its name to the "American Strategic Minerals Corporation" and entered the uranium and vanadium exploration business. In June 2012, the Company changed course by dropping the minerals business model and transitioned to real estate investments in Southern

California. By October of that year, the Company again shifted course and tried its hand with IP licensing by changing its name to "Marathon Patent Group, Inc."

99.     In 2017, the Company purchased digital asset mining machines and established a data center in Canada to mine digital assets. Three years later, the Company ended operations in Canada, relocated all mining rigs to the United States, and began mining bitcoin across the United States. On March 1, 2021, the Company changed its name to Marathon. As of the end of December 2022, Marathon's business operations have centered exclusively on mining bitcoin and related opportunities within the bitcoin ecosystem.

100.    Bitcoin is a digital asset that is decentralized and functions within a peer-to-peer network, enabling users to exchange payments directly and without intermediaries, like banks. This method of digital transactions is accomplished through utilizing blockchain technology.

101.    Throughout the Relevant Period, and unbeknownst to the investing public until February 2023, Marathon utilized improper accounting methods to report its financial information to the SEC. As a result, numerous financial figures, results, and disclosures in Marathon's quarterly and annual reports filed between 2021 and 2022 were materially false and misleading.

102.    The Individual Defendants concealed the existence of control failures that led to these significant accounting errors from the investing public, instead affirmatively representing throughout the Relevant Period that the Company maintained effective disclosure and internal controls over its financial reporting.

103.    The Company's improperly reported financial statements would ultimately cause Marathon to restate over a year's worth of its financial statements, resulting in significant losses for the Company, the extent of which remains untold, even today.

## **FALSE AND MISLEADING STATEMENTS**

### *May 10, 2021 Press Release*

104.    On May 10, 2021, Marathon issued a press release regarding the Company's first quarter of 2021 results. The press release stated the following, in relevant part:

> "As our financial and operational results for the first quarter demonstrate, 2021 is lining up to be a banner year for Marathon as we are transforming our business into one of the largest enterprise Bitcoin mining operations in North America during what is currently one of the most profitable mining environments in Bitcoin's history," said Fred Thiel, Marathon's CEO. "Since the start of 2021, we have taken several steps to establish Marathon as one of the leading pure-play Bitcoin investment opportunities by increasing our hashrate over 689%, rebranding our organization, and increasing our total bitcoin holdings to over 5,324 bitcoins. We have continued to build on that leadership position by becoming the first Bitcoin miner to produce bitcoin that is fully compliant anti-money laundering laws and OFAC's standards by directing all of our hashrate to the Marathon OFAC Pool. With new miners being delivered and installed every day, we remain on track to achieve 10.37 EH/s by early 2022, and we look forward to continuing to scale the business for the betterment of our shareholders and the broader Bitcoin ecosystem in the coming quarters.

> Marathon's chief financial officer, Sim Salzman, commented, "The first quarter marked a substantial improvement in our financial performance as we grew revenues to $9.2 million, generated net income of $83.4 million, and earned $137.4 million in adjusted EBITDA. Additionally, we exited the quarter with $211.9 million in cash and with a total liquidity, defined as cash and bitcoin holdings, of approximately $504.5 million. While Bitcoin's future price and the network difficulty rate are subject to change, we believe Marathon's financial performance will continue to improve as more miners come online, increasing our ability to generate revenues and yielding better economies of scale, which will drive profitability."

### *May 10, 2021 10-Q*

105.    Also on May 10, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2021 (the "1Q21 10-Q"). The 1Q21 10-Q was signed by Defendants Thiel and Salzman, and  contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Thiel and Salzman attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

106.    With respect to the Company's controls and procedures, the 1Q21 10-Q stated the following, in relevant part:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of March 31, 2021. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework in the 2013 COSO framework. ***Based on this assessment, management concluded that our disclosure controls and procedures were effective***.

> ***

> As part of our ongoing program to implement changes and further improve our internal controls and in conjunction with our Code of Ethics, our independent directors have been working with management to include protocols and measures aimed at ensuring quality of our internal controls. Among those measures is the implementation of a whistleblower hotline, which allows third parties to anonymously report noncompliant activity.

(Emphasis added.)

107.    The 1Q21 10-Q also reported Marathon's total revenues, impairment of digital assets, including gains and losses in connection with Marathon's investment in the NYDIG Digital Assets Fund III, LP ("Fund"), accruals for legal expenses, valuation of bifurcated derivatives related to certain investments, accumulated comprehensive income and other income, classification of prepaid expenses between short and long term, among other financial line items.

### June 16, 2021 Proxy Statement

108.    On June 16, 2021, the Company filed the 2021 Proxy Statement. Defendants Okamoto, Thiel, Antoun, Leupp, and DeNuccio solicited the 2021 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

109.     With respect to the Company's Code of Ethics and corporate governance, the 2021 Proxy Statement stated:

> We are committed to maintaining strong corporate governance practices that benefit the long-term interests of our shareholders by providing for effective oversight and management of the Company. Our governance policies, including a Code of Business Conduct and Ethics ("Code") can be found on our website at www.marathonpg.com by following the link to "Investors" and then to "Governance Docs."
>
> Our Code of Business Conduct and Ethics, effective December 2017, applies to directors, executive officers and employees of the Company. This Code is intended to focus the directors, executive officers and employees on areas of ethical risk, provide guidance to directors, executive officers and employees to help them recognize and deal with ethical issues, provide mechanisms to report unethical conduct, and help foster a culture of honesty and accountability. Each director, executive officer and employee must comply with the letter and spirit of this Code.
>
> We require that Directors and executive officers must be loyal to the Company and must act at all times in the best interest of the Company and its shareholders and subordinate self-interest to the corporate and shareholder good. Directors and executive officers should never use their position to make a personal profit. Directors and executive officers must perform their duties in good faith, with sound business judgment and with the care of a prudent person.

110.     With respect to Risk Oversight, the 2021 Proxy Statement stated:

> Our Board is primarily responsible for overseeing our risk management processes. The Board receives and reviews periodic reports from management, auditors, legal counsel, and others, as considered appropriate regarding the Company's assessment of risks. The Board focuses on the most significant risks facing the Company and our general risk management strategy, and also ensures that risks undertaken by us are consistent with the Board's risk parameters. While the Board oversees the Company, our management is responsible for day-to-day risk management processes. We believe this division of responsibilities is the most effective approach for addressing the risks facing the Company and that our board leadership structure supports this approach.

111.     The 2021 Proxy Statement also called for shareholder approval of, among other things, the election of directors Thiel, DeNuccio, Ouissal, and James, an amendment to increase in the number of shares available in the Company's 2018 Equity Incentive Plan (the "Plan") by 7,500,000 shares, and the ratification of RBSM, LLP as the Company's registered public accountant for the fiscal year ended December 31, 2021. The Plan, originally approved in 2018, provided for stock options, restricted stock,

preferred stock, stock-based awards, and other awards to incentivize employees, directors, consultants, advisors, and other service providers. As disclosed in the 2021 Proxy Statement, as of the date of the solicitation, there were no shares of common stock remaining to be issued under the Plan.

