1
2
3
4
5
6
7

Patrick R. Leverty
**LEVERTY & ASSOCIATES LAW CHTD.**
Reno Gould House
832 Willow Street
Reno, NV 89502
Telephone: (775) 322-6636
Facsimile: (775) 322-3953
Email: pat@levertylaw.com

[Additional counsel on signature block]

*Counsel for Plaintiffs*

8
9

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

10
11
12
13
14

IN RE MARATHON DIGITAL HOLDINGS,
INC. DERIVATIVE LITIGATION

Lead Case No. 2:23-cv-01055-RFB-BNW

15

## VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs Steve Hood, Gary Konigsberg, and Dennis Jaffee ("Plaintiffs"), by Plaintiffs'

undersigned attorneys, derivatively and on behalf of Nominal Defendant Marathon Digital Holdings, Inc.

("Marathon" or the "Company"), file this Verified Consolidated Amended Shareholder Derivative

Complaint against individual defendants Frederick G. Thiel ("Thiel"), Merrick Okamoto ("Okamoto"),

Simeon Salzman ("Salzman"), Hugh J. Gallagher ("Gallagher"), Georges Antoun ("Antoun"), Kevin A.

DeNuccio ("DeNuccio"), Sarita James ("James"), Jay Leupp ("Leupp"), Said Ouissal ("Ouissal"), and

Doug Mellinger ("Mellinger") (collectively, the "Individual Defendants" and together with Marathon, the

"Defendants") for breaches of their fiduciary duties as directors and officers of Marathon, unjust

enrichment, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934

(the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for

Plaintiffs' complaint against the Individual Defendants, Plaintiffs allege the following based upon

personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Marathon, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action filed derivatively on behalf of Marathon that seeks to remedy wrongdoing committed by the Company's current and former directors and/or officers from May 10, 2021 through February 23, 2023 (the "Relevant Period").

2.      Marathon is a bitcoin digital mining company incorporated in Nevada that maintains offices in Fort Lauderdale, Florida and Irvine, California.

3.      The Company began in 2010 under the name "Verve Ventures, Inc." On December 7, 2011, the Company changed its name to the "American Strategic Minerals Corporation" and entered the uranium and vanadium exploration business. In June 2012, the Company parted ways with the minerals business model and shifted to real estate investments in Southern California. By October of that year, the Company transitioned again and tried its hand with intellectual property ("IP") licensing by changing its name to "Marathon Patent Group, Inc."

4.      Beginning in 2017, the Company found its current business model when it purchased digital asset mining machines and established a data center in Canada to mine digital assets. Three years later, the Company ended operations in Canada, relocated all mining rigs from Canada to the United States, and began mining bitcoin across the United States. On March 1, 2021, the Company changed its

Verified Consolidated Amended Shareholder Derivative Complaint

name to Marathon. Marathon centered its business on mining bitcoin and ancillary opportunities within the bitcoin industry.

5.    During the Relevant Period, Marathon focused on mining digital assets with a special emphasis on the blockchain ecosystem and bitcoin.

6.    Throughout the Relevant Period, the Individual Defendants repeatedly and consistently obfuscated the truth to investors about Marathon's business, operations, and prospects. Specifically, the Individual Defendants kept hidden the Company's true revenue figures from investors while simultaneously claiming that materially misstated, publicly reported revenues were accurate by promoting an image of Marathon that differed from reality. Such falsities were included in the Company's proxy solicitations filed with the SEC during the Relevant Period, one of which solicited and received shareholder approval to amend a lucrative incentive plan that materially benefited the Individual Defendants, among others, at the Company, based on false pretenses, including Marathon's actual financial performance and standing.

7.    During the Relevant Period, the Individual Defendants concealed the existence of these control failures from the investing public, instead affirmatively representing throughout the Relevant Period that the Company maintained effective disclosure controls and internal controls over its financial reporting.

8.    The Company's improperly reported financial statements would ultimately cause Marathon to restate almost two years of its financial statements, resulting in significant losses for the Company. The Restatement was the result of improper accounting methods in violation of GAAP standards, and Defendants' failures to adhere to the Financial Accounting Standards Board's Accounting Standards Codification rules.

9.    Specifically, the Company failed to properly valuate the impairment of Marathon's digital holdings and failed to account for the Company's Bitcoin holdings by utilizing an improper mode of

measurement, deviating from the proper protocols found within the Intangible Assets definition that should have been followed.

10.    Despite improperly accounting for the Company's Bitcoin holdings, Marathon continued to paint a false sense of confidence and sufficient controls by stating the following disclosures throughout the Relevant Period in multiple SEC filings, stating in relevant part:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of March 31, 2021. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework in the 2013 COSO framework. ***Based on this assessment, management concluded that our disclosure controls and procedures were effective***. [1]

11.    The truth emerged on February 28, 2023, when Marathon "announc[ed] . . . that it ha[d] cancelled its webcast and conference call for the fourth quarter and fiscal year 2022, initially scheduled for today, February 28, 2023, at 4:30 p.m. Eastern time, and [would] postpone the publication of its corresponding financial results."

12.    On the same day, Marathon filed a Form 8-K with the SEC that acknowledged the Company was in receipt of a letter from the SEC pertaining to accounting issues in Marathon's prior financial statements.

13.    The Form 8-K stated that Marathon would need to restate its financial statements. The Company filed a notification of inability to timely file its annual report the same day. Within the Form 8-K, the Company revealed specifically, in relevant part, that:

---

[1] All emphasis added unless otherwise noted.

*[T]he Company's Audit Committee of the Board of Directors . . . concluded that due to certain accounting errors . . . the previously issued audited consolidated financial statements* contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021 and . . . financial statements for the interim periods in 2022 and 2021 . . . *should no longer be relied upon. Similarly, related earnings releases and other financial communications for these periods should no longer be relied upon.* The Company intends to correct the errors and will be restating the Impacted Financial Statements

14.    On this news, the price of the Company's stock dropped from $7.10 per share at the close of trading on February 28, 2023, the prior trading day, to $6.51 per share at the close of trading on March 1, 2023, representing a loss in value of 8.31%, or $0.59 per share.

15.    On March 16, 2023, Marathon filed its annual report on Form 10-K for the fiscal year ended December 31, 2022, which included a restatement of, *inter alia*, the Company's reported Revenue Recognition, Impairment of Digital Assets, NYDIG Digital Assets Fund, III, LP, and other adjustments, including adjustments to income tax reports (the "Restatement"). The Restatement also included restated consolidated balance sheets as of December 31, 2021, related consolidated statements of operations, and consolidated statements of cash flows for the same year; restated unaudited condensed consolidated financial statements for the interim periods in 2022 and 2021 as reported in Marathon's quarterly reports filed on Forms 10-Q for the fiscal periods ended March, 31, 2021 and 2022, June 30, 2021 and 2022, and September 2021 and 2022; and an amended management's discussion and analysis of financial condition and results of operations related to the year ended December 31, 2021.

16.    The Restatement admitted that the Company identified additional material weaknesses in its internal controls over financial reporting during its review of the above-mentioned financial statements and admitted that Marathon still had unresolved SEC Staff Comments from 2022.

17.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading

statements that failed to disclose, *inter alia*, that: (1) the Company materially misstated its revenue, cost of revenue, and other financial information in its 2021 and 2022 SEC filings; (2) the Company continuously downplayed its serious problems with internal controls; (3) because of this, Marathon would face scrutiny by the SEC, need to restate several financial statements, and was reasonably likely to suffer significant damage, including reputational harm; and (4) Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the Company's 2018 Equity Incentive Plan (the "Incentive Plan"). As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

18.     Moreover, one of the Individual Defendants breached their fiduciary duties by engaging in a lucrative insider sale of Company common stock at artificially inflated prices, obtaining proceeds of over $3 million.

19.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

20.     In light of the Individual Defendants' misconduct, which has subjected the Company, its former Chief Executive Officer ("CEO"), its former Chief Financial Officer ("CFO"), its current CEO, and its current CFO to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the District of Nevada (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

21.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, the Company directors' receipt of material benefits due to the approval of the Incentive Plan, their collective engagement in fraud, the substantial likelihood of the

directors' liability in this derivative action, the substantial likelihood of the CEO's, CFO's, and Company's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

23.    Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

24.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

25.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

26.    Venue is proper in this District because Marathon is incorporated in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiffs

27.    Plaintiff Hood is a current shareholder of Marathon. Plaintiff Hood has continuously held Marathon common stock since November 11, 2021.

28.     Plaintiff Konigsberg is a current shareholder of Marathon. Plaintiff Konigsberg has continuously held Marathon common stock since December 31, 2021.

29.     Plaintiff Jaffee is a current shareholder of Marathon. Plaintiff Jaffee has continuously held Marathon common stock since February 18, 2021.

**Nominal Defendant Marathon**

30.     Marathon is a Nevada corporation with its principal executive offices at 101 NE 3rd Avenue, Suite 1200, Fort Lauderdale, Florida 33301. Marathon's shares trade on the NASDAQ under the ticker symbol "MARA."

**Defendant Thiel**

31.     Defendant Thiel has served as the Company's CEO since April 26, 2021, and as its Chairperson of the Board since January 1, 2022. Before serving as CEO, Defendant Thiel served as a Company director since April 24, 2018. According to the Company's Schedule 14A filed with the SEC on April 29, 2024 (the "2024 Proxy Statement"), as of March 31, 2024, Defendant Thiel beneficially owned 962,159 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 28, 2024 was $22.58, Defendant Thiel owned over $21.7 million worth of Marathon stock as of that date.

32.     For the fiscal year ended December 31, 2023 ("Fiscal Year 2023"), Defendant Thiel received $36,116,620 in total compensation from the Company. This included $800,000 in salary, $1,800,000 in cash bonus awards, $33,506,720 in restricted stock unit ("RSU") awards, and $9,900 in all other compensation. For the fiscal year ended December 31, 2022 ("Fiscal Year 2022"), Defendant Thiel received $7,109,432 in total compensation from the Company. This included $677,749 in salary, $562,500 in cash bonus awards, and $5,869,183 in RSU awards. For the fiscal year ended December 31, 2021 ("Fiscal Year 2021"), Defendant Thiel received $18,022,335 in total compensation from the Company. This included $339,734 in salary, $500,000 in cash bonus awards, and $17,182,601 in RSU awards.

33.    The Company's 2024 Proxy Statement stated the following about Defendant Thiel:

***Fred Thiel – Chief Executive Officer and Chairperson of the Board (Class I Director)***
Mr. Thiel has served as our Chief Executive Officer since April 2021, and has served on our Board since April 2018. Mr. Thiel was the chairman of Sprocket, Inc. from June 2017 through 2020, a blockchain/cryptocurrency technology and financial services company whose mission is to reduce the risk and friction of cryptocurrency trading across marketplaces, regions and exchanges by establishing a federation of exchanges that together create a single aggregated global trading marketplace with large scale liquidity, rapid execution, minimal counter-party risk, and price transparency. From January 2013 until November 2015, Mr. Thiel served as a director of Local Corporation, which was a Nasdaq-listed entity (Nasdaq: LOCM) which was a leader in on-line local search and digital media, mobile search monetization and programmatic retargeting markets. He served as chairman of the board of LOCAL from January 2014 to November 2015 and as its chief executive officer from May 2014 to November 2015. Mr. Thiel has been the chairman of the board and chief advisor to Thiel Advisors, Inc. since 2012. Thiel Advisors, Inc. is a boutique advisory firm providing private equity and venture capital firms, as well as public and private company boards of director, with deep technology industry operating expertise and strategic advisory services. Mr. Thiel studied economics at the Stockholm School of Economics. Our Board believes Mr. Thiel is qualified to serve as a member of our Board because of his extensive leadership, blockchain, and cryptocurrency experience.

**Defendant Okamoto**

34.    Defendant Okamoto served as the Company's CEO from December 2017 until his retirement on April 26, 2021. He began as a Company director on August 11, 2017, and later became the Executive Chairman on February 28, 2018. He resigned as Executive Chairman on December 31, 2021. According to the Schedule 14A filed with the SEC on June 16, 2021 (the "2021 Proxy Statement"), as of June 14, 2021, Defendant Okamoto beneficially owned 4,163,859 shares of the Company's common stock, constituting 4.19% of the total outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on June 14, 2021 was $29.94, Defendant Okamoto owned approximately $124.6 million worth of Marathon stock as of that date.

35.    For the Fiscal Year 2021, Defendant Okamoto received $143,781,988 in total compensation from the Company. This included $371,315 in salary and $143,410,673 in stock awards. Further, on October 12, 2022, the Company entered into a settlement agreement with Defendant Okamoto,

concerning a dispute settlement over certain restricted stock unit awards, whereby the Company agreed to pay Defendant Okamoto $24 million.

36.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Okamoto made the following sale of company stock at artificially inflated prices:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| December 28, 2021 | 83,333 | $37.02 | $3,084,987 |

Thus, in total, before the fraud was exposed, he sold 83,333 shares of Company common stock at artificially inflated prices on inside information, for which he received approximately $3 million. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

37.     The 2021 Proxy Statement stated the following about Defendant Okamoto:

Mr. Merrick D. Okamoto, age 60, serves as the President at Viking Asset Management which he co-founded in 2002. Mr. Okamoto is responsible for research, due diligence, and structuring potential investment opportunities. He has been instrumental in providing capital to over 200 private and public companies. He is also responsible for the firm's trading operations. Prior to Viking, Mr. Okamoto co-founded TradePortal.com, Inc. in 1999 and served as its President until 2001. He was instrumental in developing the proprietary Trade Matrix software platform offered by TradePortal Securities. Mr. Okamoto's negotiations were key in selling a minority stake in TradePortal.com Inc. to Thomson Financial. Prior to that, he held Vice President positions with Shearson Lehman Brothers, Prudential Securities, and Paine Webber.

**Defendant Salzman**

38.     Defendant Salzman served as the Company's Chief Accounting Officer from March 31, 2022, until November 2022. Previously, he served as CFO from October 19, 2020, until March 31, 2022. According to the Company's Schedule 14A filed with the SEC on September 12, 2022 (the "2022 Proxy Statement"), Defendant Salzman beneficially owned 84,366 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 12, 2022 was $14.43, Defendant Salzman owned over $1.2 million worth of Marathon stock as of that date.

39.     According to the Company's Schedule 14A filed with the SEC on June 23, 2023 (the "2023 Proxy Statement"), for Fiscal Year 2022, Defendant Salzman received $1,176,292 in total compensation from the Company. This included $257,292 in salary, $137,500 in bonus awards, and $781,500 in stock awards. For the Fiscal Year 2021, Defendant Salzman received $1,452,427 in total compensation from the Company. This included $249,004 in salary, $250,000 in bonus awards, and $953,423 in stock awards.

40.     The Company's 2022 Proxy Statement stated the following about Defendant Salzman:

Mr. Simeon Salzman was named to our newly created Chief Accounting Officer Position on March 31, 2022. He served as the Chief Financial Officer and Senior Vice President of the Las Vegas Monorail Company, a private non-profit 501c(4) entity, since July 2018. The Las Vegas Monorail Company operates a driverless monorail transit system that carries approximately 4,600,000 passengers annually over a 3.9 mile elevated track. There Mr. Salzman was responsible for overseeing all financial functions including audit, treasury and corporate finance. In addition, he was responsible for internal control compliance and management strategy.

Prior to the Las Vegas Monorail Company and from May 2015 to July 2018, Mr. Salzman served as the Chief Financial Officer for Wendoh Media and Corner Bar Management for over three years. Wendoh Media operated a weekly publication, a video editing entity, and a digital advertising entity. Corner Bar Management operates four different bars and restaurants in Downtown Las Vegas. Using his previous experience as the Corporate Controller for various managed nightlife, lounges and restaurants at the most prestigious Resort & Casinos on the Las Vegas Strip, Mr. Salzman was able to parlay his skill set revitalizing the various food and beverage establishments operated by Corner Bar Management in Downtown Las Vegas. Through enhanced analytical reviews, budgeting, internal control implementation and reducing overhead, Mr. Salzman was able to save over $1.4 million in aggregate costs and generate EBITDA of over 25% for eight consecutive quarters.

Mr. Salzman previously served as the Vice President of Programs and Secretary on the Board of Director's for Financial Executives International (FEI). Financial Executives International connects senior-level financial executives by defining the profession, exchanging ideas about best practices, educating members and others while working with the government to improve the general economy. He also currently serves as the Treasurer on the Board of Directors of his local neighborhood HOA. Mr. Salzman holds a Bachelor of Science in Accounting and a Bachelor of Arts in Criminal Justice & Criminology from the University of Maryland, College Park. He is a Certified Public Accountant.