112.    The 2021 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Ethics and other governance policies were not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

113.    The 2021 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company materially misstated its revenue, cost of revenue, and other financial information in its 2021 and 2022 SEC filings; (2) the Company continuously downplayed its serious problems with internal controls; and (3) because of this, Marathon would face scrutiny by the SEC,  need to restate several  financial statements and was reasonably likely to suffer significant damage, including reputational harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

114.    As a result of the material misstatements and omissions contained in the 2021 Proxy Statement, Company shareholders elected and reelected Board members who were violating their fiduciary duties, thereby enabling the Individual Defendants to perpetuate their misconduct and increased the number of shares available in the Company's Plan by 7,500,000 shares, among other things. This enabled the Individual Defendants and others at the Company to materially benefit, unjustly, therefrom.

### *August 13, 2021 Press Release*

115.    On August 13, 2021, Marathon issued a press release regarding the Company's second quarter of 2021 results. The press release stated the following, in relevant part:

Marathon's CFO, Sim Salzman, commented, "When comparing Q2 2021 to Q1 2021, we grew our revenues by 220% to $29.3 million while generating non-GAAP operating income of $20.1 million. We exited the quarter with $170.6 million in cash and with a total liquidity, defined as cash and bitcoin holdings, of approximately $366.5 million. Given the number of non-cash items that impact our financial results, including but not limited to depreciation expense and impairments on our mined bitcoin holdings, we have introduced

non-GAAP operating income. This metric portrays an operational equivalent to our formerly reported metric, adjusted EBITDA, and we believe it will help investors more objectively track our financial progress. Bitcoin's future price and the network difficulty rate are subject to change. However, we maintain our belief that Marathon's financial performance will continue to improve as more miners come online, increasing our probability of earning bitcoin."

***August 13, 2021 Form 10-Q***

116.    Also on August 9, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2021 (the "2Q21 10-Q"). The 2Q21 10-Q was signed by Defendants Thiel and Salzman and contained SOX certifications signed by Defendants Thiel and Salzman attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

117.    With respect to the Company's internal controls, the 2Q21 10-Q stated the following, in relevant part:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2021. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework in the 2013 COSO framework. ***Based on this assessment, management concluded that our disclosure controls and procedures were effective***.
>
> ***
>
> As part of our ongoing program to implement changes and further improve our internal controls and in conjunction with our Code of Ethics, our independent directors have been working with management to include protocols and measures aimed at ensuring quality of our internal controls. Among those measures is the implementation of a whistleblower hotline, which allows third parties to anonymously report noncompliant activity.

(Emphasis added.)

118.    The 2Q21 10-Q also reported Marathon's total revenues, impairment of digital assets, including gains and losses in connection with Marathon's investment in the Fund, accruals for legal expenses, valuation of bifurcated derivatives related to certain investments, accumulated comprehensive income and other income, classification of prepaid expenses between short and long term, among other financial line items.

***November 10, 2021 Press Release***

119.    On November 10, 2021, Marathon issued a press release regarding the Company's third quarter of 2021 results. The press release stated the following, in relevant part:

> Marathon's CFO, Sim Salzman, commented, "With our increased hash rate and bitcoin's price appreciating, we grew our revenues 76% quarter-over-quarter from $29.3 million in the second quarter of 2021 to $51.7 million in the third quarter of 2021. This growth coupled with our efficient operations allowed us to generate non-GAAP income from operations of $43.5 million, or $0.43 per diluted share. Additionally, our non-GAAP net income, which excludes non-cash items and includes the change in fair value of our investment fund, was $85.4 million, or $0.85 per diluted share, as the increase in bitcoin's price drove our investment fund to appreciate as well. We exited the quarter with $32.9 million in cash and with total liquidity of approximately $315.6 million. Subsequent to the quarter's end, we obtained a $100 million line of credit, secured by our bitcoin holdings and USD, which further strengthened our liquidity position. Given our track record and growth trajectory, we maintain our position that Marathon's financial performance will continue to improve as we focus on efficiently increasing our hash rate."

***November 15, 2021 10-Q***

120.    On November 15, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2021 (the "3Q21 10-Q"). The 3Q21 10-Q was signed by Defendants Thiel and Salzman and contained SOX certifications signed by Defendants Thiel and Salzman attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

121.    With respect to the Company's internal controls, the 3Q21 10-Q stated the following, in relevant part:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of September 30, 2021. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework in the 2013 COSO framework. ***Based on this assessment, management concluded that our disclosure controls and procedures were effective***.

***

As part of our ongoing program to implement changes and further improve our internal controls and in conjunction with our Code of Ethics, our independent directors have been working with management to include protocols and measures aimed at ensuring quality of our internal controls. Among those measures is the implementation of a whistleblower hotline, which allows third parties to anonymously report noncompliant activity.

(Emphasis added.)

122.    The 3Q21 10-Q also reported Marathon's total revenues, impairment of digital assets, including gains and losses in connection with Marathon's investment in the Fund, accruals for legal expenses, valuation of bifurcated derivatives related to certain investments, accumulated comprehensive income and other income, classification of prepaid expenses between short and long term, among other financial line items.

***March 1, 2022 Press Release and NT 10-K***

123.    On March 1, 2022, Marathon issued a press release regarding the Company's fourth quarter of 2021 and fiscal year 2021 results. The press release stated the following, in relevant part:

"Our primary objectives for 2022 are to effectively deploy our miners, achieve our growth targets, and continue expanding our competitive moat. Deploying at scale behind the meter involves breaking some new ground, and now that we have overcome some of those initial hurdles, we expect deployments to accelerate this quarter and throughout the rest of the year. We believe Marathon remains well positioned to generate approximately 23.3 Eh/s and for our mining operations to be 100% carbon neutral by early 2023. We look forward to another strong year for Marathon as we continue our mission of supporting the adoption, security, and evolution of Bitcoin by building one of the largest, most agile, and most sustainably operated Bitcoin mining operations in the world.

Marathon's CFO, Sim Salzman, commented, "In 2021, we grew our revenues 3,353% year-over-year to $150.5 million. Due to the leverage in our business model, we produced non-GAAP income from operations of $118.7 million and non-GAAP net income of $168.7 million, or $1.70 per diluted share, during the same time period. In the fourth quarter, we achieved two financial milestones that strengthened our liquidity position. We obtained a $100 million line of credit secured by our bitcoin holdings, and we raised approximately $747.5 million in a convertible note offering in which the notes are unsecured and the coupon rate is 1%. Given the strength of our business model, our track record of efficiently capitalizing on market events, and our current growth trajectory, we continue to believe that our financial and operational performance will continue to improve as we focus on efficiently increasing our hash rate."