**Defendant Gallagher**

41.     Defendant Gallagher served as the Company's CFO from March 31, 2022, until his resignation on May 12, 2023.

42.     For the Fiscal Year 2023, Defendant Gallagher received $991,939 in total compensation from the Company. This included $197,894 in salary and $794,045 in all other compensation. For the Fiscal Year 2022, Defendant Gallagher received $4,797,517 in total compensation from the Company. This included $337,829 in salary, $267,188 in cash bonus awards, and $4,192,500 in RSU awards.[2]

43.     The Company's 2022 Proxy Statement stated the following about Defendant Gallagher:

> Mr. Gallagher is a seasoned C-level executive and board member who brings to Marathon over 30 years of experience in capital markets, investment analysis, treasury, investor relations, and financial and operational execution. Prior to joining Marathon, Mr. Gallagher held several senior positions at UGI Corporation and AmeriGas Propane, including chief strategy officer - Global LPG (2021-2022); president and CEO of AmeriGas Propane (2018-2021); vice president finance and CFO of AmeriGas Propane (2013-2018); treasurer (2011-2014) and director of investor relations and treasury (2007-2011) at UGI Corporation; director of corporate development (2004-2007); and director of financial planning (2000-2004) at AmeriGas Propane. Mr. Gallagher also served in various roles of increasing responsibility at both UGI and AmeriGas from 1990-2000. Mr. Gallagher holds a CPA certification in the State of Pennsylvania and a bachelor of science in accounting from Drexel University.

**Defendant Antoun**

44.     Defendant Antoun has served as a Company director since May 20, 2021. He also serves as the Chair of the Compensation Committee, as a member of the Nominating and Corporate Governance Committee, and as a member of the Audit Committee. According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Antoun beneficially owned 95,890 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 28, 2024 was $22.58, Defendant Antoun owned $2,165,196 worth of Marathon stock as of that date.

45.     For the Fiscal Year 2023, Defendant Antoun received $1,255,000 in total compensation from the Company. This included $155,000 in fees earned or paid in cash, and $1,100,000 in RSU awards. For the Fiscal Year 2022, Defendant Antoun received $404,527 in total compensation from the Company. This included $138,750 in fees earned, and $265,777 in stock awards. For the Fiscal Year 2021, Defendant

---

[2] Defendant Gallagher's 2021 compensation is not listed in Marathon's public filings.

Antoun received $625,504 in total compensation from the Company. This included $27,198 in fees earned, and $598,306 in stock awards.

46. The Company's 2024 Proxy Statement stated the following about Defendant Antoun:

***Georges Antoun – Class II Director***

Mr. Antoun has served as a member of our Board since May 2021. Mr. Antoun brings with him over 30 years of operational and technical experience, having served in various leadership positions at several global technology companies, including as a member of the board of directors of two publicly traded companies: Ruckus Wireless, Inc. and Violin Memory, Inc. He currently serves as the chief commercial officer of First Solar where he was chief operating officer before being appointed as president, U.S. in July 2015. Prior to joining First Solar, Mr. Antoun served as a venture partner at Technology Crossover Ventures ("TCV"), a private equity and venture firm, which he joined in July 2011. Before joining TCV, he was the head of product area IP & broadband networks for Ericsson. Mr. Antoun joined Ericsson in 2007, when Ericsson acquired Redback Networks, a telecommunications equipment company, where Mr. Antoun served as the senior vice president of worldwide sales & operations. After the acquisition, Mr. Antoun was promoted to chief executive officer of the Redback Networks subsidiary. Prior to Redback Networks, Mr. Antoun spent five years at Cisco Systems, where he served as vice president of worldwide systems engineering and field marketing, vice president of worldwide optical operations, and vice president of carrier sales. Prior to Cisco, he was the director of systems engineering at Newbridge Networks, a data and voice networking company. Mr. Antoun started his career as a member of the technical staff at NYNEX (now Verizon Communications), where he was part of the company's science and technology division. Mr. Antoun holds a Bachelor of Science degree in engineering from the University of Louisiana at Lafayette and a master's in information systems engineering from the Polytechnic Institute of New York University.

Our Board believes Mr. Antoun is qualified to serve as a member of our Board because of his longstanding technical and operational expertise with global technology companies.

**Defendant DeNuccio**

47. Defendant DeNuccio has served as a Company director since January 19, 2021. He currently serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of March 31, 2024, Defendant DeNuccio beneficially owned 238,087 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 28, 2024 was $22.58, Defendant DeNuccio owned $5,376,004 worth of Marathon stock as of that date.

48.     For the Fiscal Year 2023, Defendant DeNuccio received $1,195,000 in total compensation from the Company. This included $95,000 in fees earned or paid in cash and $1,100,000 in RSU awards. For the Fiscal Year 2022, Defendant DeNuccio received $342,235 in total compensation from the Company. This included $76,458 in fees earned and $265,777 in stock awards. For the Fiscal Year 2021, Defendant DeNuccio received $759,572 in total compensation from the Company. This included $56,250 in fees earned and $703,322 in stock awards.

49.     The Company's 2024 Proxy Statement stated the following about Defendant DeNuccio:

***Kevin DeNuccio – Class I Director***
Mr. DeNuccio has served as a member of our Board since January 2019. Mr. DeNuccio currently serves on the board of directors of Juniper Networks Inc. (NYSE: JNPR), since 2014. Mr. DeNuccio is the founder and general partner of Wild West Capital LLC since 2012, where he focuses on angel investments, primarily with software-as-a-service start ups. Mr. DeNuccio served on the board of directors of Calix, Inc. (NYSE: CALX, from 2012 to May 2022. From February 2014 to April 2017, he served as president and chief executive officer of Violin Memory, a flash based storage array solutions company. From May 2017 to October 2019, Mr. DeNuccio served as executive chairman of SevOne, Inc., a digital infrastructure management software company. He has more than 25 years of experience as a chief executive, global sales leader, public and private board member, and more than a dozen angel investments, managing and growing leading technology businesses. He served in senior executive positions with Verizon, Cisco Systems, Ericsson, Redback Networks, Wang Laboratories and Unisys Corporation. Mr. DeNuccio holds a Bachelor of Science in Business Administration, Finance, from Northeastern University, and a Master of Business Administration from Columbia Business School.

Our Board believes Mr. DeNuccio is qualified to serve as a member of our Board because of his long-standing public company, finance, and "high tech" experience.

**Defendant James**

50.     Defendant James has served as a Company director since August 6, 2021. She currently serves as a member of the Audit Committee and as the chair of the Nominating and Corporate Governance Committee. She previously served as a member of the Compensation Committee for Fiscal Year 2023. According to the 2024 Proxy Statement, as of March 31, 2024, Defendant James beneficially owned 62,446 shares of the Company's common stock. Given that the price per share of the Company's common

stock at the close of trading on March 28, 2024 was $22.58, Defendant James owned $1,410,030 worth of Marathon stock as of that date.

51.    For the Fiscal Year 2023, Defendant James received $1,230,000 in total compensation from the Company. This included $130,000 in fees earned or paid in cash and $1,100,000 in RSU awards. For the Fiscal Year 2022, Defendant James received $373,069 in total compensation from the Company. This included $107,292 in fees earned and $265,777 in stock awards. For the Fiscal Year 2021, Defendant James received $535,487 in total compensation from the Company. This included $9,194 in fees earned and $526,293 in stock awards.

52.    The Company's 2023 Proxy Statement stated the following about Defendant James:

Sarita James has been the Chief Executive Officer of Embark since 2014, responsible for management of the company with a focus on growth. Prior to Embark, she held executive roles at Citigroup, including Chief Operating Officer of Citi Ventures. She has experience building software at Microsoft Corporation where she received two patents and advising technology companies as a consultant at McKinsey & Company. Ms. James has a passion for education and the public sector. Under the Obama administration, she served as a White House Fellow and Acting Branch Chief of the Small Business Administration's Microloan program. During Mayor Bloomberg's second term, she ran the Strategy and Policy division for New York City Economic Development Corporation. She received a B.A. in Computer Science from Harvard College and her M.B.A. from Oxford University's Said Business School. The Company believes Ms. James is well suited to serve as a director due to her deep expertise in software and technology.

**Defendant Leupp**

53.    Defendant Leupp has served as a Company director since May 20, 2021. He also serves as the Chair of the Audit Committee, as a member of the Compensation Committee, and as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Leupp beneficially owned 124,869 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 28, 2024 was $22.58, Defendant Leupp owned $2,819,542 worth of Marathon stock as of that date.

54.    For the Fiscal Year 2023, Defendant Leupp received $1,255,000 in total compensation from the Company. This included $155,000 in fees earned or paid in cash and $1,100,000 in RSU awards.

For the Fiscal Year 2022, Defendant Leupp received $404,527 in total compensation from the Company. This included $138,750 in fees earned and $265,777 in stock awards. For the Fiscal Year 2021, Defendant Leupp received $625,504 in total compensation from the Company. This included $27,198 in fees earned and $598,306 in stock awards.

55.    The Company's 2023 Proxy Statement stated the following about Defendant Leupp:

***Jay Leupp – Class II Director***
Mr. Leupp has serves as a member of our Board since May 2021. Mr. Leupp has served on the board of directors at Apartment Investment and Management Co (NYSE:AIV), a diversified real estate company primarily focused on value add and opportunistic investments targeting the U.S. multifamily sector, since December 2020. He also currently serves on the board of directors of Healthcare Realty Trust Incorporated (NYSE: HR) and G.W. Williams Co. Mr. Leupp also serves as the managing partner and senior portfolio manager of Terra Firma Asset Management, LLC ("Terra Firma"), a private equity firm. Prior to co-founding Terra Firma in 2020, Mr. Leupp served as a managing director in various roles at Lazard Asset Management, from 2011 to June 2020, Grubb & Ellis Alesco Global Advisors, from 2006 to 2011, Royal Bank of Canada Capital Markets, from 2002 to 2006 and Robertson Stephens & Company, from 1994 to 2002. During his career, he has also held positions at The Staubach Company, from 1991 to 1994, Trammell Crow Company, from 1989 to 1991, and KPMG Peat Marwick, from 1985 to 1987. Mr. Leupp is also a member of the American Institute of Certified Public Accountants (AICPA) and serves on the boards of both non-profit and corporate organizations. Mr. Leupp holds a Bachelor of Science in Business Administration from Santa Clara University, and a Master of Business Administration from Harvard Business School.

Our Board believes Mr. Leupp is qualified to serve as a member of our Board because of his extensive audit and finance expertise.

**Defendant Ouissal**

56.    Defendant Ouissal has served as a Company director since August 6, 2021. He currently serves as a member of the Audit Committee, served as a member of the Nominating and Corporate Governance Committee during the Relevant Period, and served as a member of the Compensation Committee during the Relevant Period. According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Ouissal beneficially owned 41,375 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 28, 2024 was $22.58, Defendant Leupp owned $934,247 worth of Marathon stock as of that date.

57.    For the Fiscal Year 2023, Defendant Ouissal received $1,210,000 in total compensation from the Company. This included $110,000 in fees earned or paid in cash and $1,100,000 in RSU awards. For the Fiscal Year 2022, Defendant Ouissal received $385,777 in total compensation from the Company. This included $120,000 in fees earned and $265,777 in stock awards. For the Fiscal Year 2021, Defendant Ouissal received $535,487 in total compensation from the Company. This included $9,194 in fees earned and $526,293 in stock awards.

58.    The Company's 2024 Proxy Statement stated the following about Defendant Ouissal:

***Said Ouissal – Class I Director***
Mr. Ouissal has served as a member of our Board since August 2021. Mr. Ouissal has been the founder and chief executive officer of Zededa since 2016, a next-generation edge software infrastructure start-up for which he raised $28.5 million of venture capital funding, defined product and built company from inception. He is a seasoned business and product executive with extensive go-to-market experience in high-growth and dynamic turn-around environments, public and private; and a visionary product management and technology leader with deep technical background in various IT/technology domains and inventor of multiple patents. Prior roles include with Violin Memory, where he was the senior vice-president of Global Field Operations, product management & business development, Juniper Networks, where he was vice-president of product management, Ericsson, where he was vice-president of strategy & global customer engagement and Redback Networks, where he was the vice-president of global systems engineering. He is the inventor of two patents in the broadband access and intellectual property networking technology area. Mr. Ouissal holds a Bachelor of Science degree in Computer Science from Saxion Hogescholen in the Netherlands.

Our Board believes Mr. Ouissal is qualified to serve as a member of our Board because of his technology background and expertise.

**Defendant Mellinger**

59.    Defendant Mellinger has served as a Company director since March 31, 2022. He currently serves as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Mellinger beneficially owned 114,803 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 28, 2024 was $22.58, Defendant Mellinger owned $2,592,251 worth of Marathon stock as of that date.

60.    For the Fiscal Year 2023, Defendant Mellinger received $1,185,000 in total compensation from the Company. This included $85,000 in fees earned or paid in cash and $1,100,000 in RSU awards. For the Fiscal Year 2022, Defendant Mellinger received $285,663 in total compensation from the Company. This included $40,000 in fees earned and $245,663 in stock awards.

61.    The Company's 2024 Proxy Statement stated the following about Defendant Mellinger:

***Douglas Mellinger – Class III Director***
Mr. Mellinger has served as a member of our Board since March 2022. Mr. Mellinger is an active entrepreneur, philanthropist, impact investor, and board member, with extensive experience building and leading public and private companies in the technology and financial industries. Mellinger is a managing director at Clarion Capital Partners, a lower middle market private equity and structured credit asset management company, which he joined in January 2013. Mr. Mellinger currently serves on the board of directors of Campden Wealth and IPI (Institute for Private Investors), the largest global membership organization for wealthy families and their family offices; and the board of directors of International Education Corporation (IEC), one of the nation's largest career education colleges. Prior to Clarion Capital Partners, Mellinger was a partner at Palm Ventures and a managing partner at Zeno Ventures. From 2000 to September 2023, Mr. Mellinger co-founded and served on the board of directors of Foundation Source, a leading provider of outsourced services and technology for private foundations. He founded and served as the chairman and chief executive officer of Enherent Corp (Nasdaq: ENHT), a global software development and services company that was listed as an Inc. 500 company twice and was featured on Deloitte & Touche's Technology Fast 500 and Fast 50 lists. Throughout his career, Mr. Mellinger has served on the boards of numerous companies and organizations, including Edgar Online (Nasdaq: EDGR), Sequest Technologies, Producteev, Schiller International, and Young Entrepreneur's Organization (YEO), and Young President's Organization (YPO), among others. He has also served on several advisory boards and boards to government agencies, universities, and non-profit organizations over the past 40 years. Mr. Mellinger holds a Bachelor of Science in Entrepreneurial Science from Syracuse University.

Our Board believes Mr. Mellinger is qualified to serve as a member of our Board because of his extensive finance experience.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

62.    By reason of their positions as officers, directors, and/or fiduciaries of Marathon and because of their ability to control the business and corporate affairs of Marathon, the Individual Defendants owed Marathon and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Marathon in a fair, just,

honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Marathon and its shareholders so as to benefit all shareholders equally.

63.    Each director and officer of the Company owes to Marathon and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

64.    The Individual Defendants, because of their positions of control and authority as directors and officers of Marathon, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

65.    To discharge their duties, the officers and directors of Marathon were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

66.    Each Individual Defendant, by virtue of his, her, or its position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Marathon, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Marathon's Board at all relevant times.

67.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and

untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

68.     To discharge their duties, the officers and directors of Marathon were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Marathon were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada and the United States, and pursuant to Marathon's own Code of Business Conduct and Ethics ("Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Marathon conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Marathon and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Marathon's operations would comply with all applicable laws and Marathon's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

69.    Each of the Individual Defendants further owed to Marathon and the shareholders the duty of loyalty requiring that each favor Marathon's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

70.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Marathon and were at all times acting within the course and scope of such agency.

71.    Because of their advisory, executive, managerial, and directorial positions with Marathon, each of the Individual Defendants had access to adverse, non-public information about the Company.

72.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Marathon.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

73.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

74.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act and (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls.

75.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Marathon was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

76.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

77.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Marathon and was at all times acting within the course and scope of such agency.

## MARATHON'S CODE OF ETHICS

### Code of Ethics

78.    Marathon's Code of Ethics states that it was adopted "for directors, executive officers and employees of the Company." The Code of Ethics is specifically "intended to focus the directors, executive officers and employees on areas of ethical risk, provide guidance to directors, executive officers and employees to help them recognize and deal with ethical issues, provide mechanisms to report unethical conduct, and help foster a culture of honesty and accountability." Further, the Code of Ethics requires that "[e]ach director, executive officer, and employee must comply with the letter and spirit of [the Code of Ethics.]"

79.    In a section titled, "Maintain Fiduciary Duties," the Code of Ethics states the following, in relevant part:

> Directors and executive officers must be loyal to the Company and must act at all times in the best interest of the Company and its shareholders and subordinate self-interest to the corporate and shareholder good. Directors and executive officers should never use their position to make a personal profit. Directors and executive officers must perform their duties in good faith, with sound business judgment and with the care of a prudent person.

80.    In a section titled, "Protection and Proper Use of Company Assets," the Code of Ethics states the following:

> Directors, executive officers and employees must protect the Company's assets and ensure their efficient use. Theft, loss, misuse, carelessness and waste of assets have a direct impact on the Company's profitability. Directors, executive officers and employees must not use Company time, employees, supplies, equipment, tools, buildings or other assets for personal benefit without prior authorization from the Chairman of the Audit Committee or as part of a compensation or expense reimbursement program available to all directors or executive officers.

81.    In a section titled, "Fair Dealing," the Code of Ethics states the following:

Directors, executive officers and employees shall deal fairly and directors and executive officers shall oversee fair dealing by employees and officers with the Company's directors, officers, employees, customers, suppliers and competitors. ***No one should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of' material facts or any other unfair dealing practices***.