124.    The same day, the Company filed a Notification of Inability to Timely File its annual report on Form 10-K with the SEC on Form 12b-25. According to the notice, Marathon encountered a delay in its independent registered accounting firm's completion of the audit of its financial statements for the year ended December 31, 2021 because of: "(i) the significant increase in amount and complexity of revenues in 2021 over 2020, (ii) the Company's transition to large accelerated filer status, shortening filing deadlines by 30 days, and (iii) the Company's first year of being audited for internal controls." The Company disclosed that it expected to file its 10-K within 15 days of the due date.

***March 10, 2022 10-K***

125.    On March 10, 2022, Marathon filed its annual report for the fiscal year ended December 31, 2021 on Form 10-K with the SEC (the "2021 10-K"). The 2021 10-K was signed by Defendants Thiel, Salzman, Ouissal, Leupp, Antoun, DeNuccio, and James and contained SOX certifications signed by Thiel and Salzman attesting to its accuracy.

126.    The 2021 10-K included an adverse opinion by Marcum LLP regarding material weaknesses identified in Marathon's internal controls. Specifically, the 2021 10-K disclosed the following about management's assessment of Marathon's internal controls:

Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2021. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control - Integrated Framework in the 2013 COSO framework. Based on this evaluation, management identified a weakness in internal control over financial reporting

related to Information Technology General Controls (ITGC). Specifically, the Company did not design and/or implement user access controls to ensure appropriate segregation of duties or program change management controls for certain financially relevant systems impacting the Company's processes around revenue recognition and digital assets to ensure that IT program and data changes affecting the Company's (i) financial IT applications, (ii) digital currency mining equipment, and (iii) underlying accounting records, are identified, tested, authorized and implemented appropriately to validate that data produced by its relevant IT system(s) were complete and accurate. Automated process-level controls and manual controls that are dependent upon the information derived from such financially relevant systems were also determined to be ineffective as a result of such deficiency. In addition, the Company has not effectively designed a manual key control to detect material misstatements in revenue.

The material weakness described above did not result in a material misstatement to the Company's previously issued consolidated financial statements, nor in the consolidated financial statements included in this Annual Report on Form 10-K.

127.    The 2021 10-K also reported Marathon's Consolidated Balance Sheets, Statements of Operations and Cash Flows for the year ended December 31, 2021.For example, the 2021 10-K reported $268,522 thousand in cash and cash equivalents, $102,806 thousand in digital assets, $223,779 thousand in digital assets held in the Fund, and 1,448,245 in total liabilities and stockholders' equity. These amounts (among other line items, including Marathon's reported debt and accrued expenses) were incorrect and would later be restated. In truth, the Company's total liabilities and stockholders' equity for the 2021 fiscal year was $1,444,331.

### *May 4, 2022 Press Release*

128.    On May 4, 2022, Marathon issued a press release regarding the Company's first quarter of 2022 results. The press release stated the following, in relevant part:

**First Quarter 2022 Financial Results**
Revenue increased to $51.7 million, an increase of $42.6 million, or 465%, from the prior-year quarter and a decrease of $8.6 million, or 14%, from the fourth quarter of 2021. Bitcoin production increased to 1,259 bitcoin during the period, a 556% increase from the prior-year quarter and a 15% increase from the fourth quarter of 2021. The revenue decline from the fourth quarter of 2021 was the result of an approximate 25% decrease in average revenue per bitcoin mined, partially offset by the increase in bitcoin production during the first quarter of 2022.

\*\*\*

"In the first quarter of 2022, we increased our bitcoin production 556% year-over-year and 15% from the prior quarter, producing a record 1,259 bitcoin even as the global hash rate rose by approximately 17% in the same period," said Fred Thiel, Marathon's chairman and CEO. "At Marathon, we are constantly pushing boundaries to propel our business and our industry forward, but as the first quarter and subsequent events have demonstrated, not every industry operates at the same pace as we do. Innovation is not a linear process, and in the first quarter, we experienced regulatory friction related to breaking the mold on deploying our miners behind the meter at power facilities operated by some of the largest renewable energy companies in the United States. As a result, our deployment schedule shifted by 45 days in the first quarter. Encouragingly, in March, the grid operators in Texas granted permission for all 280 megawatts of the first major facility in Texas to be energized. Currently, the pace of deployment is predominantly determined by the pace of construction, which continued unimpeded as we worked through the regulatory and permitting friction.

"Our primary focus for 2022 remains the deployment of our miners. This year is all about execution. Given the progress we have made to date in deploying behind the meter, we believe we will be through our backlog of miners and fully back on track with deployments before the end of this year, keeping us on pace to reach 23.3 EH/s by early 2023. We believe 2022 will be transformational for Marathon as we are in the process of deploying nearly 200,000 miners and transitioning our operations to be 100% carbon neutral."

**May 4, 2022 Conference Call**

129.    Also on May 4, 2022, Marathon held a conference call with analysts and investors to discuss the first quarter of 2022 results. During the call, Defendant Thiel stated, in relevant part:

Some strategic and operational highlights. In Q1, we made substantial progress, strengthening Marathon's competitive advantages to expand our position as the leading Bitcoin miner in North America. A year ago, when I transitioned from the Board of Directors to become CEO, we had 12,000 miners operating. Our hash rate was 1.3x hash and Marathon consisted of 4 full-time employees. Today, we have approximately 37,000 miners installed. Our hash rate is more than 3x higher and we have 15 full-time employees. Most of whom are in senior level positions that extend across technology, operations, strategy and finance.

**May 6, 2022 10-Q**

130.    On May 6, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2022 (the "1Q22 10-Q"). The 1Q22 10-Q was signed by Defendants Thiel and Gallagher, and contained SOX certifications signed by Defendants Thiel and Gallagher attesting to the accuracy of the financial statements contained therein, the disclosure of any material

changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

131.   With respect to the Company's controls and procedures, the 1Q22 10-Q acknowledged that disclosure controls were not effective, stating the following, in relevant part:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of March 31, 2022. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework in the 2013 COSO framework. Based on this assessment, management concluded that our disclosure controls and procedures were not effective as of March 31, 2022 for the reasons stated in our Annual Report on Form 10-K for the year ended December 31, 2021.

132.   Nonetheless, the extent of the deficiencies remained concealed from investors. The 1Q22 10-Q also reported Marathon's total revenues, operating expenses, net losses, impairment of digital assets, realized and unrealized gains on digital assets held in the Fund, and income taxes, among other financial line items.