82.    In a section titled, "Compliance with Laws, Rules and Regulations," the Code of Ethics states the following:

Directors and executive officers shall comply, and oversee compliance by employees, officers and other directors, with all laws, rules and regulations applicable to the Company, including insider-trading laws. Transactions in Company securities are to be governed by any Company policy relating to insider trading that may be in place.

83.    In a section titled, "Accuracy of Records," the Code of Ethics states the following:

***The integrity, reliability and accuracy in all material respects of the Company's books, records and financial statements is fundamental to the Company's continued and future business success.*** No director, executive officer or employee may cause the Company to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner. In addition, no director, executive officer, or employee may create any false or artificial documentation or book entry for any transaction entered into by the Company. Similarly, executive officers and employees who have responsibility for accounting and financial reporting matters have a responsibility to accurately record all funds, assets and transactions on the Company's books and records.

84.    In a section titled, "Quality of Public Disclosures," the Code of Ethics provides the following:

The Company is committed to providing its shareholders with information about its financial condition and results of operations as required by the securities laws of' the United States. It is the Company's policy that the reports and documents it files with or submits to the Securities and Exchange Commission, and its earnings releases and similar public communications made by the Company, include fair, timely and understandable disclosure. Executive officers and employees who are responsible for these filings and disclosures, including the Company's principal executive, financial and accounting officers, must use reasonable judgment and perform their responsibilities honestly, ethically and objectively in order to ensure that this disclosure policy is fulfilled. ***The Company's senior management is primarily responsible for monitoring the Company's public disclosure.***

85.    In a section titled, "Failure to Comply; Compliance Procedures," the Code of Ethics states the following:

A failure by any director or executive officer to comply with the laws or regulations governing the Company's business, this Code or any other Company policy or requirement may result in disciplinary action, and, if warranted, legal proceedings.

**The Insider Trading Policy**

86.    Marathon's Insider Trading Policy states that "[i]llegal insider trading occurs when a person buys or sells a security when in possession of inside information in violation of a duty of trust or confidence," and that "Marathon has adopted this Insider Trading Policy ("Policy") to assist the Company in preventing illegal insider trading and to avoid even the appearance of improper conduct on the part of any director, officer, employee or contractor of the Company."

87.    In a section titled, "Scope and Applicability," the Insider Trading Policy defines "Covered Persons" by stating the following, in relevant part:

> **Covered Persons***. This Policy applies to each member of the Board and to all directors, officers*, employees and, where appropriate in the Company's determination, contractors, within all of Marathon's operations. All persons covered by this Policy are referred to as "Covered Persons."

88.    Under the heading "Prohibited Activities," the Company states the following, in relevant part:

> **Prohibitions. . .** [T]he following shall apply to all transactions in Company securities:
>
> 5.1.1.   No Covered Person may purchase, sell, transfer or effectuate any other transaction in Company securities while in possession of inside information concerning the Company or its securities. This prohibition includes sales of shares received upon exercise of stock options or warrants, upon vesting of restricted stock, or upon settlement of restricted stock units.

89.    Also under "Prohibited Activities," the Insider Trading Policy sets certain parameters to its listed "Prohibitions" stating the following, in relevant part:

> **Exceptions to Prohibited Activities.** Prohibitions in trading securities under this Policy do not include:
>
> 5.2.2.   The exercise of vested stock options or warrants, either on a ***"cash for stock"*** or ***"stock for stock"*** basis, where no Company stock is sold (by the Covered Person, the Company or otherwise) to fund the option or warrant exercise.  However, while

vested stock options and warrants are not prevented from being exercised under this Policy, ***the sale of any stock acquired upon such exercise is subject to this Policy.***

**Audit Committee Charter**

90.     Marathon's Audit Committee Charter states that the Audit Committee's purpose is to "provide assistance to the Board of Directors in fulfilling their responsibility to the shareholders, potential shareholders and investment community relating to corporate accounting, reporting practices of the Corporation, the quality and integrity of the financial reports of the Corporation and the Corporation's compliance with legal and regulatory requirements."

91.     In a section titled, "Responsibilities," the Audit Committee is charged with, *inter alia*, the following responsibilities:

- Serve as an independent and objective party to monitor the Corporation's financial reporting process and internal control system and complaints or concerns relating thereto.

- To recommend, for shareholder approval, the independent auditor to examine the Corporation's accounts, controls and financial statements. The Committee shall have the sole authority and responsibility to select, evaluate and if necessary replace the independent auditor. The Committee shall have the sole authority to approve all audit engagement fees and terms and the Committee, or a member of the Committee, must pre-approve any non-audit service provided to the Corporation by the Corporation's independent auditor.

- Meet with the independent auditors and financial management of the Corporation to review the scope of the proposed audit for the current year and the audit procedures to be utilized, and at the conclusion thereof review such audit, including any comments or recommendations of the independent auditors.

- Obtain and review at least annually, a formal written report from the independent auditor setting forth its internal quality-control procedures; material issues raised in the prior five years by its internal quality-control reviews and their resolution.

- Review and appraise the audit efforts of independent auditors of the Corporation and, where appropriate, recommend the replacement of the independent accountants.

- Consider and approve, if appropriate, major changes to the Corporation's accounting principles and practices as suggested by the independent auditors or management.

- Establish regular and separate systems of reporting to the Committee by management and the independent auditors regarding any significant judgments made in management's preparation of the financial statements and the view of each as to appropriateness of such judgments and additional items as required under the Sarbanes-Oxley Act including critical accounting policies.

- Review with the independent auditors and financial accounting personnel, the adequacy and effectiveness of the accounting and financial controls of the Corporation, and elicit any recommendations for the improvement of such internal control procedures or particular areas where new or more detailed controls or procedures are desirable. Particular emphasis should be given to the adequacy of such internal controls to assess and manage financial risk exposure and to expose any payments, transactions or procedures that might be deemed illegal or otherwise improper.

- Review the financial statements contained in the annual report and quarterly report to shareholders with management and the independent auditors to determine that the independent auditors are satisfied with the disclosure and content of the financial statements to be presented to the shareholders. Any changes in accounting principles should be reviewed.

- Review with management of the Corporation any financial information, earnings press releases and earnings guidance filed with the Securities and Exchange Commission or disseminated to the public, including any certification, report, opinion or review rendered by the independent auditors.

- Establish procedures for receiving and treating complaints received by the Corporation regarding accounting, internal accounting controls and auditing matters, and the confidential anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

92.    In violation of the Code of Ethics, the Insider Trading Policy, and the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. Moreover, at least one of the Individual Defendants violated the Insider Trading Policy by engaging in insider trading. Also, in violation of the Code of Ethics, the

Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Overview of Bitcoin Mining and Trading

93.    Bitcoin is a digital asset that is decentralized, or operates without a central authority, and functions within a peer-to-peer network, enabling users to exchange payments directly and without intermediaries. This method of digital transactions is accomplished through utilizing a blockchain technology form of ledger system. Such a ledger system employs cryptographic procedures to chain together databases of information stored across multiple computer platforms.

94.    New bitcoins are dispersed into market circulation and are officially entered on the blockchain through Bitcoin[3] mining. Bitcoin mining's purpose is to validate the information contained in the ledger system via computational processes. Miners—those who use hardware and software to generate cryptographic numbers that are at most equal in value to the number set by the Bitcoin network's algorithm—receive bitcoin rewards for finding solutions to problems that arise during the verification process.

95.    Bitcoin rewards incentivize miners to function as auditors by conducting the first layer of Bitcoin transaction verifications. At Bitcoin's inception in 2009, a miner could have earned 50 BTC (the currency of bitcoins) for every block. However, after every four-year period, Bitcoin mining rewards are cut in half. As of April 2024, the rate of Bitcoin mining rewards was valued at 3.125 BTC per one block. The result of this process motivates Bitcoin miners to receive as many bitcoins as possible since the supply of new coins is deteriorating. It is estimated that new bitcoins will cease to exist by 2140.

---

[3] "Bitcoin" with a capital first letter will refer to the software and Bitcoin investing community at-large. "bitcoin" with a lower case first letter refers to the currency.

96.    The number of computers participating to solve the hash4 in this peer-to-peer validation network increase with the popularity of cryptocurrencies, including Bitcoin. "Hashpower" of the entire network increases as the number of participants increase trying to solve the hash (the "Mining Difficulty" or "Difficulty").

97.    Mining Difficulty adjusts automatically upward or downward depending on the number of participants in the mining network and their combined hashpower, and after 2,016 blocks are mined in the network. Therefore, in order for one to have a reasonable chance of receiving a mining reward, greater processing power ("Hashing power") is required.

98.    Due to Hashing power requirements, Bitcoin mining is now largely done on application-specific integrated circuits ("ASIC" or "ASICs"). ASICs, in the cryptocurrency sense, are integrated circuit chips optimized for a specific digital currency, such as bitcoin. Today, the Bitcoin network mining industry is largely composed of large mining firms, including Marathon. Outside of these large mining firms, "mining pools" have formed, whereby individual miners combine their hashing power to produce new bitcoin. At the beginning of the Relevant Period, as an example, Marathon reported that its "active mining fleet" included approximately 12,084 miners, all of which were ASIC machines. Marathon reported that this ASIC mining fleet generated approximately 1.29 exahashes ("EH/s") per second.5

99.    One can trade bitcoins on a digital marketplace Bitcoin exchange, which serves as an intermediary between sellers and purchasers of bitcoin. These Bitcoin exchanges operate in a similar manner as a traditional stock exchange. However, as they are decentralized, Bitcoin exchanges allow transaction trading without the assistance of an exchange authority.

---

[4] A "hash" is a computer science term defined as a function which converts one value into another, for the purposes of securing information. Hashes are used in cryptocurrency matters to ensure that blockchain data is not altered. Hash encrypted information is validated by network participants when those participants attempt to generate a hash less than the target network. Blocks are closed by the network once a target hash is reached.
[5] One exahash equals one quintillion hashes.

Verified Consolidated Amended Shareholder Derivative Complaint

100.    In contrast to a typical stock exchange, trading hours for Bitcoin exchanges are always active. Therefore, bitcoin values are more volatile than traditional securities, and lack an "opening" or "closing" price.

**Accounting Compliance Standards**

101.    All publicly traded U.S. companies, including Marathon, must comply with U.S. Generally Accepted Accounting Principles ("GAAP"). GAAP are the official procedures, rules, and convention standards adopted by the American Institute of Certified Public Accountants (the "AICPA"). AICPA established three successor groups including, the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the "FASB").

102.    The FASB issued the FASB Accounting Standards Codification ("ASC") which is a systematic framework used to organize and present accounting standards and principles. The SEC tasked FASB with setting accounting standards for US public companies. ASC is "the source of authoritative [GAAP] recognized by the FASB to be applied by nongovernmental entities." (ASC, Topic 105, Sub-topic 10, § 5, ¶1).

103.    SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that any filed financial statements not prepared in compliance with GAAP are presumed to be false and misleading. Regulation S-X extends GAAP duties to interim financial statements. However, if such disclosures would simply duplicate disclosures typically made in an annual financial statement, then such disclosures are unnecessary and are excluded from Regulation S-X compliance burdens. (17 C.F.R. § 210.10-01(a)).

104.    Senior management is responsible for a company's financial reporting. The AICPA Code of Professional Conduct states, in relevant part:

> The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. Management is responsible for adopting sound accounting policies and for establishing and maintaining an internal control structure that will, among other things, record, process, summarize, and report financial data that is consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge

and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

(1 CCH AICPA Professional Standards, SAS No. 1, § 110.02 (1982)).

105.    Section 13 of the Exchange Act addresses senior management responsibilities for ensuring a company's internal accounting controls, stating, in relevant part:

Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall- . . . devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that- . . . transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements

(15 U.S.C. § 77m(b)(2)(B)(ii)(I).)

**Accounting Reporting Standards for Impaired Bitcoin Assets**

106.    Intangible Assets are defined in the FASB ASC Master Glossary as assets that lack a physical structure (not including financial assets). As Bitcoin is a form of cryptocurrency asset that falls under the intangible assets definition, Bitcoin falls under FASB ASC 350, Intangibles — Goodwill and Other. ASC 350-30-35-4 states that:

If no legal, regulatory, contractual, competitive, economic, or other factors limit the useful life of an intangible asset to the reporting entity, the useful life of the asset shall be considered to be indefinite. The term indefinite does not mean the same as infinite or indeterminate. The useful life of an intangible asset is indefinite if that life extends beyond the foreseeable horizon—that is, there is no foreseeable limit on the period of time over which it is expected to contribute to the cash flows of the reporting entity. Such intangible assets might be airport route authorities, certain trademarks, and taxicab medallions.

107.    Specifically, Bitcoin is an indefinite-termed intangible asset, since there is no foreseeable horizon limit imposed on Bitcoin's useful life in which the asset may contribute cashflow to the reporting entity. Therefore, accounting and reporting that applies to crypto assets, such as Bitcoin, is much more similarly situated to that of a trademark than to that of currency, a cash equivalent or a financial instrument. Importantly, crypto currencies only qualify as legal tender with the endorsement of a government. In 2018,

the SEC declared through comment letters, that bitcoin (or ether) should not be regarded as cash equivalents or equity, and therefore, companies should not base such intangible assets' valuation on fair value option accounting methods.[6]

108.    Further, indefinite-term intangible assets may not be amortized. Rather, indefinite intangible assets must at least be annually assessed for impairment and are subject to more frequent assessments if circumstances or subsequent events indicate increased impairment. An impairment is declared if the carrying value of the intangible asset exceeds its fair market value. The difference between the two figures is referred to as the "impairment loss."

109.    Under ASC 810-10-20, fair value is defined as, "[t]he price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."

110.    Under ASC 820-10-35-6, "if there is a principal market for the asset or liability, the fair value measurement shall represent the price in that market (whether that price is directly observable or estimated using another valuation technique), even if the price in a different market is potentially more advantageous at the measurement date."

111.    ASC 820-10-35-41 states that, "[a] quoted price in an active market provides the most reliable evidence of fair value and shall be used without adjustment to measure fair value whenever available[.]" In light of Bitcoin's fungible nature, the trading price of bitcoin reflects the most reliable evidence of fair value.

112.    Therefore, GAAP requires all companies to record an impairment any time the trading price of Bitcoin falls beneath the purchase price, as this reflects a change in circumstances indicating that

---

[6] See, e.g., July 23, 2018 SEC comment letter to Blockchain Industries, Inc. (https://www.sec.gov/Archives/edgar/data/1084370/000000000018022481/filename1.pdf; August 21, 2018 SEC comment letter to BTCS Inc. (https://www.sec.gov/Archives/edgar/data/1436229/000000000018026066/filename1.pdf).

the intangible asset is impaired. The record should reflect the difference between the Bitcoin's lowest trading price and its preexisting carrying value.

113.    ASC 350-30-35-20 states that, "[s]ubsequent reversal of a previously recognized impairment loss is prohibited." This prohibition extends even if the fair value of the intangible asset recovers during the same reporting period.

114.    For many companies that engage in these types of intangible indefinite assets, these rules are commonsense. For instance, Tesla—widely regarded as a large bitcoin purchaser—stated the following in its annual report on Form 10-K for its fiscal year ended December 31, 2020, filed with the SEC on February 2, 2021:

> We will account for digital assets as indefinite-lived intangible assets in accordance with ASC 350, Intangibles–Goodwill and Other. The digital assets are initially recorded at cost and are subsequently remeasured on the consolidated balance sheet at cost, net of any impairment losses incurred since acquisition. We will perform an analysis each quarter to identify impairment. *If the carrying value of the digital asset exceeds the fair value **based on the lowest price quoted in the active exchanges during the period, we will recognize an impairment loss equal to the difference in the consolidated statement of operations***.

115.    Another large Bitcoin development company, MicroStrategy, also acknowledged the proper Bitcoin-asset valuation GAAP requirements. Under MicroStrategy's annual report on Form 10-K for its fiscal year ended December 31, 2020, filed with the SEC on February 12, 2021, the company stated, in relevant part:

> The Company determines the fair value of its bitcoin on a nonrecurring basis in accordance with ASC 820, Fair Value Measurement, based on quoted (unadjusted) prices on the active exchange that the Company has determined is its principal market for bitcoin (Level 1 inputs). The Company performs an analysis each quarter to identify whether events or changes in circumstances, principally decreases in the quoted (unadjusted) prices on the active exchange, indicate that it is more likely than not that any of the assets are impaired. *In determining if an impairment has occurred, the Company considers the **lowest price of one bitcoin quoted on the active exchange at any time** since acquiring the specific bitcoin held by the Company.* If the carrying value of a bitcoin exceeds that lowest price, an impairment loss has occurred with respect to that bitcoin in the amount equal to the difference between its carrying value and such lowest price.

116.    Regarding what constitutes a "principal entity," ASC 606-20-66-37 states, "[a]n entity is a principal if it controls the specified good or service before that good or service is transferred to a customer."

117.    If an entity is a principal entity, then under ASC 606-10-55-37B, the principal must follow the "gross" approach and recognize revenue whenever the principal entity satisfies its performance obligation. Under ASC 606-10-55-37B, revenue is calculated as the amount paid by the consumer. Any amounts sent to third parties necessary for the principal entity to complete their performance obligations, may be designated as an "expense."