***August 8, 2022 Press Release***

133.   On August 8, 2022, Marathon issued a press release regarding the Company's second quarter of 2022 results, along with bitcoin and digital asset mining operation updates for July 2022. The press release stated the following, in relevant part:

> "In the second quarter of 2022, we increased our bitcoin production 8% year-over-year, producing 707 bitcoin, and we continued to install miners in Texas in anticipation of energization as we worked through both operational obstacles and a challenging macro environment," said Fred Thiel Marathon's chairman and CEO. "Energization delays, maintenance and weather issues in Montana, and an approximately 56% decline in the price of bitcoin during the quarter, severely impacted our bitcoin production and financial results. These items reduced our revenues, caused us to record a $127.6 million impairment on our bitcoin holdings, and decreased the fair market value of our investment fund by $79.7 million. However, given the groundwork we laid during the quarter and the progress

we have made since, we are optimistic that Marathon's operational and financial positioning is improving.

***August 8, 2022 Conference Call***

134.   Also on August 8, 2022, Marathon held a conference call with analysts and investors to discuss the second quarter of 2022 results. During the call, Defendant Thiel stated, in relevant part:

The second quarter tested our resilience and our resourcefulness. As a result, even as recent events have demonstrated, we not only weathered the difficult times, but we capitalized on opportunities to improve our operational and financial position subsequent to the quarter's end.

\*\*\*

In summary, the second quarter was challenging for the industry and for Marathon in particular. Bitcoin mining is a nascent industry, and as I mentioned in our last call, there is no playbook. However, given our progress, we're confident that we remain on track to grow our position as a leader in this space. Miners are coming online in Texas. We have hosting arrangements secured to achieve our target of 23.3 exahash by mid-next year. Our mining fleet is state-of-the-art, consisting predominantly of the most efficient bitcoin miners available in the market. We have a warchest big point in our liquidity position, balance sheet continued to improve.

Overall, we have entered the second half of the year with added confidence that we remain on track to grow our position as a leader in supporting and securing the bitcoin ecosystem.

***August 9, 2022 10-Q***

135.   On August 9, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2022 (the "2Q22 10-Q"). The 2Q22 10-Q was signed by Defendants Thiel and Salzman, and contained SOX certifications signed by Defendants Thiel and Salzman attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

136.   With respect to the Company's controls and procedures, the 2Q22 10-Q acknowledged that disclosure controls were not effective, stating the following, in relevant part:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our

38

internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2022. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework in the 2013 COSO framework. Based on this assessment, management concluded that our disclosure controls and procedures were not effective as of June 30, 2022 for the reasons stated in our Annual Report on Form 10-K for the year ended December 31, 2021.

137.     Nonetheless, the extent of the deficiencies remained concealed from investors. The 2Q22 10-Q also reported Marathon's total revenues, operating expenses, net losses, impairment of digital assets, realized and unrealized gains on digital assets held in the Fund, and income taxes, among other financial line items.

***September 12, 2022 Proxy Statement***

138.     On September 12, 2022, the Company filed the 2022 Proxy Statement. Defendants Thiel, Antoun, DeNuccio, Leupp, James, Ouissal, and Mellinger solicited the 2022 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

139.     With respect to the Company's Code of Ethics and corporate governance, the 2022 Proxy Statement stated:

We are committed to maintaining strong corporate governance practices that benefit the long-term interests of our shareholders by providing for effective oversight and management of the Company. Our governance policies, including a Code of Business Conduct and Ethics ("Code") can be found on our website at www.marathonpg.com by following the link to "Investors" and then to "Governance Docs."

Our Code of Business Conduct and Ethics, effective December 2017, applies to directors, executive officers and employees of the Company. This Code is intended to focus the directors, executive officers and employees on areas of ethical risk, provide guidance to directors, executive officers and employees to help them recognize and deal with ethical issues, provide mechanisms to report unethical conduct, and help foster a culture of honesty and accountability. Each director, executive officer and employee must comply with the letter and spirit of this Code.

We require that Directors and executive officers must be loyal to the Company and must act at all times in the best interest of the Company and its shareholders and subordinate

self-interest to the corporate and shareholder good. Directors and executive officers should never use their position to make a personal profit. Directors and executive officers must perform their duties in good faith, with sound business judgment and with the care of a prudent person.

140.   With respect to Risk Oversight, the 2022 Proxy Statement stated:

Our Board is primarily responsible for overseeing our risk management processes. The Board receives and reviews periodic reports from management, auditors, legal counsel, and others, as considered appropriate regarding the Company's assessment of risks. The Board focuses on the most significant risks facing the Company and our general risk management strategy, and also ensures that risks undertaken by us are consistent with the Board's risk parameters. While the Board oversees the Company, our management is responsible for day-to-day risk management processes. We believe this division of responsibilities is the most effective approach for addressing the risks facing the Company and that our board leadership structure supports this approach.

141.   The 2022 Proxy Statement also called for shareholder approval of, among other things, the election of directors Antoun and Leupp, an increase of the Company's authorized shares of common stock from 200 million to 300 million, and the ratification of Marcum LLP as the Company's registered public accountant for the fiscal year ended December 31, 2022.

142.   The 2022 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Ethics and other governance policies were not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

143.   The 2022 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company materially misstated its revenue, cost of revenue, and other financial information in its 2021 and 2022 SEC filings; (2) the Company continuously downplayed its serious problems with internal controls; and (3) because of this, Marathon would face scrutiny by the SEC, need to restate several financial statements and was reasonably likely to suffer significant damage, including reputational harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

144.     As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company shareholders elected and reelected Board members who were violating their fiduciary duties, thereby enabling the Individual Defendants to perpetuate their misconduct and increased the Company's authorized shares of common stock from 200 million to 300 million, among other things.

***November 8, 2022 Press Release***

145.     On November 8, 2022, Marathon issued a press release regarding the Company's third quarter of 2022 results. The press release stated the following, in relevant part:

> "The third quarter of 2022 was a transition and rebuilding period at Marathon, during which we fully exited the Hardin facility in Montana and began energizing servers at new locations, most notably the 280-megawatt data center that resides behind the meter at the King Mountain wind farm in McCamey, Texas," said Fred Thiel, Marathon's chairman and CEO. "We sequentially improved our bitcoin production each month during the quarter as we rebuilt our hash rate from approximately 0.7 exahashes per second in early July to 3.8 exahashes per second by September 30. This progress continued subsequent to the quarter's end as we increased our hash rate an additional 84% to approximately 7 exahashes per second by November 1. We also realized our highest production month to date in October when we produced 615 bitcoin, nearly equal to our entire production during the third quarter.

> "We believe Marathon has a strong foundation on which we can continue to build our hash rate. Our near-term goal is to reach approximately 9.0 exahashes per second by the end of the year, and we continue to target 23 exahashes per second near the middle of 2023 as we strive to establish our position as a leader in supporting and securing the bitcoin ecosystem."