118.    ASC 606-10-55-38 defines "agent" entities and instructs agents on proper accounting stating, in relevant part:

> An entity is an agent if the entity's performance obligation is to arrange for the provision of the specified good or service by another party. An entity that is an agent does not control the specified good or service provided by another party before that good or service is transferred to the customer. *When (or as) an entity that is an agent satisfies a performance obligation, the entity recognizes revenue in the amount of any fee or commission to which it expects to be entitled in exchange for arranging for the specified goods or services to be provided by the other party.* **An entity's fee or commission might be the net amount of consideration** *that the entity retains after paying the other party the consideration received in exchange for the goods or services to be provided by that party.*

**Marathon's History**

119.    Marathon is a bitcoin digital mining company incorporated in Nevada that maintains offices in Fort Lauderdale, Florida and Irvine, California.

120.    The Company began in 2010 under the name "Verve Ventures, Inc." On December 7, 2011, the Company changed its name to the "American Strategic Minerals Corporation" and entered the uranium and vanadium exploration business. In June 2012, the Company changed course by dropping the minerals business model and transitioned to real estate investments in Southern California. By October of that year, the Company again shifted course and tried its hand with IP licensing by changing its name to "Marathon Patent Group, Inc."

121.     In 2017, the Company entered into a merger agreement with Global Bit Ventures, Inc. ("Global Bit Ventures"), purchased digital asset mining machines, and established a data center in Canada to mine digital assets. However, in June 2018, the Company revealed that its Board decided to terminate the merger agreement with Global Bit Ventures, paying them a termination fee of 750,000 shares of common stock totaling approximately $2.85 million. Three years later, the Company ended operations in Canada, relocated all mining rigs to the United States, and began mining bitcoin across the United States. On March 1, 2021, the Company changed its name to Marathon. As of the end of December 2022, Marathon's business operations have centered exclusively on mining bitcoin and related opportunities within the bitcoin ecosystem.

**Background on Marathon's MaraPool Technology**

122.     On March 25, 2021, Marathon announced the Company obtained an irrevocable license to use another company's Bitcoin mining pool technology. Marathon confirmed that the Company intended on using this new technology in connection with the Company's new Bitcoin mining pool: "MaraPool." Marathon stated, in relevant part:

> [MaraPool] functions as a strategic differentiator for Marathon, as it provides us with improved insight into the performance of our mining operations, the potential to further optimize our performance, and the ability to vote on proposed upgrades and changes to the Bitcoin network

123.     From September 2021 until May 2022, Marathon allowed third-party participants to utilize the MaraPool technology through pool service contracts under which Marathon would receive a "pool fee" for performing operator functions over the entire pool of participants. Marathon's MaraPool operator duties included providing MaraPool access to third party participants, tracking the hash rate generated by each participant, and delegating mining work to each participant through algorithmic-based software programs with the goal of determining the hash value. Further, whenever a pool participant solved the target hash's value, Marathon calculated the pro-rata block reward and transaction fee payment to/from each pool participant by tracking the hash rate generated by each pool participant. By delegating

mining work to each pool participant, Marathon directed the MaraPool third-party participants to contribute their own hash rates to solve hash values that the Company itself designated.

124.    Marathon owned and operated a bitcoin wallet, with which MaraPool was associated. The bitcoin wallet was recorded as the winner of proof of work block rewards as per the distributed Bitcoin ledger. Further, the bitcoin wallet also served as the assignee of all validations and as a result, was designated as the transaction verifier of record. Through this process, Marathon determined that it controlled and provided transaction verification services to both the network as well as any requester. Marathon recorded MaraPool fees as cost of revenues on their filings.

125.    Marathon also participated in MaraPool. Due to the Company's mining power contributions, Marathon was entitled to consideration at a rate equal to a fractional share of the Bitcoin reward whenever MaraPool successfully added a block to the blockchain. Calculating the fractional share of the Bitcoin reward is as follows: the non-cash consideration, less any pool fees paid to Marathon as the mining pool operator, recorded as contra-revenues. This fractional share is based on the proportion of the Company's contributed hash rate to the combined total computing power from all mining pool participants that solved the algorithmic problem. Marathon, as the pool operator, calculates and determines the fractional share amount, net of any pool fees received.

126.    In light of the foregoing, Marathon satisfies ASC 606-10-55-37's definition of a principal entity, since the Company exercised control over MaraPool's mining operations.

127.    Throughout the Relevant Period, and unbeknownst to the investing public until February 2023, Marathon utilized improper accounting methods to report its financial information to the SEC. As a result, numerous financial figures, results, and disclosures in Marathon's quarterly and annual reports filed between 2021 and 2022 were materially false and misleading.

128.    The Individual Defendants concealed the existence of control failures that led to these significant accounting errors from the investing public, instead affirmatively representing throughout the

Relevant Period that the Company maintained effective disclosure and internal controls over its financial reporting.

129.    The Company's improperly reported financial statements would ultimately cause Marathon to restate over a year's worth of its financial statements, resulting in significant losses for the Company, the extent of which remains untold, even today.

## <u>FALSE AND MISLEADING STATEMENTS</u>

### *May 10, 2021 10-Q*

130.    On May 10, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2021 (the "Q1 2021 10-Q"). The Q1 2021 10-Q was signed by Defendants Thiel and Salzman, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Thiel and Salzman attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

131.    With respect to the Company's controls and procedures, the Q1 2021 10-Q stated the following, in relevant part:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of March 31, 2021. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework in the 2013 COSO framework. ***Based on this assessment, management concluded that our disclosure controls and procedures were effective***.

132.    The Q1 2021 10-Q also reported Marathon's total revenues, impairment of digital assets, including gains and losses in connection with Marathon's investment in the NYDIG Digital Assets Fund III, LP ("Fund"), accruals for legal expenses, valuation of bifurcated derivatives related to certain investments, accumulated comprehensive income and other income, classification of prepaid expenses between short and long term, among other financial line items.

133.    The Q1 2021 10-Q described the Company's method for assessing bitcoin impairment by stating the following, in relevant part:

> Digital currencies are included in current assets in the consolidated balance sheets. Digital currencies are recorded at cost less impairment.
>
> ***An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value.*** In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

134.    The Q1 2021 10-Q stated that the Company's bitcoin holdings were impaired by $662,119 during the relevant quarter and, as a result, the Company's total operating expenses were $56,208,229.

135.    The impairment figures and total operating expenses reported in the Q1 2021 10-Q were materially false and misleading because the Company failed to disclose that, despite the Company's 2021 10-K statements to the contrary, the Company violated ASC 350 by selecting and using an arbitrary cutoff time to assess indefinite-lived asset impairment value, rather than the lowest trading price at any time during the period, as required by GAAP. As a result, the Company understated its impairment values and overstated their bitcoin holdings' value since the lowest trading price of bitcoin was in fact, lower than the price at the Company's selected arbitrary cutoff. The false impairment report was revealed on February 28, 2023 and the true impairment values were revealed in the Restatement.

136.    These statements in the Q1 2021 10-Q were materially false and misleading because the Q1 2021 10-Q  failed to disclose, *inter alia*, that the Company: (1) insufficiently met its disclosure, procedure, and internal financial reporting controls; (2) stated its MaraPool revenues and cost of revenues in violation of GAAP standards; (3) assessed its bitcoin holding's impairment in violation of GAAP standards specifically by (a) failing to recognize impairment losses when events or changes in circumstances indicated it was probable that the indefinite-lived assets were impaired, and (b) violating ASC 350 and 820, which requires companies to record impairment by measuring the intangible asset's carrying value in excess of its fair value; (4) materially misstated its cost of revenue during the Relevant Period as a result; (5) the foregoingcaused the Company's bitcoin holdings to be materially misstated during the Relevant Period, and (6) the foregoing would predictably impact the Company's financial condition in a materially negative manner, once the foregoing information would be revealed.

### June 16, 2021 Proxy Statement

137.    On June 16, 2021, the Company filed the 2021 Proxy Statement. Defendants Okamoto, Thiel, Antoun, Leupp, and DeNuccio solicited the 2021 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

138.    With respect to the Company's Code of Ethics and corporate governance, the 2021 Proxy Statement stated:

> We are committed to maintaining strong corporate governance practices that benefit the long-term interests of our shareholders by providing for effective oversight and management of the Company. Our governance policies, including a Code of Business Conduct and Ethics ("Code") can be found on our website at www.marathonpg.com by following the link to "Investors" and then to "Governance Docs."

> Our Code of Business Conduct and Ethics, effective December 2017, applies to directors, executive officers and employees of the Company. This Code is intended to focus the directors, executive officers and employees on areas of ethical risk, provide guidance to directors, executive officers and employees to help them recognize and deal with ethical issues, provide mechanisms to report unethical conduct, and help foster a culture of honesty and accountability. Each director, executive officer and employee must comply with the letter and spirit of this Code.

We require that Directors and executive officers must be loyal to the Company and must act at all times in the best interest of the Company and its shareholders and subordinate self-interest to the corporate and shareholder good. Directors and executive officers should never use their position to make a personal profit. Directors and executive officers must perform their duties in good faith, with sound business judgment and with the care of a prudent person.

139.    With respect to Risk Oversight, the 2021 Proxy Statement stated:

Our Board is primarily responsible for overseeing our risk management processes. The Board receives and reviews periodic reports from management, auditors, legal counsel, and others, as considered appropriate regarding the Company's assessment of risks. The Board focuses on the most significant risks facing the Company and our general risk management strategy, and also ensures that risks undertaken by us are consistent with the Board's risk parameters. While the Board oversees the Company, our management is responsible for day-to-day risk management processes. We believe this division of responsibilities is the most effective approach for addressing the risks facing the Company and that our board leadership structure supports this approach.

140.    The 2021 Proxy Statement also called for shareholder approval of, among other things, the election of directors Thiel, DeNuccio, Ouissal, and James, an amendment to increase the number of shares available in the Incentive Plan by 7,500,000 shares, and the ratification of RBSM, LLP as the Company's registered public accountant for the fiscal year ended December 31, 2021. The Incentive Plan, originally approved in 2018, provided for stock options, restricted stock, preferred stock, stock-based awards, and other awards to incentivize employees, directors, consultants, advisors, and other service providers. As disclosed in the 2021 Proxy Statement, as of the date of the solicitation, there were no shares of common stock remaining to be issued under the Incentive Plan.

141.    The Individual Defendants received lucrative compensation, while numerous of them made false and misleading statements, during and after the solicitation of the 2021 Proxy Statement. Shareholders would not have approved the proposals in the 2021 Proxy Statement, and thus, the amendment to the Incentive Plan, had they known the truth about Marathon. In total to date, the Company has awarded the following awards of restricted stock units ("RSUs") to the Individual Defendants

pursuant to the amended Incentive Plan as a result of shareholders approving the amended Incentive Plan

under false pretenses:

### AMOUNTS RECEIVED UNDER THE AMENDED INCENTIVE PLAN[7]

| Individual | Date | RSUs Awarded | Price of Derivative Security (as noted in Form 4) |
|---|---|---|---|
| **Fred Thiel**, defendant, CEO | 08/23/2021 | 19,949 | $35.26 |
| | 10/05/2021 | 19,948 | $33.63 |
| | 04/25/2022 | 166,800 | $18.15 |
| | 07/26/2022 | 41,650 | $10.11 |
| | 11/01/2022 | 41,650 | $13.11 |
| | 01/30/2023 | 41,650 | $8.75 |
| | 04/26/2023 | 41,650 | $9.46 |
| | 05/01/2023 | 500,000 | $8.78 |
| | **TOTAL RSUS:** | **873,297** | |
| **Merrick Okamoto**, defendant, former CEO/ Director | 03/31/2021 | 454,941 | $48.02 |
| | 03/31/2021 | 2,547,392 | $35.26 |
| | 12/28/2021 | 83,333 | $37.02 |
| | **TOTAL RSUS:** | **3,085,666** | |
| **Simeon Salzman**, defendant, Chief Accounting Officer/ former CFO | 02/15/2022 | 10,000 | $25.55 |
| | **TOTAL RSUS:** | **10,000** | |
| **Georges Antoun**, defendant, Director | 08/23/2021 | 4,069 | N/A |
| | 10/05/2021 | 4,069 | $33.63 |
| | 01/03/2022 | 4,069 | $32.89 |
| | 04/18/2022 | 4,069 | $20.90 |
| | 04/25/2022 | 12,632 | $18.15 |
| | 01/16/2023 | 32,552 | $7.68 |

---

[7] Includes amounts received under the amended Incentive Plan by the Individual Defendants between August 23, 2021, the date that the shareholder-approved amended Incentive Plan went into effect, to November 10, 2023, the date that the shareholders approved the subsequent Incentive Plan amendment.

| | | TOTAL RSUS: | 61,460 | |
| --- | --- | --- | --- | --- |
| | | | | |
| **Kevin DeNuccio,** defendant, Director | | 08/23/2021 | 16,842 | $35.26 |
| | | 10/05/2021 | 16,842 | $33.63 |
| | | 04/25/2022 | 12,632 | $18.15 |
| | | 01/16/2023 | 32,552 | $7.68 |
| | | TOTAL RSUS: | 78,868 | |
| | | | | |
| **Sarita James,** defendant, Director | | 08/23/2021 | 3,579 | N/A |
| | | 10/05/2021 | 3,579 | $33.63 |
| | | 01/03/2022 | 3,579 | $32.89 |
| | | 04/18/2022 | 3,580 | $20.90 |
| | | 04/25/2022 | 12,632 | $18.15 |
| | | 01/16/2023 | 32,552 | $7.68 |
| | | TOTAL RSUS: | 59,501 | |
| | | | | |
| **Jay Leupp,** defendant, Director | | 08/23/2021 | 4,069 | N/A |
| | | 10/05/2021 | 4,069 | $33.63 |
| | | 01/03/2022 | 4,069 | $32.89 |
| | | 04/18/2022 | 4,069 | $20.90 |
| | | 04/25/2022 | 12,632 | $18.15 |
| | | TOTAL RSUS: | 28,908 | |
| | | | | |
| **Doug Mellinger,** defendant, Director | | 04/25/2022 | 11,676 | $20.90 |
| | | 01/16/2023 | 32,552 | $7.68 |
| | | TOTAL RSUS: | 44,228 | |
| | | | | |
| **Said Ouissal,** defendant, Director | | 08/23/2021 | 3,579 | N/A |
| | | 10/05/2021 | 3,579 | $33.63 |
| | | 01/03/2022 | 3,579 | $32.89 |
| | | 04/18/2022 | 3,580 | $20.90 |
| | | 04/25/2022 | 12,632 | $18.15 |
| | | 01/16/2023 | 32,552 | $7.68 |
| | | TOTAL RSUS: | 59,501 | |

142.    The 2021 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Ethics and other governance policies were not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

143.    The 2021 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company materially misstated its revenue, cost of revenue, and other financial information in its 2021 and 2022

SEC filings; (2) the Company continuously downplayed its serious problems with internal controls; (3) because of this, Marathon would face scrutiny by the SEC, need to restate several financial statements and was reasonably likely to suffer significant damage, including reputational harm; and (4) Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the Company's amended Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

144.    As a result of the material misstatements and omissions contained in the 2021 Proxy Statement, Company shareholders elected and reelected Board members who were violating their fiduciary duties, thereby enabling the Individual Defendants to perpetuate their misconduct, and increased the number of shares available for issuance under the Company's Incentive Plan by 7,500,000 shares, among other things. This enabled the Individual Defendants to personally materially benefit, unjustly, therefrom.

***August 13, 2021 Form 10-Q***

145.    Also on August 9, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2021 (the "Q2 2021 10-Q"). The Q2 2021 10-Q was signed by Defendants Thiel and Salzman and contained SOX certifications signed by Defendants Thiel and Salzman attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

146.    With respect to the Company's internal controls, the Q2 2021 10-Q stated the following, in relevant part:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial

reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2021. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework in the 2013 COSO framework. ***Based on this assessment, management concluded that our disclosure controls and procedures were effective***.

147.    The Q2 2021 10-Q also reported Marathon's total revenues, impairment of digital assets, including gains and losses in connection with Marathon's investment in the Fund, accruals for legal expenses, valuation of bifurcated derivatives related to certain investments, accumulated comprehensive income and other income, classification of prepaid expenses between short and long term, among other financial line items.

148.    The Q2 2021 10-Q described the Company's method for assessing bitcoin impairment as stating under the heading "Digital Currencies," the following, in relevant part:

**Digital Currencies**
Digital currencies, restricted and Digital currencies loaned are included in current assets in the consolidated balance sheets. Digital currencies are recorded at cost less impairment..