***November 8, 2022 Conference Call***

146.     Also on November 8, 2022, Marathon held a conference call with analysts and investors to discuss the third quarter of 2022 results. During the call, Defendant Thiel stated, in relevant part:

> The third quarter was a transition and rebuilding period at Marathon. With the facility in Hardin, Montana off-line and energization of miners in Texas delayed, we entered the third quarter with only 6,000 miners operational, producing approximately 0.7x exahashes per second. Unsurprisingly, the operational transition that occurred during the third quarter caused our financial results to dip both quarter-over-quarter and year-over-year. However, as our consistently improving Bitcoin production substantiates, our confidence in our ability to rebuild our hash rate while maintaining a healthy balance sheet was well founded. Today, we believe Marathon is a strong foundation on which we can continue to efficiently

grow towards our goal of 23 exahashes per second by mid-2023, and expand our position as the leader in securing and supporting the Bitcoin ecosystem.

***November 14, 2022 10-Q***

147.    On November 14, 2022, the Company belatedly filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2022 (the "3Q22 10-Q"). The 3Q22 10-Q was signed by Defendants Thiel and Gallagher and contained SOX certifications signed by Defendants Thiel and Gallagher attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

148.    With respect to the Company's controls and procedures, the 3Q22 10-Q acknowledged that disclosure controls were not effective, stating the following, in relevant part:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of September 30, 2022. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control – Integrated Framework in the 2013 COSO framework. Based on this assessment, management concluded that our disclosure controls and procedures were not effective as of September 30, 2022 for the reasons stated in our Annual Report on Form 10-K for the year ended December 31, 2021.

149.    Nonetheless, the extent of the deficiencies remained concealed from investors. The 3Q22 10-Q also reported Marathon's total revenues, operating expenses, net losses, impairment of digital assets, realized and unrealized gains on digital assets held in the Fund, and income taxes, among other financial line items.

150.    The statements identified in ¶¶ 104-107, 115-118, 119-137, and 145-149 were materially false and misleading, and failed to disclose material facts necessary to make the statements not false and

misleading. Specifically, the Company's financial reports, including its revenues, expenses, losses, and other material line items were incorrectly reported due to Marathon's improper accounting for impairment on digital assets and designation of the Company as an agent instead of principal in operating third party mining pools. Moreover, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company materially misstated its revenue, cost of revenue, and other financial information in its 2021 and 2022 SEC filings; (2) the Company continuously downplayed its serious problems with internal controls; and (3) because of this, Marathon would face scrutiny by the SEC,  need to restate several financial statements and was reasonably likely to suffer significant damage, including reputational harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

151.   On February 28, 2023, Marathon issued a press release "announc[ing] . . . that it has cancelled its webcast and conference call for the fourth quarter and fiscal year 2022, initially scheduled for today, February 28, 2023, at 4:30 p.m. Eastern time, and will postpone the publication of its corresponding financial results."

152.   Also on February 28, 2023, Marathon filed a Form 8-K with the SEC that acknowledged the Company was in receipt of a letter from the SEC pertaining to accounting issues in Marathon's prior financial statements. The 8-K stated, in relevant part:

> On February 27, 2023, the Company's Audit Committee of the Board of Directors, after consultation with Marcum LLP, the Company's independent auditor, concluded that due to certain accounting errors, as described below, the previously issued audited consolidated financial statements contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021 and the previously issued unaudited condensed consolidated financial statements for the interim periods in 2022 and 2021 as contained in the Company's Quarterly Reports on Form 10-Q for the fiscal periods ended March 31, 2021 and 2022, June 30, 2021 and 2022 and September 30, 2021 and 2022 (the "Impacted Financial Statements") should no longer be relied upon. Similarly, related earnings releases and other financial communications for these periods should no longer be relied upon. The Company intends to correct the errors and will be restating the Impacted Financial Statements.

153.     Moreover, also on February 28, 2023, *Seeking Alpha* observed that since Marathon will need to restate its financial statements, the Company would be unable to timely file the 2022 annual report on Form 10-K, among other things. The *Seeking Alpha* article stated the following, in relevant part:

Marathon [. . .] said Tuesday it will restate its full year 2021 and quarterly earnings for that year and for the first three quarters of 2022 due to accounting errors.

Specifically, the bitcoin miner determined that it had incorrectly calculated impairment on a daily basis of its digital assets and it had incorrectly accounted for revenue from a bitcoin mining pool that it had participated in and operated in late 2021 and early 2022.
Now that Marathon [] needs to restate its previously reported financial statements for 2021 and 2022, the company will not be able to file its 2022 annual 10-K statement by the filing deadline of March 1, it said in a filing. It cancelled its conference call for Q4 earnings and will postpone the publication of its financial results.

The company said its method for calculating the impairment of digital assets, chiefly bitcoin [], on a daily basis using a standard cutoff time wasn't in compliance with a requirement that calls for the intraday low price to be used.

Regarding the bitcoin mining pool's revenue recognition, Marathon [] had determined that the company acted as an agent in the pool, which included a small number of unrelated third-party participants. As a result, it recorded revenue on a net basis, subtracting any revenue allocated to the third-party pool participants from its revenue as the operator of the pool.

It later found out that its assessment was incorrect and should have concluded that it acted as principal. That means the company should have recorded gross revenue rather than net revenue.

Marathon [] now estimates that both its revenue and cost of revenue for the year ended Dec. 31, 2021 were understated. Revenue and cost of revenue, energy, hosting and other, are expected to increase in the restated 2021 numbers.

The restatement of the impacted financial statement isn't expected to have any effect on total margin, operating income or net income in 2021 or any of the interim periods in 2021 or 2022, it said.

Marathon [] also said it no longer operates a pool that includes third parties.

The company was expected to post a Q4 loss per share of $0.17 and revenue of $33.98M, according to consensus estimates.

154.    On this news, the price of the Company's stock dropped from $7.10 per share at the close of trading on February 28, 2023, to $6.51 per share at the close of trading on March 1, 2023, representing a loss in value of 8.31%, or $0.59 per share.

155.    On March 16, 2023, the Company filed the Restatement. The Restatement included restated Consolidated Balance Sheets as of December 31, 2021, related Consolidated Statements of Operations, and Consolidated Statements of Cash Flows for the year ended December 31, 2021; restated unaudited condensed consolidated financial statements for the interim periods in 2022 and 2021 contained in Marathon's quarterly reports filed on Forms 10-Q for the fiscal periods ended March 31, 2021 and 2022, June 30, 2021 and 2022, and September 30, 2021 and 2022, and an amended Management's Discussion and Analysis of Financial Condition and Results of Operations related to the year ended December 31, 2021. The Restatement purported to correct Marathon's reports for Revenue Recognition – Principal versus Agent, Impairment of Digital Assets, NYDIG Digital Assets related to the Fund, Disposal of Assets, Other Adjustments, and related income tax adjustments.

156.    The Restatement also revealed that during the Company's internal investigation, it discovered additional material weaknesses in its internal controls over financial reporting.