***An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired.*** Impairment exists when the carrying amount exceeds its fair value. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

149.    The Q2 2021 10-Q addressed ASC proper accounting measures stating, in relevant part:

***The Company accounts for its digital currencies as indefinite-lived intangible assets in accordance with Accounting Standards Codification ("ASC") 350, Intangibles – Goodwill and Other***. The Company's digital currencies are initially recorded at fair value upon receipt (or "carrying value"). On a quarterly basis, they are measured at carrying value, ***net of any impairment losses incurred since receipt. Pursuant to guidance from ASC 820, Fair Value Measurement, the Company is required to determine the non-recurring fair value measurement used to determine impairment of the digital currencies held on the balance sheet. The Company will record impairment losses as the fair value***

***falls below the carrying value of the digital currencies.*** The digital currencies can only be marked down when impaired and not marked up when their value increases. ***The resulting carrying value represents the fair value of the asset.***

150.    The statement in the Q2 2021 10-Q directly above was materially false and misleading because the Company (1) violated ASC 350 and ASC 820 by improperly valuating its bitcoin holdings; (2) failed to assess its bitcoin holdings' carrying value net of any impairment losses incurred since delivery; and (3) failed to record impairment losses reflecting the fair value of bitcoin as it fell below the Company's carrying value of its bitcoin holdings. Further, the Company violated accounting rules and principles by selecting and using an arbitrary cutoff time to assess indefinite-lived asset impairment value, rather than the lowest trading price at any time during the period, as required by GAAP. As a result, the Company understated its impairment values and overstated their bitcoin holdings' value since the lowest trading price of bitcoin was in fact, lower than the price at the Company's selected arbitrary cutoff.

151.    The Q2 2021 10-Q reported that the Company's mined bitcoin holdings were impaired by $11,078,660 during the relevant quarter and that, as a result, the Company's total operating expenses were $24,700,251.

152.    Marathon's reported impairment figures and total operating expenses were materially false and misleading because the Company failed to disclose that, despite the Company's 2021 10-K statements to the contrary, the Company violated ASC 350 by selecting and using an arbitrary cutoff time to assess indefinite-lived asset impairment value, rather than the lowest trading price at any time during the period, as required by GAAP. As a result, the Company understated its impairment values and overstated their bitcoin holdings' value since the lowest trading price of bitcoin was in fact, lower than the price at the Company's selected arbitrary cutoff. The false impairment report was revealed on February 28, 2023 and the true impairment values were revealed in the Restatement.

153.    The statements in the Q2 2021 10-Q were materially false and misleading because the Company failed to disclose, *inter alia*, that the Company (1) insufficiently met its disclosure, procedure,

and internal financial reporting controls; (2) stated its MaraPool revenues and cost of revenues in violation of GAAP standards; (3) assessed its bitcoin holding's impairment in violation of GAAP standards specifically by (a) failing to recognize impairment losses when events or changes in circumstances indicated it was probable that the indefinite-lived assets were impaired, (b) violating ASC 350 and 820, which requires companies to record impairment by measuring the intangible asset's carrying value in excess of its fair value; (4) materially misstated its cost of revenue during the Relevant Period as a result; (5) which caused the Company's bitcoin holdings to be materially misstated during the Relevant Period, and (6) would predictably impact the Company's financial condition in a materially negative manner, once the foregoing information would be revealed. Further, the Company violated accounting rules and principles by selecting and using an arbitrary cutoff time to assess indefinite-lived asset impairment value, rather than the lowest trading price at any time during the period, as required by GAAP. As a result, the Company understated its impairment values and overstated their bitcoin holdings' value since the lowest trading price of bitcoin was in fact, lower than the price at the Company's selected arbitrary cutoff.

### *November 15, 2021 10-Q*

154.    On November 15, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2021 (the "Q3 2021 10-Q"). The Q3 2021 10-Q was signed by Defendants Thiel and Salzman and contained SOX certifications signed by Defendants Thiel and Salzman attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

155.    With respect to the Company's internal controls, the Q3 2021 10-Q stated the following, in relevant part:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange

Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of September 30, 2021. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework in the 2013 COSO framework. ***Based on this assessment, management concluded that our disclosure controls and procedures were effective***.

156. The Q3 2021 10-Q described the Company's method for assessing bitcoin impairment as stating under the heading "Digital Currencies," the following, in relevant part:

Digital currencies are included in current assets in the consolidated balance sheets. Digital currencies are recorded at cost less impairment.

***An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value***. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

157. The Q3 2021 10-Q addressed ASC proper accounting measures stating, in relevant part:

***The Company accounts for its digital currencies as indefinite-lived intangible assets in accordance with Accounting Standards Codification ("ASC") 350, Intangibles – Goodwill and Other***. The Company's digital currencies are initially recorded at fair value upon receipt (or "carrying value"). On a quarterly basis, they are measured at carrying value, ***net of any impairment losses incurred since receipt. Pursuant to guidance from ASC 820, Fair Value Measurement, the Company is required to determine the non-recurring fair value measurement used to determine impairment of the digital currencies held on the balance sheet. The Company will record impairment losses as the fair value falls below the carrying value of the digital currencies.*** The digital currencies can only be marked down when impaired and not marked up when their value increases. ***The resulting carrying value represents the fair value of the asset.***

158. The statement in the Q3 2021 10-Q directly above was materially false and misleading because the Company (1) violated ASC 350 and ASC 820 by improperly valuating its bitcoin holdings;

(2) failed to assess its bitcoin holdings' carrying value net of any impairment losses incurred since delivery; and (3) failed to record impairment losses reflecting the fair value of bitcoin as it fell below the Company's carrying value of its bitcoin holdings. Further, the Company violated accounting rules and principles by selecting and using an arbitrary cutoff time to assess indefinite-lived asset impairment value, rather than the lowest trading price at any time during the period, as required by GAAP. As a result, the Company understated its impairment values and overstated their bitcoin holdings' value since the lowest trading price of bitcoin was in fact, lower than the price at the Company's selected arbitrary cutoff.

159.    The Q3 2021 10-Q also reported Marathon's total revenues, impairment of digital assets, including gains and losses in connection with Marathon's investment in the Fund, accruals for legal expenses, valuation of bifurcated derivatives related to certain investments, accumulated comprehensive income and other income, classification of prepaid expenses between short and long term, among other financial line items.

160.    The Q3 2021 10-Q reported that the Company's bitcoin holdings were impaired by $6,731,890 in that quarter and that, as a result, the Company's total operating expenses were $115,991,238.

161.    The impairment figures and total operating expenses reported in the Q3 2021 10-Q were materially false and misleading because the Company failed to disclose that, despite the Company's 2021 10-K statements to the contrary, the Company violated ASC 350 by selecting and using an arbitrary cutoff time to assess indefinite-lived asset impairment value, rather than the lowest trading price at any time during the period, as required by GAAP. As a result, the Company understated its impairment values and overstated their bitcoin holdings' value since the lowest trading price of bitcoin was in fact, lower than the price at the Company's selected arbitrary cutoff. The false impairment report was revealed on February 28, 2023 and the true impairment values were revealed in the Restatement.

162.    The Q3 2021 10-Q reported MaraPool cost of revenues incorrectly, in reliance on improper accounting methods, and in violation of GAAP, as revealed by the Restatement. The Q3 2021 10-Q incorrectly stated that the cost of revenue for the third quarter of 2021 was $10,263,009.

163.    Marathon's reported MaraPool cost of revenue figures in the Q3 2021 10-Q were materially false and misleading because the Company failed to disclose that the figures were calculated using improper accounting methods in violation of GAAP and as such were understated. The false cost of revenue report was revealed on February 28, 2023 and the true cost of revenue figures were revealed in the Restatement.

164.    The statements in the Q3 2021 10-Q were materially false and misleading because the Company failed to disclose, *inter alia*, that the Company (1) insufficiently met its disclosure, procedure, and internal financial reporting controls; (2) stated its MaraPool revenues and cost of revenues in violation of GAAP standards; (3) assessed its bitcoin holding's impairment in violation of GAAP standards specifically by (a) failing to recognize impairment losses when events or changes in circumstances indicated it was probable that the indefinite-lived assets were impaired, (b) violating ASC 350 and 820, which requires companies to record impairment by measuring the intangible asset's carrying value in excess of its fair value; (4) materially misstated its cost of revenue during the Relevant Period as a result; (5) which caused the Company's bitcoin holdings to be materially misstated during the Relevant Period, and (6) would predictably impact the Company's financial condition in a materially negative manner, once the foregoing information would be revealed. Further, the Company violated accounting rules and principles by selecting and using an arbitrary cutoff time to assess indefinite-lived asset impairment value, rather than the lowest trading price at any time during the period, as required by GAAP. As a result, the Company understated its impairment values and overstated their bitcoin holdings' value since the lowest trading price of bitcoin was in fact, lower than the price at the Company's selected arbitrary cutoff.

165.    The same day, the Company filed a Notification of Inability to Timely File its annual report on Form 10-K with the SEC on Form 12b-25. According to the notice, Marathon encountered a delay in its independent registered accounting firm's completion of the audit of its financial statements for the year ended December 31, 2021 because of: "(i) the significant increase in amount and complexity of revenues in 2021 over 2020, (ii) the Company's transition to large accelerated filer status, shortening filing deadlines by 30 days, and (iii) the Company's first year of being audited for internal controls." The Company disclosed that it expected to file its 10-K within 15 days of the due date.

***March 10, 2022 10-K***

166.    On March 10, 2022, Marathon filed its annual report for the Fiscal Year 2021 on Form 10-K with the SEC (the "2021 10-K"). The 2021 10-K was signed by Defendants Thiel, Salzman, Ouissal, Leupp, Antoun, DeNuccio, and James and contained SOX certifications signed by Thiel and Salzman attesting to its accuracy.

167.    The 2021 10-K included an adverse opinion by Marcum LLP regarding material weaknesses identified in Marathon's internal controls. Specifically, the 2021 10-K disclosed the following about management's assessment of Marathon's internal controls:

> Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2021. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control - Integrated Framework in the 2013 COSO framework. Based on this evaluation, management identified a weakness in internal control over financial reporting related to Information Technology General Controls (ITGC). Specifically, the Company did not design and/or implement user access controls to ensure appropriate segregation of duties or program change management controls for certain financially relevant systems impacting the Company's processes around revenue recognition and digital assets to ensure that IT program and data changes affecting the Company's (i) financial IT applications, (ii) digital currency mining equipment, and (iii) underlying accounting records, are identified, tested, authorized and implemented appropriately to validate that data produced by its relevant IT system(s) were complete and accurate. Automated process-level controls and manual controls that are dependent upon the information derived from such financially relevant systems were also determined to be ineffective as a result of such deficiency. In addition, the Company has not effectively designed a manual key control to detect material misstatements in revenue.

The material weakness described above did not result in a material misstatement to the Company's previously issued consolidated financial statements, nor in the consolidated financial statements included in this Annual Report on Form 10-K.

168.    With respect to the Company's internal controls, the 2021 10-K stated the following, in relevant part:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of September 30, 2021. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework in the 2013 COSO framework. ***Based on this assessment, management concluded that our disclosure controls and procedures were effective***.

169.    The 2021 10-K referred to Marathon's digital assets as "indefinite-lived" intangible assets and acknowledged that the Company was aware of what GAAP required, stating, in relevant part:

"[The Company] account[ed] for [its] bitcoin as indefinite-lived intangible assets, which are subject to impairment losses if the fair value of our bitcoin decreases below their carrying value at any time since their acquisition" and that "***the carrying value of each bitcoin we held at the end of the reporting period reflects the lowest price of one bitcoin quoted on the active exchange at any time since its acquisition***."

170.    The 2021 10-K addressed ASC proper accounting measures stating, in relevant part:

The Company intends to account for its digital currency assets as indefinite life intangible assets. ***An intangible asset with an indefinite useful life is not amortized, but rather is assessed for impairment annually, or more frequently, when events or changes in circumstances occur which indicate that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value.*** In testing for impairment, the Company will have the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted. Realized gain or loss on the sale of digital currencies is included in other income or expenses in the Company's statements of operations.

171.    The 2021 10-K described the Company's method for assessing bitcoin impairment under the heading "Digital Currencies," by stating the following, in relevant part:

Digital currencies are included in current assets in the consolidated balance sheets. Digital currencies are recorded at cost less impairment.

*An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value, which is measured using the quoted price of the digital currency at the time its fair value is being measured.* In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

172.    The 2021 10-K also reported Marathon's Consolidated Balance Sheets, Statements of Operations and Cash Flows for Fiscal Year 2021. For example, the 2021 10-K reported $268,522 thousand in cash and cash equivalents, $102,806 thousand in digital assets, $223,779 thousand in digital assets held in the Fund, and 1,448,245 in total liabilities and stockholders' equity. These amounts (among other line items, including Marathon's reported debt and accrued expenses) were incorrect and would later be restated. In truth, the Company's total liabilities and stockholders' equity for Fiscal Year 2021 was $1,444,331.

173.    The 2021 10-K failed to report the carrying value of each bitcoin held at the end of the reporting period, in a manner consistent with GAAP. GAAP requires the applicable carrying value to be recorded as reflecting the lowest price of one bitcoin quote on the active market at any time since its acquisition. In violation of these rules, Marathon used the US Dollar bitcoin spot rate at an arbitrary closing time determined by the Company itself. As a result, the lowest price at the Company's self-selected closing-period was higher than the real lowest trading price of bitcoin. The Company stated, in relevant part:

*Market Price Risk of Bitcoin*. We have invested a significant portion of our cash in bitcoin and, as of December 31, 2021, we held approximately 8,115 bitcoins. The carrying value of our bitcoins as of December 31, 2021 was $42,667, which reflects cumulative impairments of $29.6 million, on our Consolidated Balance Sheet. As discussed in Note 2, Summary of Significant Accounting Policies, to the Consolidated Financial Statements, *we account for our bitcoin as indefinite-lived intangible assets, which are subject to impairment losses if the fair value of our bitcoin decreases below their carrying value at any time since their acquisition.* Impairment losses cannot be recovered for any subsequent increase in fair value. For example, the market price of one bitcoin in our principal market ranged from $46,178 - $67,634 during the three months ended December 31, 2021, *but the carrying value of each bitcoin we held at the end of the reporting period reflects the lowest price of one bitcoin quoted on the active exchange at any time since its acquisition.* Therefore, negative swings in the market price of bitcoin could have a material impact on our earnings and on the carrying value of our digital assets. Positive swings in the market price of bitcoin are not reflected in the carrying value of our digital assets and impact earnings only when the bitcoin is sold at a gain. For the year ended December 31, 2021, we incurred impairment losses of $29.6 million on our bitcoin. As of March 9, 2022, at 4:00 p.m. EST, the market price of one bitcoin in our principal market was $38,900.

174.     The statement directly above from the 2021 10-K was materially false and misleading because the Company failed to disclose that they violated accounting rules and principles by selecting and using an arbitrary cutoff time to assess indefinite-lived asset impairment value, rather than the lowest trading price at any time during the period, as required by GAAP. As a result, the Company understated its impairment values and overstated their bitcoin holdings' value since the lowest trading price of bitcoin was in fact, lower than the price at the Company's selected arbitrary cutoff.

175.     The 2021 10-K reported that the Company's bitcoin holdings were impaired by $29,552,991 in that year and that, as a result, the Company's total operating expenses were $201,855,397.

176.     The impairment figures and total operating expenses reported in the 2021 10-K were materially false and misleading because the Company failed to disclose that the Company violated ASC 350 by selecting and using an arbitrary cutoff time to assess indefinite-lived asset impairment value, rather than the lowest trading price at any time during the period, as required by GAAP. As a result, the Company understated its impairment values and overstated their bitcoin holdings' value since the lowest trading price of bitcoin was in fact, lower than the price at the Company's selected arbitrary cutoff. The

false impairment report was revealed on February 28, 2023 and the true impairment values were revealed in the Restatement.

177.    The Company reported MaraPool cost of revenues incorrectly, in reliance on improper accounting methods, and in violation of GAAP, as revealed by the Restatement. The 2021 10-K incorrectly stated that cost of revenue for the fiscal year ended December 31, 2021 was $33,696,103.

178.    Marathon's reported MaraPool cost of revenue figures were materially false and misleading because the Company failed to disclose that the figures were calculated using improper accounting methods in violation of GAAP and as such were understated. The false cost of revenue report was revealed on February 28, 2023 and the true cost of revenue figures were revealed in the Restatement.

179.    These statements in the 2021 10-K were materially false and misleading because the Company failed to disclose, *inter alia*, that the Company (1) insufficiently met its disclosure, procedure, and internal financial reporting controls; (2) stated its MaraPool revenues and cost of revenues in violation of GAAP standards; (3) assessed its bitcoin holding's impairment in violation of GAAP standards specifically by (a) failing to recognize impairment losses when events or changes in circumstances indicated it was probable that the indefinite-lived assets were impaired, (b) violating ASC 350 and 820, which requires companies to record impairment by measuring the intangible asset's carrying value in excess of its fair value; (4) materially misstated its cost of revenue during the Relevant Period as a result; (5) which caused the Company's bitcoin holdings to be materially misstated during the Relevant Period, and (6) would predictably impact the Company's financial condition in a materially negative manner, once the foregoing information would be revealed. Further, the Company violated accounting rules and principles by selecting and using an arbitrary cutoff time to assess indefinite-lived asset impairment value, rather than the lowest trading price at any time during the period, as required by GAAP. As a result, the Company understated its impairment values and overstated their bitcoin holdings'

value since the lowest trading price of bitcoin was in fact, lower than the price at the Company's selected arbitrary cutoff.