157.    The Restatement also disclosed that, despite that the Company restated its financial statements, several of the SEC's comments remained unresolved and thus, Marathon could be forced to restate its financial statements further. Specifically, the Restatement outlined the following unresolved SEC Staff Comments:

● Revenue recognition. The Staff commented on the Company's revenue recognition policy in its capacity as a pool operator and in its capacity as a pool participant, with specific attention on the Company's previous net recognition of revenue as an operator of a pool. The Company has, in the restated financial results, revised its revenue to include gross revenue earned as pool operator with any amounts remitted to third party pool participants as cost of revenue. The Staff further commented on the Company's accounting convention to recognize its noncash (bitcoin) revenue using fair value that is not at contract inception. The Company has evaluated the difference between its current accounting policy and fair value at contract inception and has determined that any differences in revenue are not material for all periods stated.

● Impairment of bitcoin. The Staff objected to the Company's calculation of impairment of bitcoin using a daily closing price. The Company has, in the restated financial results, revised its calculation to calculate impairment of bitcoin using the intraday low price of bitcoin.

● Accounting for investment fund. The Staff commented on whether the Company should have consolidated an investment fund in which the Company was the sole limited partner and, if so, whether its accounting for the income and expenses of the investment fund were appropriately classified within the Company's Statements of Other Comprehensive Income (Loss). The Company has since determined it would consolidate the NYDIG Fund and updated its classification of income and expenses of the investment fund within the Statements of Other Comprehensive Income (Loss) as part of the restated financial results.

● Statements of Other Comprehensive Income (Loss) Presentation. The Staff has commented on the classification and inclusion of certain items in loss from operation versus in other income (expense). These items include realized gain (loss) on sales of digital assets, interest income, impairment on digital assets and patents, and gain on sale of equipment. The Company has since revised its presentation prospectively, and in the restated financial results.

● Embedded leases in Hosting and Power Arrangements. The Staff has asked the Company for a comprehensive analysis around whether each of its server hosting arrangements contain embedded leases. The Company has provided such analysis and included any required disclosure as a result of such analysis in the Notes to its Consolidated Financial Statements.

● Investments. The Staff has requested fulsome analysis of the Company's accounting for various Simple Agreements on Future Equity ("SAFEs") and its investment in equity of certain investees. The Company has provided such analysis and has included impacts of any change in accounting for such investments in the restated financial results.

● Risk factors. The Staff has requested further disclosure on material risks due to regulations, ability to obtain financing, reputational harm, and depreciation of digital assets prices. The Company has considered such risks and has made the disclosures accordingly.

● Bitcoin as collateral. The Staff has raised several comments on the Company's accounting for bitcoin used as collateral within the Company's lending arrangements. The Company continues to respond to the Staff's comments based on its application of U.S. GAAP and has not changed its classification of such bitcoin used as collateral as Digital assets, restricted.

158.    The Restatement disclosed the impacts of the accounting mishaps on Marathon's Revenue

Recognition and Impairment of Digital Assets as follows:

| | Three months ended (unaudited) | Year ended |
|---|---|---|

| (in thousands) | March 31, 2022 (Restated) | June 30, 2022 (Restated) | September 30, 2022 (Restated) | December 31, 2022 | December 31, 2022 |
|---|---|---|---|---|---|
| Consolidated Statements of Comprehensive Income (Loss) Impact | | | | | |
| Total revenues | 5 | 1 | — | — | **6** |
| Cost of revenues - energy, hosting and other | (5) | (1) | — | — | **(6)** |
| **Net income (loss) impact** | — | — | — | — | **—** |

| (in thousands) | Three months ended (unaudited) | | | | Year ended |
|---|---|---|---|---|---|
| | March 31, 2021 (Restated) | June 30, 2021 (Restated) | September 30, 2021 (Restated) | December 31, 2021 (Restated) | December 31, 2021 (Restated) |
| Consolidated Statements of Comprehensive Income (Loss) Impact | | | | | |
| Total revenues | — | — | 624 | 8,075 | **8,699** |
| Cost of revenues - energy, hosting and other | — | — | (624) | (8,075) | **(8,699)** |
| **Net income (loss) impact** | — | — | — | — | **—** |

* * *

| (in thousands) | March 31, 2022 (Restated) | June 30, 2022 (Restated) | September 30, 2022 (Restated) | December 31, 2022 |
|---|---|---|---|---|
| | As of (unaudited) | | | |
| Consolidated Balance Sheets Impact | | | | |
| Digital assets | (6,204) | (9,344) | (5,433) | — |
| Digital assets, restricted - Current assets | — | (3,657) | — | — |
| Digital assets, restricted - Other assets | — | — | (3,039) | — |

| (in thousands) | Three months ended (unaudited) | | | | Year ended |
|---|---|---|---|---|---|
| | March 31, 2022 (Restated) | June 30, 2022 (Restated) | September 30, 2022 (Restated) | December 31, 2022 | December 31, 2022 |
| Consolidated Statements of Comprehensive Income (Loss) Impact | | | | | |
| Impairment of digital assets | (3,756) | (6,797) | 4,529 | — | **(6,024)** |
| **Net income (loss) impact** | (3,756) | (6,797) | 4,529 | — | **(6,024)** |

| (in thousands) | March 31, 2021 (Restated) | June 30, 2021 (Restated) | September 30, 2021 (Restated) | December 31, 2021 (Restated) |
|---|---|---|---|---|
| | As of (unaudited) | | | |
| Consolidated Balance Sheets Impact | | | | |
| Digital assets | (204) | (2,148) | (1,597) | (2,448) |

| (in thousands) | Three months ended (unaudited) | | | | Year ended |
|---|---|---|---|---|---|
| | March 31, | June 30, | September | December 31, | December 31, |

Verified Shareholder Derivative Complaint

| | 2021 (Restated) | 2021 (Restated) | 30, 2021 (Restated) | 2021 (Restated) | 2021 (Restated) |
|---|---|---|---|---|---|
| **Consolidated Statements of Comprehensive Income (Loss) Impact** | | | | | |
| Impairment of digital assets | (204) | (1,944) | 551 | (851) | **(2,448)** |
| **Net income (loss) impact** | (204) | (1,944) | 551 | (851) | **(2,448)** |

159.   Several other line items were restated between 2021 and 2022, as well, in the Restatement, including the Consolidated Balance Sheets and Comprehensive Income (Loss) of the Fund, Disposal of Assets, accruals for legal expenses, accumulated comprehensive income, prepaid expenses, income tax expenses, total assets, liabilities and stockholders' equity, and more.