**May 6, 2022 10-Q**

180.    On May 6, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2022 (the "Q1 2022 10-Q"). The Q1 2022 10-Q was signed by Defendants Thiel and Gallagher and contained SOX certifications signed by Defendants Thiel and Gallagher attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

181.    With respect to the Company's controls and procedures, the Q1 2022 10-Q acknowledged that disclosure controls were not effective, stating the following, in relevant part:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of March 31, 2022. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework in the 2013 COSO framework. Based on this assessment, ***management concluded that our disclosure controls and procedures were not effective as of March 31, 2022 for the reasons stated in our Annual Report on Form 10-K for the year ended December 31, 2021***.

182.    The Q1 2022 10-Q described the Company's method for assessing bitcoin impairment as stating under the heading "Digital Currencies," the following, in relevant part:

> Digital currencies are included in current assets in the consolidated balance sheets. Digital currencies are recorded at cost less impairment.
>
> ***An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired.***

1
2
3
4
5

***Impairment exists when the carrying amount exceeds its fair value.*** In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

6
7
8
9
10

183.    Nonetheless, the extent of the deficiencies remained concealed from investors. The Q1 2022 10-Q also reported Marathon's total revenues, operating expenses, net losses, impairment of digital assets, realized and unrealized gains on digital assets held in the Fund, and income taxes, among other financial line items.

11
12
13

184.    The Q1 2022 10-Q reported that the Company's bitcoin holdings were impaired by $19,551,254 in that quarter and that, as a result, the Company's total operating and administrative expenses were $34,450,350.

14
15
16
17
18
19
20
21
22

185.    Marathon's reported impairment figures and total operating expenses were materially false and misleading because the Company failed to disclose that, despite the Company's 2021 10-K statements to the contrary, the Company violated ASC 350 by selecting and using an arbitrary cutoff time to assess indefinite-lived asset impairment value, rather than the lowest trading price at any time during the period, as required by GAAP. As a result, the Company understated its impairment values and overstated their bitcoin holdings' value since the lowest trading price of bitcoin was in fact, lower than the price at the Company's selected arbitrary cutoff. The false impairment report was revealed on February 28, 2023 and the true impairment values were revealed in the Restatement.

23
24
25
26

186.    The Company reported MaraPool cost of revenues incorrectly, in reliance on improper accounting methods and in violation of GAAP, as revealed by the Restatement. The Q1 2022 10-Q incorrectly stated that cost of revenue for the first quarter of 2022 was $26,393,636.

27
28

187.    Marathon's reported MaraPool cost of revenue figures were materially false and misleading because the Company failed to disclose that the figures were calculated using improper

accounting methods in violation of GAAP and as such were understated. The false cost of revenue report was revealed on February 28, 2023 and the true cost of revenue figures were revealed in the Restatement.

188.    These statements were materially false and misleading because the Company failed to disclose, *inter alia*, that the Company (1) insufficiently met its disclosure, procedure, and internal financial reporting controls; (2) stated its MaraPool revenues and cost of revenues in violation of GAAP standards; (3) assessed its bitcoin holding's impairment in violation of GAAP standards specifically by (a) failing to recognize impairment losses when events or changes in circumstances indicated it was probable that the indefinite-lived assets were impaired, (b) violating ASC 350 and 820, which requires companies to record impairment by measuring the intangible asset's carrying value in excess of its fair value; (4) materially misstated its cost of revenue during the Relevant Period as a result; (5) which caused the Company's bitcoin holdings to be materially misstated during the Relevant Period, and (6) would predictably impact the Company's financial condition in a materially negative manner, once the foregoing information would be revealed. Further, the Company violated accounting rules and principles by selecting and using an arbitrary cutoff time to assess indefinite-lived asset impairment value, rather than the lowest trading price at any time during the period, as required by GAAP. As a result, the Company understated its impairment values and overstated their bitcoin holdings' value since the lowest trading price of bitcoin was in fact, lower than the price at the Company's selected arbitrary cutoff.

**August 9, 2022 10-Q**

189.    On August 9, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2022 (the "Q2 2022 10-Q"). The Q2 2022 10-Q was signed by Defendants Thiel and Salzman, and contained SOX certifications signed by Defendants Thiel and Salzman attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

190.    With respect to the Company's controls and procedures, the Q2 2022 10-Q acknowledged that disclosure controls were not effective, stating the following, in relevant part:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2022. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework in the 2013 COSO framework. Based on this assessment, management concluded that our disclosure controls and procedures were not effective as of June 30, 2022 for the reasons stated in our Annual Report on Form 10-K for the year ended December 31, 2021.

191.    Concerning MaraPool, Marathon's Q2 2022 10-Q stated that the Company viewed itself as an agent entity. As an agent, ASC 606-10-55-38 rules govern. The Company stated they complied with GAAP and that all financial reporting were subject to robust internal controls. However, the Company failed to state whether they regarded revenues generated from MaraPool on a gross or net basis. The Q2 2022 10-Q stated, in relevant part:

The Company is a pool operator and acts as an agent, and not as a principal. The Company did not have control over any third party contributing hashrate to its pool. It merely facilitated the contribution of hash rate by third party pool participants who could choose to join or leave a pool as they wish. As the pool operator, the Company recognized 100% of all pool fees generated by such pool as fee revenue and not mining revenue. The Company therefore concluded that in its capacity as the pool operator it was an agent, and not a principal.

192.    The Q2 2022 10-Q described the Company's method for assessing bitcoin impairment as stating under the heading "Digital Currencies," the following, in relevant part:

Digital currencies are included in current assets in the consolidated balance sheets. Digital currencies are recorded at cost less impairment.

***An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value.*** In testing for

impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

193.    Nonetheless, the extent of the deficiencies remained concealed from investors. The Q2 2022 10-Q also reported Marathon's total revenues, operating expenses, net losses, impairment of digital assets, realized and unrealized gains on digital assets held in the Fund, and income taxes, among other financial line items.

194.    The Q2 2022 10-Q reported that the Company's bitcoin holdings were impaired by $127,590,231 in that quarter.

195.    Marathon's reported impairment figures and total operating expenses were materially false and misleading because the Company failed to disclose that, despite the Company's 2021 10-K statements to the contrary, the Company violated ASC 350 by selecting and using an arbitrary cutoff time to assess indefinite-lived asset impairment value, rather than the lowest trading price at any time during the period, as required by GAAP. As a result, the Company understated its impairment values and overstated their bitcoin holdings' value since the lowest trading price of bitcoin was in fact, lower than the price at the Company's selected arbitrary cutoff. The false impairment report was revealed on February 28, 2023 and the true impairment values were revealed in the Restatement.

196.    The Company reported MaraPool cost of revenues incorrectly in reliance on improper accounting methods and in violation of GAAP, as revealed by the Restatement. The Q2 2022 10-Q incorrectly stated, that of revenue for second first quarter of 2022 was $41,394,556.

197.    Marathon's reported MaraPool cost of revenue figures were materially false and misleading because the Company failed to disclose that the figures were calculated using improper

accounting methods in violation of GAAP and as such were understated. The false cost of revenue report was revealed on February 28, 2023 and the true cost of revenue figures were revealed in the Restatement.

198.    These statements were materially false and misleading because the Company failed to disclose, *inter alia*, that the Company (1) insufficiently met its disclosure, procedure, and internal financial reporting controls; (2) stated its MaraPool revenues and cost of revenues in violation of GAAP standards; (3) assessed its bitcoin holding's impairment in violation of GAAP standards specifically by (a) failing to recognize impairment losses when events or changes in circumstances indicated it was probable that the indefinite-lived assets were impaired, (b) violating ASC 350 and 820, which requires companies to record impairment by measuring the intangible asset's carrying value in excess of its fair value; (4) materially misstated its cost of revenue during the Relevant Period as a result; (5) which caused the Company's bitcoin holdings to be materially misstated during the Relevant Period, and (6) would predictably impact the Company's financial condition in a materially negative manner, once the foregoing information would be revealed. Further, the Company violated accounting rules and principles by selecting and using an arbitrary cutoff time to assess indefinite-lived asset impairment value, rather than the lowest trading price at any time during the period, as required by GAAP. As a result, the Company understated its impairment values and overstated their bitcoin holdings' value since the lowest trading price of bitcoin was in fact, lower than the price at the Company's selected arbitrary cutoff.

### September 12, 2022 Proxy Statement

199.    On September 12, 2022, the Company filed the 2022 Proxy Statement. Defendants Thiel, Antoun, DeNuccio, Leupp, James, Ouissal, and Mellinger solicited the 2022 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

200.    With respect to the Company's Code of Ethics and corporate governance, the 2022 Proxy Statement stated:

> We are committed to maintaining strong corporate governance practices that benefit the long-term interests of our shareholders by providing for effective oversight and

management of the Company. Our governance policies, including a Code of Business Conduct and Ethics ("Code") can be found on our website at www.marathonpg.com by following the link to "Investors" and then to "Governance Docs."

Our Code of Business Conduct and Ethics, effective December 2017, applies to directors, executive officers and employees of the Company. This Code is intended to focus the directors, executive officers and employees on areas of ethical risk, provide guidance to directors, executive officers and employees to help them recognize and deal with ethical issues, provide mechanisms to report unethical conduct, and help foster a culture of honesty and accountability. Each director, executive officer and employee must comply with the letter and spirit of this Code.

We require that Directors and executive officers must be loyal to the Company and must act at all times in the best interest of the Company and its shareholders and subordinate self-interest to the corporate and shareholder good. Directors and executive officers should never use their position to make a personal profit. Directors and executive officers must perform their duties in good faith, with sound business judgment and with the care of a prudent person.

201.    With respect to Risk Oversight, the 2022 Proxy Statement stated:

Our Board is primarily responsible for overseeing our risk management processes. The Board receives and reviews periodic reports from management, auditors, legal counsel, and others, as considered appropriate regarding the Company's assessment of risks. The Board focuses on the most significant risks facing the Company and our general risk management strategy, and also ensures that risks undertaken by us are consistent with the Board's risk parameters. While the Board oversees the Company, our management is responsible for day-to-day risk management processes. We believe this division of responsibilities is the most effective approach for addressing the risks facing the Company and that our board leadership structure supports this approach.

202.    The 2022 Proxy Statement also called for shareholder approval of, among other things, the election of directors Antoun and Leupp, an increase of the Company's authorized shares of common stock from 200 million to 300 million, and the ratification of Marcum LLP as the Company's registered public accountant for the fiscal year ended December 31, 2022.

203.    The 2022 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Ethics and other governance policies were not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

204.    The 2022 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company materially misstated its revenue, cost of revenue, and other financial information in its 2021 and 2022 SEC filings; (2) the Company continuously downplayed its serious problems with internal controls; and (3) because of this, Marathon would face scrutiny by the SEC,  need to restate several financial statements and was reasonably likely to suffer significant damage, including reputational harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

205.    As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company shareholders elected and reelected Board members who were violating their fiduciary duties, thereby enabling the Individual Defendants to perpetuate their misconduct and increased the Company's authorized shares of common stock from 200 million to 300 million, among other things.

### *October 20, 2022 Article by Marcum LLP*

206.    On October 20, 2022, Marathon's auditor, Marcum LLP, explicitly acknowledged GAAP's impairment requirements as it relates to bitcoin in an article attributed to Robert Graham's Marcum's National Leader – Digital Assets & Blockchain. The article acknowledged that GAAP principles required bitcoin impairment to be measured at the currency's lowest value – not at an arbitrary "closing" time. The article addressed the FASB's recent recommendation to modify the accounting rules for cryptocurrency assets, stating:

> This recommendation may prove a boon to the cryptocurrency industry as advocates for the change have long suggested that adopting the fair-value accounting method will enable crypto holdings to be accurately valued on corporate balance sheets. The existing impairment requirement will be phased out so an asset won't have to be recorded at its lowest ever post-purchase value.

### *November 14, 2022 10-Q*

207.    On November 14, 2022, the Company belatedly filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2022 (the "Q3 2022 10-Q"). The Q3 2022 10-Q was signed by Defendants Thiel and Gallagher and contained SOX certifications signed by Defendants

Thiel and Gallagher attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

208.    With respect to the Company's controls and procedures, the Q3 2022 10-Q acknowledged that disclosure controls were not effective, stating the following, in relevant part:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of September 30, 2022. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control – Integrated Framework in the 2013 COSO framework. Based on this assessment, management concluded that our disclosure controls and procedures were not effective as of September 30, 2022 for the reasons stated in our Annual Report on Form 10-K for the year ended December 31, 2021.

209.    The Q3 2022 10-Q described the Company's method for assessing bitcoin impairment as stating under the heading "Digital Currencies," the following, in relevant part:

> Digital currencies are included in current and other assets in the consolidated balance sheets as intangible assets with indefinite useful life and are recorded at cost less impairment. An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, *or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value, which is measured using the quoted price of the digital currency at the time its fair value is being measured*. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. *If it is determined that the price of Bitcoin declines to lower than the carrying value, the Company has determined that it is more likely than not that an impairment exists. The Company determines the amount of impairment to record based on the fair value of bitcoin following the fair value measurement framework in ASC 820 – Fair Value Measurement. If the fair value of bitcoin is lower than the carrying amount the Company will record an impairment* and subsequent reversal of impairment losses is not permitted.

210.    In addressing the fair value of digital currency in general, the Q3 2022 10-Q further stated, in relevant part:

Digital currencies, and Digital currencies loaned are included in current assets in the consolidated balance sheets. Digital currencies are recorded as indefinite lived intangibles at cost less impairment in accordance with FASB ASC 350 – Intangibles-Goodwill and Other. Digital currencies, restricted represent collateral for long-term loans and as such are classified as a non-current asset.

*An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. When the exchange-traded price of digital currencies declines below its carrying value, the Company has determined that it is more likely than not that an impairment exists*. When this occurs, the amount of impairment to record is determined based on the fair value of digital currencies in accordance with the fair value measurement framework in FASB ASC 820 – Fair Value Measurement "(ASC 820)". *If the fair value of digital currency is lower than its carrying amount, the Company will record an impairment in an amount by which the carrying value exceeds the fair value of the digital currency*. Subsequent reversal of impairment losses is not permitted.

211.    Nonetheless, the extent of the deficiencies remained concealed from investors. The Q3 2022 10-Q also reported Marathon's total revenues, operating expenses, net losses, impairment of digital assets, realized and unrealized gains on digital assets held in the Fund, and income taxes, among other financial line items.

212.    The Q3 2022 10-Q reported that the Company's bitcoin holdings were impaired by $5,903,891 in that quarter.

213.    Marathon's reported impairment figures and total operating expenses were materially false and misleading because the Company failed to disclose that, despite the Company's 2021 10-K statements to the contrary, the Company violated ASC 350 by selecting and using an arbitrary cutoff time to assess indefinite-lived asset impairment value, rather than the lowest trading price at any time during the period, as required by GAAP. As a result, the Company understated its impairment values and overstated their bitcoin holdings' value since the lowest trading price of bitcoin was in fact, lower than the price at the Company's selected arbitrary cutoff. The false impairment report was revealed on February 28, 2023 and the true impairment values were revealed in the Restatement.

214. These statements were materially false and misleading because the Company failed to disclose, *inter alia*, that the Company (1) insufficiently met its disclosure, procedure, and internal financial reporting controls; (2) stated its MaraPool revenues and cost of revenues in violation of GAAP standards; (3) assessed its bitcoin holding's impairment in violation of GAAP standards specifically by (a) failing to recognize impairment losses when events or changes in circumstances indicated it was probable that the indefinite-lived assets were impaired, (b) violating ASC 350 and 820, which requires companies to record impairment by measuring the intangible asset's carrying value in excess of its fair value; (4) materially misstated its cost of revenue during the Relevant Period as a result; (5) which caused the Company's bitcoin holdings to be materially misstated during the Relevant Period, and (6) would predictably impact the Company's financial condition in a materially negative manner, once the foregoing information would be revealed. Further, the Company violated accounting rules and principles by selecting and using an arbitrary cutoff time to assess indefinite-lived asset impairment value, rather than the lowest trading price at any time during the period, as required by GAAP. As a result, the Company understated its impairment values and overstated their bitcoin holdings' value since the lowest trading price of bitcoin was in fact, lower than the price at the Company's selected arbitrary cutoff.

215. The statements identified in ¶¶ 130-214 were materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Company's financial reports, including its revenues, expenses, losses, and other material line items were incorrectly reported due to Marathon's improper accounting in violation of GAAP for impairment on digital assets and designation of the Company as an agent instead of principal in operating third party mining pools. Moreover, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company materially misstated its revenue, cost of revenue, and other financial information in its 2021 and 2022 SEC filings; (2) the Company continuously downplayed its serious problems with internal controls; and (3) because of this, Marathon would face scrutiny by the SEC, need to restate several

financial statements and was reasonably likely to suffer significant damage, including reputational harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

216.    On February 28, 2023, Marathon issued a press release "announc[ing] . . . that it has cancelled its webcast and conference call for the fourth quarter and fiscal year 2022, initially scheduled for today, February 28, 2023, at 4:30 p.m. Eastern time, and will postpone the publication of its corresponding financial results."

*February 28, 2023 8-K*

217.    Also on February 28, 2023, Marathon filed a Form 8-K ("February 28th 8-K") with the SEC that acknowledged the Company was in receipt of "a comment letter from the Corporation Finance Staff of the Securities and Exchange Commission relating to, among other things, certain accounting matters as described further below." Marathon further disclosed the following, in relevant part:

On February 22, 2023, Marathon Digital Holdings, Inc. [] received a comment letter from the Corporation Finance Staff of the Securities and Exchange Commission relating to, among other things, certain accounting matters as described further below.