160.   The Restatement further disclosed specific material weaknesses in Marathon's, including related to its application and interpretation of Generally Accepted Accounting Principles ("GAAP"), stating in relevant part:

> management identified a weakness in internal control over financial reporting related to the application and interpretation of generally accepted accounting principles ("GAAP") primarily in the areas of consolidation, impairment of digital assets, disposal of property and equipment and principal versus agent considerations in revenue recognition. In addition, the Company has not designed or implemented user access controls to ensure appropriate segregation of duties, or program change management controls for certain financially relevant systems impacting the Company's processes around revenue recognition and digital assets to ensure that IT program and data changes affecting the Company's (i) financial IT applications, (ii) digital currency mining equipment, and (iii) underlying accounting records, are identified, tested, authorized and implemented appropriately to validate that data produced by its relevant IT system(s) were complete and accurate. Automated process-level controls and manual controls that are dependent upon the information derived from such financially relevant systems were also determined to be ineffective as a result of such deficiency. The Company has also not effectively designed a key manual control to detect material misstatements in revenue.

> The material weakness related to the application and interpretation of GAAP, as described above, resulted in a material misstatement to the Company's previously issued consolidated financial statements. The material weakness associated with the manual control over revenue recognition did not result in a material misstatement to the Company's previously issued consolidated financial statements, nor in the consolidated financial statements included in this Annual Report on Form 10-K.

**DAMAGES TO MARATHON**

161.    As a direct and proximate result of the Individual Defendants' conduct, Marathon has lost and will continue to lose and expend many millions of dollars.

162.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action, and its internal investigation, the SEC's investigation and the Restatement, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

163.    These expenditures also include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company and others pursuant to the Plan.

164.    Additionally, these expenditures include costs associated with remediating the deficiencies in the Company's disclosure controls and internal controls, including the costs of restating the Company's false and misleading financial statements described herein.

165.    As a direct and proximate result of the Individual Defendants' conduct, Marathon has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, and unjust enrichment.

**DERIVATIVE ALLEGATIONS**

166.    Plaintiff brings this action derivatively and for the benefit of Marathon to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of Marathon, unjust enrichment, waste of corporate assets, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

167.    Marathon is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

168.     Plaintiff is, and has been at all relevant times, a shareholder of Marathon. Plaintiff will adequately and fairly represent the interests of Marathon in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

169.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

170.     A pre-suit demand on the Board of Marathon is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Thiel, Antoun, DeNuccio, James, Leupp, Ouissal, and Mellinger (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the seven Directors who are on the Board at the time this action is commenced.

171.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

172.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly made and/or caused the Company to make the materially false and misleading statements alleged herein. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

173.     Demand is excused as to the Director-Defendants because they breached their fiduciary duty to the Company—for which they face a substantial likelihood of liability—by causing the Company

to pay Defendants Thiel, Antoun, DeNuccio, James, Leupp, Ouissal, and Mellinger their annual salary, stock awards, option awards, non-equity incentive plan compensation, and/or all other compensation each year that they violated the Company's policies. Indeed, the misconduct described herein could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.

174.   In addition, Defendants Thiel, Antoun, Leupp, and DeNuccio caused the 2021 Proxy Statement to call for a shareholder vote to approve an increase in the number of shares available in the Plan by 7,500,000, which provided for the grant of stock and cash-based performance awards for officers and directors, including each of the Director-Defendants. The misrepresentations and omissions set forth herein were material to shareholders in voting on the increase in the number of shares available in the Plan who would not have approved the increase of available shares in the Plan, had they been informed about the Individual Defendants' misconduct. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

175.   Moreover, Director-Defendants Thiel, Antoun, DeNuccio, James, Leupp, and Ouissal each received lucrative awards under the Plan between August 2021, when the Plan was amended by way of the 2021 Proxy Statement, and 2023, the year of this filing. The specific awards of restricted stock units ("RSUs") to the Director-Defendants directly linked to the Plan are disclosed in Marathon's Form 3s and 4s and/or its proxies filed with the SEC include (at least) the following:

| Name | RSU Award Total | Received |
|------|-----------------|----------|
| Thiel | $3.42 million | August 23, 2021- April 26, 2023 |
| DeNuccio | $1.63 million | August 23, 2021- January 16, 2023 |

| Antoun | $792,497 | August 23, 2021-January 16, 2023 |
| Leupp | $728,455 | August 23, 2021-April 25, 2022 |
| James | $633,518 | August 23, 2021-January 16, 2023 |
| Ouissal | $490,255 | August 23, 2021-January 16, 2023 |

176.    These material benefits provided to the Director-Defendants make it unlikely that they would be able to consider a demand challenging the avenue by which such benefits were unlocked with the requisite level of disinterestedness. For this reason, too, any demand on the Director-Defendants would be futile and is excused.

177.    Additional reasons that demand on Defendant Thiel is futile follow. Defendant Thiel is Marathon's CEO and Chairman of the Board and has served in those positions since April 26, 2021, and January 1, 2022, respectively. Thus, as the Company admits, Defendant Thiel is not an independent director. The Company provides Defendant Thiel with his principal occupation, and he receives handsome compensation, including $18,022,335 in 2021 and $1,240,249 in 2022 for his services. Defendant Thiel was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in each of the Company's SEC filings referenced herein as well as the press releases, cited above, wherein he personally made the false and misleading statements at issue. In addition, he solicited the 2021 and 2022 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and approving the availability of 7,500,000 more common shares in the Plan on false pretenses. As the Company's top officer and trusted Chairman of the Board, he conducted little, if any, oversight of the

Individual Defendants' scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Thiel is a defendant in the Securities Class Action. For these reasons, too, Defendant Thiel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

178.     Additional reasons that demand on Defendant Antoun is futile follow. Defendant Antoun has served as a Company director since May 2021. He also serves as the chair of the Compensation Committee, as a member of the Nominating and Corporate Governance Committee, and as a member of the Audit Committee. The Company provides Defendant Antoun with handsome compensation, including $625,504 in 2021 and $404,527 in 2022 for his services. In addition, he solicited the 2021 and 2022 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and approving the availability of 7,500,000 more common shares in the Plan on false pretenses. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Antoun breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

179.     Additional reasons that demand on Defendant DeNuccio is futile follow. Defendant DeNuccio has served as a Company director since January 2021. The Company provides Defendant DeNuccio with handsome compensation, including $759,572 in 2021 and $342,235 in 2022, for his services. In addition, he solicited the 2021 and 2022 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and

approving the availability of 7,500,000 more common shares in the Plan on false pretenses. As a trusted Company director, he conducted little, if any, oversight of the Individual Defendants' scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. This is even more alarming considering his extensive background in operations, finance, and public companies. For these reasons, Defendant DeNuccio breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

180.    Additional reasons that demand on Defendant James is futile follow. Defendant James has served as a Company director since August 2021. She also serves as the chair of the Nominating and Corporate Governance Committee. The Company provides Defendant James with handsome compensation, including $535,487 in 2021 and $373,069 in 2022 for her services. In addition, she solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting her to the Board. As a trusted Company director, she conducted little, if any, oversight of the Individual Defendants' scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant James breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