On February 27, 2023, **the Company's Audit Committee of the Board of Directors, after consultation with Marcum LLP, the Company's independent auditor, concluded that due to certain accounting errors, as described below, the previously issued audited consolidated financial statements** contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021 and the previously issued unaudited condensed consolidated financial statements for the interim periods in 2022 and 2021 as contained in the Company's Quarterly Reports on Form 10-Q for the fiscal periods ended March 31, 2021 and 2022, June 30, 2021 and 2022 and September 30, 2021 and 2022 (the "Impacted Financial Statements") **should no longer be relied upon. Similarly, related earnings releases and other financial communications for these periods should no longer be relied upon.** The Company intends to correct the errors and will be restating the Impacted Financial Statements.

Management and the Audit Committee have discussed these matters with Marcum LLP.

**As a result of receiving the SEC comments on February 22, 2023** and the Audit Committee's determination to restate the Impacted Financial Statements, **the Company is unable to complete and file its Annual Report on Form 10-K for the fiscal year ended**

*December 31, 2022 ("2022 Form 10-K") and to make the required corrections to its financials and accompanying disclosures for the Impacted Financial Statements by the filing deadline for the Company's 2022 Form 10-K of March 1, 2023*. The Company expects to file a Form 12b-25 with the SEC indicating that the Company intends to file its 2022 Form 10-K on or before the fifteenth calendar day following the prescribed due date.

Among the restatement issues are:

**Impairment of digital assets**: The Company's digital assets (bitcoin) are indefinite lived intangible assets within the scope of FASB ASC 350 – *Intangible Assets Goodwill and Other* ("ASC 350") and as such, are subject to impairment testing on an annual basis or more frequently if events or changes in circumstances indicate it is more likely than not that the asset is impaired in accordance with ASC 350-30- 35-18.

The Company recently determined that its method of calculating impairment on a daily basis using a standard cutoff time was not in compliance with the ASC 350-30-35-19 requirement to recognize impairment whenever carrying value exceeds fair value, which effectively calls for the intraday low price to be utilized in calculating impairment whenever events or changes in circumstances indicate it is more likely than not that the asset is impaired.

**Operation of a bitcoin mining pool that included third party participants**: In late 2021 and early 2022, the Company operated a bitcoin mining pool that included a small number of unrelated third-party participants. The Company accounts for revenues based on ASC Topic 606, *Revenue from Contracts with Customers* (ASC "606") and had determined that in its capacity as the operator of a mining pool that included third parties, it acted as an agent. As a result, the Company recorded revenues on a net basis, subtracting any revenue allocated to the third-party pool participants from its revenue as the operator of the pool.

The Company recently determined that its assessment that it acted as an Agent in operating the third-party mining pool was incorrect and that it should have concluded that it was acting as a principal in its capacity as the pool operator. The effect of this change from Agent to Principal is that the Company should have recorded revenue from the pool on a gross basis with an offsetting cost of revenue to reflect amounts allocated to third party participants.

The Company estimates that both its revenues and its cost of revenues for the year ended December 31, 2021 were understated due to the "net" vs. "gross" presentation of revenues in its financial statements. As a result, both revenues and cost of revenues, energy, hosting and other are expected to increase upon completion of this restatement for 2021. There will also be minor increases to revenues and cost of revenues, energy, hosting and other in previously issued interim financial statements in both 2021 and 2022. The restatement of the Impacted Financial Statements is not expected to have any impact on total margin, operating income or net income in 2021 or in any of the interim periods in 2021 or 2022. The Company no longer operates a pool that includes third parties.

Verified Consolidated Amended Shareholder Derivative Complaint

218.    On this news, the price of the Company's stock dropped from $7.10 per share at the close of trading on February 28, 2023, to $6.51 per share at the close of trading on March 1, 2023, representing a loss in value of 8.31%, or $0.59 per share. This indicated a negative abnormal company-specific return as the NASDAQ Blockchain Economy Index rose during this period.

## Subsequent Developments

### *The March 16, 2023 Restatement*

219.    On March 16, 2023, Marathon filed a Restatement in its annual report for Fiscal Year 2022 on Form 10-K with the SEC (the "2022 10-K" or "Restatement"). The 2022 10-K was signed by Defendants Thiel, Gallagher, Leupp, Antoun, and James and contained SOX certifications signed by Thiel and Gallagher attesting to its accuracy.

220.    The Restatement included restated Consolidated Balance Sheets as of December 31, 2021, related Consolidated Statements of Operations, and Consolidated Statements of Cash Flows for Fiscal Year 2021; restated unaudited condensed consolidated financial statements for the interim periods in 2022 and 2021 contained in Marathon's quarterly reports filed on Forms 10-Q for the fiscal periods ended March 31, 2021 and 2022, June 30, 2021 and 2022, and September 30, 2021 and 2022, and an amended Management's Discussion and Analysis of Financial Condition and Results of Operations related to Fiscal Year 2021. The Restatement purported to correct Marathon's reports for Revenue Recognition – Principal versus Agent, Impairment of Digital Assets, NYDIG Digital Assets related to the Fund, Disposal of Assets, Other Adjustments, and related income tax adjustments.

221.    The 2022 10-K disclosed that, "[t]he Company received Staff comments ***during 2022 which are material and still under review as set forth below.***" The 2022 10-K expressed that: "[w]e ***additionally*** have described below certain comments ***more recently received*** which relate to certain restatement items in this Form 10-K in order to provide complete disclosure and not imply that the restated items set forth below have been fully resolved."

222.    Specifically, the Company revealed in the Restatement, that GAAP standards were not followed nor applied in valuing the impairment of Marathon's bitcoin holdings for every quarter of 2021 and the first three quarter of 2022. In fact, contrary to what the Company stated in the 2021 10-K and in violation of GAAP, Marathon failed to apply the lowest prices of bitcoin "at any time" to determine impairment. In addressing bitcoin impairments, the Company stated they,

> *corrected its calculation of impairment on digital assets that used the U.S. Dollar bitcoin spot rate at a standard cutoff time instead of the lowest U.S. Dollar bitcoin spot rate at any point in time during the day.* The Company's correction of this calculation results in it recognizing impairment in an amount by which the carrying value exceeds the fair value of the digital assets at any point in time during the day.

223.    The Restatement also disclosed that, despite that the Company restated its financial statements, several of the SEC's comments remained unresolved and thus, Marathon could be forced to restate its financial statements further. Specifically, the Restatement outlined the following unresolved SEC Staff Comments:

> The Company received Staff comments during 2022 which are material and still under review as set forth below. We additionally have described below certain comments more recently received which relate to certain restatement items in this Form 10-K in order to provide complete disclosure and not imply that the restated items set forth below have been fully resolved.
>
> ● Revenue recognition. *The Staff commented on the Company's revenue recognition policy in its capacity as a pool operator and in its capacity as a pool participant, with specific attention on the Company's previous net recognition of revenue as an operator of a pool.* The Company has, in the restated financial results, revised its revenue to include gross revenue earned as pool operator with any amounts remitted to third party pool participants as cost of revenue. The Staff further commented on the Company's accounting convention to recognize its noncash (bitcoin) revenue using fair value that is not at contract inception. The Company has evaluated the difference between its current accounting policy and fair value at contract inception and has determined that any differences in revenue are not material for all periods stated.
>
> ● Impairment of bitcoin. *The Staff objected to the Company's calculation of impairment of bitcoin using a daily closing price. The Company has, in the restated financial results, revised its calculation to calculate impairment of bitcoin using the intraday low price of bitcoin.*
>
> ● Accounting for investment fund. The Staff commented on whether the Company should have consolidated an investment fund in which the Company was the sole limited partner

and, if so, whether its accounting for the income and expenses of the investment fund were appropriately classified within the Company's Statements of Other Comprehensive Income (Loss). The Company has since determined it would consolidate the NYDIG Fund and updated its classification of income and expenses of the investment fund within the Statements of Other Comprehensive Income (Loss) as part of the restated financial results.

● Statements of Other Comprehensive Income (Loss) Presentation. The Staff has commented on the classification and inclusion of certain items in loss from operation versus in other income (expense). These items include realized gain (loss) on sales of digital assets, interest income, impairment on digital assets and patents, and gain on sale of equipment. The Company has since revised its presentation prospectively, and in the restated financial results.

● Embedded leases in Hosting and Power Arrangements. The Staff has asked the Company for a comprehensive analysis around whether each of its server hosting arrangements contain embedded leases. The Company has provided such analysis and included any required disclosure as a result of such analysis in the Notes to its Consolidated Financial Statements.

● Investments. The Staff has requested fulsome analysis of the Company's accounting for various Simple Agreements on Future Equity ("SAFEs") and its investment in equity of certain investees. The Company has provided such analysis and has included impacts of any change in accounting for such investments in the restated financial results.

● Risk factors. The Staff has requested further disclosure on material risks due to regulations, ability to obtain financing, reputational harm, and depreciation of digital assets prices. The Company has considered such risks and has made the disclosures accordingly.

● Bitcoin as collateral. The Staff has raised several comments on the Company's accounting for bitcoin used as collateral within the Company's lending arrangements. The Company continues to respond to the Staff's comments based on its application of U.S. GAAP and has not changed its classification of such bitcoin used as collateral as Digital assets, restricted.

224.    The 2022 10-K further stated that, in relevant part:

The Company corrected its previous conclusion that as the operator of MaraPool ("Operator"), third-party mining pool participants ("pool participants") are its customer. The Company previously viewed such pool participants as principal to the delivery of transaction verification services to the network and requester and therefore recognized revenue net of amount remitted to pool participants' pro rata entitlement to block rewards and transaction fees. The Company has since corrected its revenue recognition policy and concluded that the Company's customers are the transaction requestor and the blockchain network, and that the Company controls the transaction verification services as an Operator. This results in recognition of all transaction fees and block rewards earned from transaction verification services performed by the Company in its role as an Operator of MaraPool as revenue from contracts with customers under Topic 606, with the portion of

the transaction fees and block rewards remitted to MaraPool participants as cost of revenues.

225.    The Restatement disclosed the impacts of the accounting mishaps on Marathon's Revenue Recognition and Impairment of Digital Assets as follows:

| (in thousands) | Three months ended (unaudited) | | | | Year ended |
|---|---|---|---|---|---|
| | March 31, 2022 (Restated) | June 30, 2022 (Restated) | September 30, 2022 (Restated) | December 31, 2022 | December 31, 2022 |
| **Consolidated Statements of Comprehensive Income (Loss) Impact** | | | | | |
| Total revenues | 5 | 1 | — | — | **6** |
| Cost of revenues - energy, hosting and other | (5) | (1) | — | — | **(6)** |
| **Net income (loss) impact** | — | — | — | — | — |

| (in thousands) | Three months ended (unaudited) | | | | Year ended |
|---|---|---|---|---|---|
| | March 31, 2021 (Restated) | June 30, 2021 (Restated) | September 30, 2021 (Restated) | December 31, 2021 (Restated) | December 31, 2021 (Restated) |
| **Consolidated Statements of Comprehensive Income (Loss) Impact** | | | | | |
| Total revenues | — | — | 624 | 8,075 | **8,699** |
| Cost of revenues - energy, hosting and other | — | — | (624) | (8,075) | **(8,699)** |
| **Net income (loss) impact** | — | — | — | — | — |

\* \* \*

| (in thousands) | As of (unaudited) | | | |
|---|---|---|---|---|
| | March 31, 2022 (Restated) | June 30, 2022 (Restated) | September 30, 2022 (Restated) | December 31, 2022 |
| **Consolidated Balance Sheets Impact** | | | | |
| Digital assets | (6,204) | (9,344) | (5,433) | — |
| Digital assets, restricted - Current assets | — | (3,657) | — | — |
| Digital assets, restricted - Other assets | — | — | (3,039) | — |

| (in thousands) | Three months ended (unaudited) | | | | Year ended |
|---|---|---|---|---|---|
| | March 31, 2022 (Restated) | June 30, 2022 (Restated) | September 30, 2022 (Restated) | December 31, 2022 | December 31, 2022 |
| **Consolidated Statements of Comprehensive Income (Loss) Impact** | | | | | |
| Impairment of digital assets | (3,756) | (6,797) | 4,529 | — | **(6,024)** |
| **Net income (loss) impact** | (3,756) | (6,797) | 4,529 | — | **(6,024)** |

| (in thousands) | As of (unaudited) | | | |
| --- | --- | --- | --- | --- |
| | March 31, 2021 (Restated) | June 30, 2021 (Restated) | September 30, 2021 (Restated) | December 31, 2021 (Restated) |
| Consolidated Balance Sheets Impact | | | | |
| Digital assets | (204) | (2,148) | (1,597) | (2,448) |

| (in thousands) | Three months ended (unaudited) | | | | Year ended |
| --- | --- | --- | --- | --- | --- |
| | March 31, 2021 (Restated) | June 30, 2021 (Restated) | September 30, 2021 (Restated) | December 31, 2021 (Restated) | December 31, 2021 (Restated) |
| Consolidated Statements of Comprehensive Income (Loss) Impact | | | | | |
| Impairment of digital assets | (204) | (1,944) | 551 | (851) | **(2,448)** |
| **Net income (loss) impact** | (204) | (1,944) | 551 | (851) | **(2,448)** |

226.     Several other line items were restated between 2021 and 2022, as well, in the Restatement, including the Consolidated Balance Sheets and Comprehensive Income (Loss) of the Fund, Disposal of Assets, accruals for legal expenses, accumulated comprehensive income, prepaid expenses, income tax expenses, total assets, liabilities and stockholders' equity, and more.

227.     Regarding MaraPool, the Restatement revealed that the Company's prior cost of revenue reports were understated as a result of the Company's accounting methods in violation of GAAP, by the following amounts:

| Period | Amount of Understatement in Original Report |
| --- | --- |
| Q3 2021 | 6% or $624,000 |
| Fiscal Year 2021 | 25.8% or $8,699,000 |
| Q1 2022 | 0.19% or $5,000 |
| Q2 2022 | 0.02% or $1,000 |

228.     Regarding the Company's Bitcoin holdings, the Restatement revealed that the Company's prior impairment calculations were materially understated as a result of the Company's accounting methods in violation of GAAP, by the following amounts:

| Period | Amount of Understatement in Original Report |
|---|---|
| Q1 2021 | 30.8% or $204,000 |
| Q2 2021 | 17.6% or $1,944,000 |
| Fiscal Year 2021 | 8.3% or $2,448,000 |
| Q1 2022 | 19.2% or $3,756,000 |
| Q2 2022 | 5.3% or $6,797,000 |

229.    The Restatement further disclosed specific material weaknesses in Marathon's, including

related to its application and interpretation of GAAP, stating in relevant part:

> management identified a weakness in internal control over financial reporting related to the application and interpretation of generally accepted accounting principles ("GAAP") primarily in the areas of consolidation, impairment of digital assets, disposal of property and equipment and principal versus agent considerations in revenue recognition. In addition, the Company has not designed or implemented user access controls to ensure appropriate segregation of duties, or program change management controls for certain financially relevant systems impacting the Company's processes around revenue recognition and digital assets to ensure that IT program and data changes affecting the Company's (i) financial IT applications, (ii) digital currency mining equipment, and (iii) underlying accounting records, are identified, tested, authorized and implemented appropriately to validate that data produced by its relevant IT system(s) were complete and accurate. Automated process-level controls and manual controls that are dependent upon the information derived from such financially relevant systems were also determined to be ineffective as a result of such deficiency. The Company has also not effectively designed a key manual control to detect material misstatements in revenue.

> The material weakness related to the application and interpretation of GAAP, as described above, resulted in a material misstatement to the Company's previously issued consolidated financial statements. The material weakness associated with the manual control over revenue recognition did not result in a material misstatement to the Company's previously issued consolidated financial statements, nor in the consolidated financial statements included in this Annual Report on Form 10-K.

230.    Marathon further concluded that, "the Company's customers are the transaction requestor

and the blockchain network, and that the Company controls the transaction verification services as an

Operator," and therefore Marathon had acted as a principal rather than an agent. However, the Company

failed to address any new facts that led to this correction.

231.    As a result of the Company's MaraPool accounting violations, the Company understated its cost of revenues by 25.8% or approximately $8.7 million.

232.    Defendant Gallagher resigned from the Company's CFO position two weeks after the Restatement, on March 31, 2023 citing "personal reasons." As a result of his departure, Defendant Gallagher surrendered 100,000 RSUs that were scheduled to vest over the next two years at a rate of 12,500 RSUs every three months. Marathon did not announce a CFO successor for over a month until June 14, 2023. During this month period without a CFO, the Company consummated a Series A private placement offering worth over $14 million of redeemable convertible preferred stock – a transaction in which a CFO is ordinarily centrally involved.

## DAMAGES TO MARATHON

233.    As a direct and proximate result of the Individual Defendants' conduct, Marathon has lost and will continue to lose and expend many millions of dollars.

234.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgement associated with the Securities Class Action, and its internal investigation, the SEC's investigation and the Restatement, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

235.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and any amounts paid to outside lawyers, accountants, and investigators in connection thereto.