181.    Additional reasons that demand on Defendant Leupp is futile follow. Defendant Leupp has served as a Company director since May 2021. He also serves as the chair of the Audit Committee, as a member of the Compensation Committee, and as a member of the Nominating and Corporate Governance Committee. The Company provides Defendant Leupp with handsome compensation, including $625,504 in 2021 and $404,527 in 2022 for his services. In addition, he solicited the 2021 and

2022 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and approving the availability of 7,500,000 more common shares in the Plan on false pretenses. As a trusted Company officer and director, he conducted little, if any, oversight of the Individual Defendants' scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. This is even more alarming considering his extensive background in accounting. For these reasons, Defendant Leupp breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

182.     Additional reasons that demand on Defendant Ouissal is futile follow. Defendant Ouissal has served as a Company director since August 2021. He also serves as a member of the Nominating and Corporate Governance Committee, as a member of the Audit Committee, and as a member of the Compensation Committee. The Company provides Defendant Ouissal with handsome compensation, including $535,487 in 2021 and $385,777 in 2022, for his services. In addition, he solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Antoun and Leupp to the Board, among other things. As a trusted Company director, he conducted little, if any, oversight of the Individual Defendants' scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Ouissal breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

183.     Additional reasons that demand on Defendant Mellinger is futile follow. Defendant Mellinger has served as a Company director since March 2022. In addition, he solicited the 2022 Proxy

Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Antoun and Leupp to the Board, among other things. As a trusted Company director, he conducted little, if any, oversight of the Individual Defendants' scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. This is even more alarming considering his extensive background in finance. For these reasons, Defendant Mellinger breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

184.     Additional reasons that demand on the Board is futile follow.

185.     Defendants Leupp, Ouissal, and Antoun (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the integrity of the Company's financial statements, the performance of the Company's internal audit function, and the Company's compliance with applicable laws and regulations. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

186.     In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, violations of the Exchange Act, and for contribution under Sections 10(b) and 21D of the Exchange Act. Moreover, in violation of the Code of Ethics, the Director-

Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, or conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

187.    Marathon has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Marathon any part of the damages Marathon suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

188.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

189.    The acts complained of herein constitute violations of fiduciary duties owed by Marathon's officers and directors, and these acts are incapable of ratification.

190.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Marathon. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-

versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Marathon, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

191.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Marathon to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

192.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for Violations of Section 14(a) of the Exchange Act**

193.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

194.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

195.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

196.    Under the direction and watch of the Director-Defendants, the 2021 Proxy Statement and 2022 Proxy Statement (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) the Company materially misstated its revenue, cost of revenue, and other financial information in its 2021 and 2022 SEC filings; (2) the Company continuously downplayed its serious problems with internal controls; and (3) because of this, Marathon would face scrutiny by the SEC,  need to restate several financial statements and was reasonably likely to suffer significant damage, including reputational harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

197.    Moreover, the Proxy Statements were false and misleading when both discussed the Company's adherence to specific governance policies and procedures, including the Code of Ethics, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

198.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors, ratification of an independent auditor, and changes to the named executives' compensation plan.

199.    The false and misleading elements of the Proxy Statements led to the increase by 7,500,000 of shares available in the Company's Plan, the increase of authorized shares of Company

common stock from 200 to 300 million, and to the re-election of Defendants Thiel, DeNuccio, Ouissal, James, Antoun, and Leupp to the Board, which allowed them to continue breaching their fiduciary duties to Marathon.

200.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

201.    Plaintiff on behalf of Marathon has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

202.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Marathon's business and affairs.

204.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

205.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Marathon.

206.    In breach of their fiduciary duties owed to Marathon, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company materially misstated its revenue, cost of revenue, and other financial information in its 2021 and 2022 SEC filings; (2) the Company continuously downplayed its serious problems with internal controls; and (3) because of this, Marathon would face scrutiny by the SEC,  need to restate several financial statements and was reasonably likely

to suffer significant damage, including reputational harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

207.   The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

208.   In breach of their fiduciary duties, at least one of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

209.   Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain effective disclosure controls and procedures and internal controls.

210.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Marathon's securities and disguising insider sales.

211.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose

and effect of artificially inflating the price of Marathon's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

212.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

213.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Marathon has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

214.     Plaintiff on behalf of Marathon has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

215.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

216.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Marathon.

217.     The Individual Defendants and others at the Company either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Marathon that was tied to the performance or artificially inflated valuation of Marathon by way of the Plan, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

218.     Plaintiff, as a shareholder and a representative of Marathon, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based

compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

219.    Plaintiff on behalf of Marathon has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

220.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

221.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company.

222.    Furthermore, the Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct, thereby wasting the Company's assets.

223.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Marathon to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions.

224.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

225.    Plaintiff on behalf of Marathon has no adequate remedy at law.

## FIFTH CLAIM

### Against Defendants Okamoto, Thiel, Salzman, and Gallagher for Contribution Under Sections 10(b) and 21D of the Exchange Act

226.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

227.    Marathon, along with Defendants Okamoto, Thiel, Salzman, and Gallagher, are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for

violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Okamoto, Thiel, Salzman, and Gallagher's willful and/or reckless violations of their obligations as officers and/or directors of Marathon.

228.   Defendants Okamoto, Thiel, Salzman, and Gallagher, because of their positions of control and authority as officers and/or directors of Marathon, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Marathon, including the wrongful acts complained of herein and in the Securities Class Action.

229.   Accordingly, Defendants Okamoto, Thiel, Salzman, Gallagher are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

230.   As such, Marathon is entitled to receive all appropriate contribution or indemnification from Defendants Okamoto, Thiel, Salzman, and Gallagher.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Marathon, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Marathon;

(c)   Determining and awarding to Marathon the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with

pre-judgment and post-judgment interest thereon;

(d)      Directing Marathon and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Marathon and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.  a provision to permit the shareholders of Marathon to nominate at least four candidates for election to the Board;

3.  a provision to eliminate the staggered, class-based director election and director term-length system; and

4. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding Marathon restitution from Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: July 8, 2023                              Respectfully submitted,


**THE BROWN LAW FIRM, P.C.**                    Patrick R. Leverty
Timothy Brown                                    **LEVERTY & ASSOCIATES LAW CHTD.**
767 Third Avenue, Suite 2501                     Reno Gould House
New York, NY 10017                               832 Willow Street
Telephone: (516) 922-5427                        Reno, NV 89502
Facsimile: (516) 344-6204                        Telephone: (775) 322-6636
Email: tbrown@thebrownlawfirm.net                Facsimile: (775) 322-3953
                                                 Email: pat@levertylaw.com

                                                 *Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Steve Hood am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __ day of _____, 2023.

6/30/2023

DocuSigned by:

Steve Hood

0B30BE7B4780407...