236.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

237.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company and others, including those received pursuant to the amended Incentive Plan.

238.    As a direct and proximate result of the Individual Defendants' conduct, Marathon has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

239.    Plaintiffs bring this action derivatively and for the benefit of Marathon to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of Marathon, unjust enrichment, waste of corporate assets, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

240.    Marathon is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

241.    Plaintiffs are, and have been at all relevant times, shareholders of Marathon. Plaintiffs will adequately and fairly represent the interests of Marathon in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

242.    Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

243.    A pre-suit demand on the Board of Marathon is futile and, therefore, excused. At the time of filing of this consolidated amended complaint, the Board consists of the following eight individuals: Defendants Thiel, Antoun, DeNuccio, James, Leupp, Ouissal, and Mellinger (the "Director-

Defendants"), along with non-party Vicki Mealer-Burke (together with the Director-Defendants, the "Directors"). Plaintiffs need only to allege demand futility as to four of the eight Directors who are on the Board at the time of the filing of this consolidated amended complaint.

244. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

245. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly made and/or caused the Company to make the materially false and misleading statements alleged herein. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

246. Demand is excused as to the Director-Defendants because they breached their fiduciary duty to the Company—for which they face a substantial likelihood of liability—by causing the Company to pay Defendants Thiel, Antoun, DeNuccio, James, Leupp, Ouissal, and Mellinger their annual salary, stock awards, option awards, non-equity incentive plan compensation, and/or all other compensation each year that they violated the Company's policies. Indeed, the misconduct described herein could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.

247. In addition, Defendants Thiel, Antoun, Leupp, and DeNuccio caused the 2021 Proxy Statement to call for a shareholder vote to approve an increase in the number of shares available for issuance under the Incentive Plan by 7,500,000, which provided for the grant of stock and cash-based performance awards for officers and directors, including each of the Director-Defendants. The

misrepresentations and omissions set forth herein were material to shareholders in voting on the increase in the number of shares available for issuance under the Incentive Plan who would not have approved the increase of available shares in the Incentive Plan, had they been informed about the Individual Defendants' misconduct. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

248.    Moreover, Director-Defendants Thiel, Antoun, DeNuccio, James, Leupp, Mellinger, and Ouissal have received material personal benefits pursuant to the amended Incentive Plan between August 2021, when the Incentive Plan was amended by way of the false and misleading 2021 Proxy Statement, and November 10, 2023, the date that the shareholders approved the subsequent Incentive Plan amendment. The specific awards of RSUs to the Director-Defendants directly linked to the Incentive Plan are disclosed in Marathon's Form 3s and 4s and/or its proxies filed with the SEC and include (at least) the following:

| Individual | Date | RSUs Awarded | Price of Derivative Security (as noted in Form 4) |
|---|---|---|---|
| **Fred Thiel**, defendant, CEO | 08/23/2021 | 19,949 | $35.26 |
| | 10/05/2021 | 19,948 | $33.63 |
| | 04/25/2022 | 166,800 | $18.15 |
| | 07/26/2022 | 41,650 | $10.11 |
| | 11/01/2022 | 41,650 | $13.11 |
| | 01/30/2023 | 41,650 | $8.75 |
| | 04/26/2023 | 41,650 | $9.46 |
| | 05/01/2023 | 500,000 | $8.78 |
| | **TOTAL RSUS:** | **873,297** | |
| | | | |
| **Georges Antoun**, defendant, Director | 08/23/2021 | 4,069 | N/A |
| | 10/05/2021 | 4,069 | $33.63 |
| | 01/03/2022 | 4,069 | $32.89 |
| | 04/18/2022 | 4,069 | $20.90 |
| | 04/25/2022 | 12,632 | $18.15 |
| | 01/16/2023 | 32,552 | $7.68 |
| | **TOTAL RSUS:** | **61,460** | |
| | | | |
| **Kevin DeNuccio**, defendant, Director | 08/23/2021 | 16,842 | $35.26 |
| | 10/05/2021 | 16,842 | $33.63 |
| | 04/25/2022 | 12,632 | $18.15 |
| | 01/16/2023 | 32,552 | $7.68 |

| | | | |
|---|---|---|---|
| | **TOTAL RSUS:** | **78,868** | |
| | | | |
| ***Sarita James***, defendant, Director | **08/23/2021** | 3,579 | N/A |
| | **10/05/2021** | 3,579 | $33.63 |
| | **01/03/2022** | 3,579 | $32.89 |
| | **04/18/2022** | 3,580 | $20.90 |
| | **04/25/2022** | 12,632 | $18.15 |
| | **01/16/2023** | 32,552 | $7.68 |
| | **TOTAL RSUS:** | **59,501** | |
| | | | |
| ***Jay Leupp***, defendant, Director | **08/23/2021** | 4,069 | N/A |
| | **10/05/2021** | 4,069 | $33.63 |
| | **01/03/2022** | 4,069 | $32.89 |
| | **04/18/2022** | 4,069 | $20.90 |
| | **04/25/2022** | 12,632 | $18.15 |
| | **TOTAL RSUS:** | **28,908** | |
| | | | |
| ***Doug Mellinger***, defendant, Director | **04/25/2022** | 11,676 | $20.90 |
| | **01/16/2023** | 32,552 | $7.68 |
| | **TOTAL RSUS:** | **44,228** | |
| | | | |
| ***Said Ouissal***, defendant, Director | **08/23/2021** | 3,579 | N/A |
| | **10/05/2021** | 3,579 | $33.63 |
| | **01/03/2022** | 3,579 | $32.89 |
| | **04/18/2022** | 3,580 | $20.90 |
| | **04/25/2022** | 12,632 | $18.15 |
| | **01/16/2023** | 32,552 | $7.68 |
| | **TOTAL RSUS:** | **59,501** | |

249.    Among other awards, Defendants Antoun, DeNuccio, Ouissal, Mellinger, Leupp, and James materially benefited from receiving RSUs on January 16, 2023 pursuant to the amended Incentive Plan, which vested immediately and were worth $250,000 in vested stock awards, as evidenced by the 2024 Proxy Statement and accompanying Form 4s. *See* Exhibits 1 and 2. In particular, the 2024 Proxy Statement stated the following, in relevant part, regarding the material benefits received by all of the non-employee directors (*i.e.* Defendants Leupp, Antoun, DeNuccio, Ouissal, James, and Mellinger) for their service in 2023 pursuant to the amended Incentive Plan: "The non-employee directors received two RSU grants with respect to service to us during 2023. ***The first RSU was issued on January 16, 2023 and had a grant date fair value of approximately $250,000.***" Similarly, on May 1, 2023, Defendant Thiel received

awards in the form of 500,000 RSUs pursuant to the amended Incentive Plan worth $4,390,000. *See* Exhibit 3 (page 40 of the 2024 Proxy Statement). These material benefits provided to the Director-Defendants, as well as those evidenced above in paragraph 248, make it unlikely that they would be able to consider a demand challenging the avenue by which such benefits were unlocked (i.e. challenging the false and misleading 2021 Proxy Statement) with the requisite level of disinterestedness. For this reason, too, any demand on the Director-Defendants would be futile and is excused.

250.    Additional reasons that demand on Defendant Thiel is futile follow. Defendant Thiel is Marathon's CEO and Chairman of the Board and has served in those positions since April 26, 2021, and January 1, 2022, respectively. Thus, as the Company admits, Defendant Thiel is not an independent director. The Company provides Defendant Thiel with his principal occupation, and he receives handsome compensation, including $36,116,620 in 2023, $7,109,432 in 2022, and $18,022,335 in 2021 for his services. Defendant Thiel was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in each of the Company's SEC filings referenced herein as well as the press releases, cited above, wherein he personally made the false and misleading statements at issue. In addition, he solicited the 2021 and 2022 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and approving the availability of 7,500,000 more common shares in the Incentive Plan on false pretenses. As the Company's top officer and trusted Chairman of the Board, he conducted little, if any, oversight of the Individual Defendants' scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Thiel is a defendant in the Securities Class Action. For these reasons, too, Defendant Thiel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

251.    Additional reasons that demand on Defendant Antoun is futile follow. Defendant Antoun has served as a Company director since May 2021. He also serves as the chair of the Compensation Committee, as a member of the Nominating and Corporate Governance Committee, and as a member of the Audit Committee. The Company provides Defendant Antoun with handsome compensation, including $1,255,000 in 2023, $404,527 in 2022, $625,504 in 2021 for his services. In addition, he solicited the 2021 and 2022 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and approving the availability of 7,500,000 more common shares in the Incentive Plan on false pretenses. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Antoun breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

252.    Additional reasons that demand on Defendant DeNuccio is futile follow. Defendant DeNuccio has served as a Company director since January 2021 and currently serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. The Company provides Defendant DeNuccio with handsome compensation, including $1,195,000 in 2023, $342,235 in 2022, and $759,572 in 2021, for his services. In addition, he solicited the 2021 and 2022 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and approving the availability of 7,500,000 more common shares in the Incentive Plan on false pretenses. As a trusted Company director, he conducted little, if any, oversight of the Individual Defendants' scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement

in the scheme, and consciously disregarded his duties to protect corporate assets. This is even more alarming considering his extensive background in operations, finance, and public companies. For these reasons, Defendant DeNuccio breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

253.    Additional reasons that demand on Defendant James is futile follow. Defendant James has served as a Company director since August 2021. She currently serves as the chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. The Company provides Defendant James with handsome compensation, including $1,230,000 in 2023, $373,069 in 2022, and $535,487 in 2021 for her services. In addition, she solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting her to the Board. As a trusted Company director, she conducted little, if any, oversight of the Individual Defendants' scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant James breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

254.    Additional reasons that demand on Defendant Leupp is futile follow. Defendant Leupp has served as a Company director since May 2021. He also serves as the chair of the Audit Committee, as a member of the Compensation Committee, and as a member of the Nominating and Corporate Governance Committee. The Company provides Defendant Leupp with handsome compensation, including $1,255,000 in 2023, $404,527 in 2022, and $625,504 in 2021 for his services. In addition, he solicited the 2021 and 2022 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and approving the availability of 7,500,000 more common shares in the Incentive Plan on false pretenses. As a trusted Company officer

and director, he conducted little, if any, oversight of the Individual Defendants' scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. This is even more alarming considering his extensive background in accounting. For these reasons, Defendant Leupp breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

255.    Additional reasons that demand on Defendant Ouissal is futile follow. Defendant Ouissal has served as a Company director since August 2021. He also serves as a member of the Audit Committee. The Company provides Defendant Ouissal with handsome compensation, including $1,210,000 in 2023, $385,777 in 2022, and $535,487 in 2021, for his services. In addition, he solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Antoun and Leupp to the Board, among other things. As a trusted Company director, he conducted little, if any, oversight of the Individual Defendants' scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Ouissal breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

256.    Additional reasons that demand on Defendant Mellinger is futile follow. Defendant Mellinger has served as a Company director since March 2022. He also serves as a member of the Nominating and Corporate Governance Committee. The Company provides Defendant Mellinger with handsome compensation, including $1,185,000 in 2023 and $285,663 in 2022, for his services. In addition, he solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Antoun and Leupp to the Board, among other things.

As a trusted Company director, he conducted little, if any, oversight of the Individual Defendants' scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. This is even more alarming considering his extensive background in finance. For these reasons, Defendant Mellinger breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

257.    Additional reasons that demand on the Board is futile follow.

258.    Defendants Leupp, Ouissal, and Antoun (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the integrity of the Company's financial statements, the performance of the Company's internal audit function, and the Company's compliance with applicable laws and regulations. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

259.    In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, violations of the Exchange Act, and for contribution under Sections 10(b) and 21D of the Exchange Act. Moreover, in violation of the Code of Ethics, the Director-Defendants failed to maintain the accuracy of Company records and reports, comply with laws and

regulations, or conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

260.     Marathon has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Marathon any part of the damages Marathon suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

261.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

262.     The acts complained of herein constitute violations of fiduciary duties owed by Marathon's officers and directors, and these acts are incapable of ratification.

263.     The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Marathon. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of

the officers of Marathon, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

264.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Marathon to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

265.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Individual Defendants for Violations of
Section 14(a) of the Exchange Act**

266.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

267.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

268.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under

which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

269.    Under the direction and watch of the Director-Defendants, the 2021 Proxy Statement and 2022 Proxy Statement (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) the Company materially misstated its revenue, cost of revenue, and other financial information in its 2021 and 2022 SEC filings; (2) the Company continuously downplayed its serious problems with internal controls; (3) because of this, Marathon would face scrutiny by the SEC, need to restate several financial statements and was reasonably likely to suffer significant damage, including reputational harm, and (4) Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

270.    Moreover, the Proxy Statements were false and misleading when both discussed the Company's adherence to specific governance policies and procedures, including the Code of Ethics, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

271.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors, ratification of an independent auditor, and changes to the named executives' compensation Incentive plan.

272.    The false and misleading elements of the Proxy Statements led to the increase by 7,500,000 of shares available for issuance under the Company's Incentive Plan, the increase of authorized

shares of Company common stock from 200 to 300 million, and to the re-election of Defendants Thiel, DeNuccio, Ouissal, James, Antoun, and Leupp to the Board, which allowed them to continue breaching their fiduciary duties to Marathon.

273.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

274.    Plaintiffs on behalf of Marathon have no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

275.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

276.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Marathon's business and affairs.

277.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

278.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Marathon.

279.    In breach of their fiduciary duties owed to Marathon, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company materially misstated its revenue, cost of revenue, and other financial information in its 2021 and 2022 SEC filings; (2) the Company continuously downplayed its serious problems with internal controls; (3) because of this, Marathon would face scrutiny by the SEC,  need to restate several financial statements and was reasonably likely to suffer

significant damage, including reputational harm and (4) Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

280.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

281.    In breach of their fiduciary duties, at least one of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

282.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain effective disclosure controls and procedures and internal controls.

283.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Marathon's securities and disguising insider sales.

284.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the

fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Marathon's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

285.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

286.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Marathon has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

287.    Plaintiffs on behalf of Marathon have no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

288.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

289.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Marathon.

290.    The Individual Defendants and others at the Company either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Marathon that was tied to the performance or artificially inflated valuation of Marathon by way of the Incentive Plan, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

291.    Plaintiffs, as shareholders and representatives of Marathon, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

292.    Plaintiffs on behalf of Marathon have no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

293.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

294.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company.

295.    Furthermore, the Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct, thereby wasting the Company's assets.

296.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Marathon to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions.

297.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

298.    Plaintiffs on behalf of Marathon have no adequate remedy at law.

## FIFTH CLAIM

### Against Defendants Okamoto, Thiel, Salzman, and Gallagher for Contribution Under Sections 10(b) and 21D of the Exchange Act

299.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

300.    Marathon, along with Defendants Okamoto, Thiel, Salzman, and Gallagher, are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Okamoto, Thiel, Salzman, and Gallagher's willful and/or reckless violations of their obligations as officers and/or directors of Marathon.

301.    Defendants Okamoto, Thiel, Salzman, and Gallagher, because of their positions of control and authority as officers and/or directors of Marathon, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Marathon, including the wrongful acts complained of herein and in the Securities Class Action.

302.    Accordingly, Defendants Okamoto, Thiel, Salzman, Gallagher are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

303.    As such, Marathon is entitled to receive all appropriate contribution or indemnification from Defendants Okamoto, Thiel, Salzman, and Gallagher.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of Marathon, and that Plaintiffs are adequate representatives of the Company;

(b)      Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Marathon;

(c)      Determining and awarding to Marathon the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)      Directing Marathon and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Marathon and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.  a provision to permit the shareholders of Marathon to nominate at least five candidates for election to the Board;

3.  a provision to eliminate the staggered, class-based director election and director term-length system; and

4.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding Marathon restitution from Individual Defendants, and each of them;

(f)      Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

1

## JURY TRIAL DEMANDED

2

Plaintiffs hereby demand a trial by jury.

3

4    Dated: June 25, 2024                          Respectfully submitted,

5                                                  */s/ Patrick R. Leverty*
                                                   Patrick R. Leverty
6                                                  **LEVERTY & ASSOCIATES LAW CHTD.**
                                                   Reno Gould House
7                                                  832 Willow Street
                                                   Reno, NV 89502
8                                                  Telephone: (775) 322-6636
                                                   Facsimile: (775) 322-3953
9                                                  Email: pat@levertylaw.com

10                                                 **THE BROWN LAW FIRM, P.C.**
                                                   Timothy Brown
11                                                 767 Third Avenue, Suite 2501
                                                   New York, NY 10017
12                                                 Telephone: (516) 922-5427
                                                   Facsimile: (516) 344-6204
13                                                 Email: tbrown@thebrownlawfirm.net

14                                                 **THE ROSEN LAW FIRM, P.A.**
                                                   Phillip Kim
15                                                 275 Madison Avenue 40th Floor
                                                   New York, NY 10016
16                                                 Tel.: (212) 686-1060
                                                   Email: pkim@rosenlegal.com

17
                                                   *Counsel for Plaintiffs*
18

19

20

21

22

23

24

25

26

27

28

Verified Consolidated Amended Shareholder Derivative Complaint