1

**FLANGAS LAW GROUP**
KIMBERLY P. STEIN
2   Nevada Bar No. 8675
Email: kps@fdlawlv.com
3   3275 South Jones Boulevard, Suite 105
Las Vegas, NV 89146
4   Telephone: (702) 307-9500

5

**PAUL, WEISS, RIFKIND, WHARTON &**
6    **GARRISON LLP**
ANDREW J. EHRLICH (*Admitted Pro Hac Vice*)
7   New York Bar No. 4103909
Email: aehrlich@paulweiss.com
8   DANIEL S. SINNREICH (*Admitted Pro Hac Vice*)
New York Bar No. 5192497
9   Email: dsinnreich@paulweiss.com
KEVIN P. MADDEN (*Admitted Pro Hac Vice*)
10   New York Bar No. 5990049
Email: kmadden@paulweiss.com
11   1285 Avenue of the Americas
New York, NY 10019-6064
12   Telephone: (212) 373-3000

13

14   MATTHEW D. STACHEL (*Admitted Pro Hac Vice*)
Delaware Bar No. 5419
15   Email: mstachel@paulweiss.com
1313 North Market Street, Suite 806
16   Wilmington, DE 19801-0032
Telephone: (302) 655-4410
17

18   *Attorneys for Defendants*

19

20                  **UNITED STATES DISTRICT COURT**

21                       **DISTRICT OF NEVADA**

22

23   IN RE MARATHON DIGITAL HOLDINGS | Lead Case No: 2:23-cv-01055-RFB-BNW
DERIVATIVE LITIGATION
24   _____

25   This Document Relates to:               **MOTION TO DISMISS PLAINTIFFS'**
         ALL ACTIONS                          **SECOND VERIFIED CONSOLIDATED**
26                                            **AMENDED SHAREHOLDER**
                                             **DERIVATIVE COMPLAINT**
27   _____

28

Defendants Antoun, DeNuccio, Gallagher, James, Leupp, Mellinger, Okamoto, Ouissal, Salzman, and Thiel, and Nominal Defendant MARA Holdings, Inc., f/k/a Marathon Digital Holdings Inc. ("Marathon" or the "Company," and collectively, "Defendants"), by and through their counsel of record, move to dismiss the Second Verified Consolidated Amended Shareholder Derivative Complaint (the "SAC"), ECF No. 68, pursuant to Federal Rules of Civil Procedure 23.1 and 12(b)(6) and Nevada law. This motion is made and based upon the attached Memorandum of Points and Authorities, the Declaration of Kimberly P. Stein ("Stein Declaration"), the Stein Declaration exhibits, the pleadings and papers on file, and any oral argument the Court may consider.

Dated this 20th day of May 2025.

**FLANGAS LAW GROUP**
*/s/Kimberly P. Stein*
Kimberly P. Stein

**MEMORANDUM OF POINTS AND AUTHORITIES**

**PRELIMINARY STATEMENT**

The Court properly dismissed the first iteration of this stockholder derivative case for Plaintiffs' failure to plead particularized facts demonstrating that making demand on Marathon's Board—the proper course for stockholder complaints like this one, rather than rushing into court, as they have—was futile. This Court warned Plaintiffs, when dismissing the First Amended Complaint ("FAC"), that they would have only "one additional opportunity to amend." The SAC squanders that opportunity and fails to cure any of the FAC's defects. The SAC persists in advancing the same strained and illogical theories that the directors were supposedly unable to independently entertain a stockholder demand, now just seasoned haphazardly with a handful of additional facts, many of them irrelevant, and none of which meets Plaintiffs' burden of pleading particularized facts supporting their allegations. This case should thus now be dismissed with prejudice.

Plaintiffs—alleged Marathon shareholders suing derivatively—purport to stand in the Company's shoes and sue certain of its current and former directors and officers on the Company's behalf. Plaintiffs allege that Defendants violated Nevada state law and Section

1

14(a) of the Securities Exchange Act of 1934 by failing to prevent Marathon from making two errors related to esoteric aspects of cryptocurrency accounting that caused the Company to restate its financials on February 28, 2023. This was the basis of the FAC, and the SAC simply repeats verbatim nearly every allegation in the FAC, but adds a hodgepodge of conclusory and otherwise inadequate allegations that have been routinely rejected by courts as insufficient to plead demand futility and to state a claim for relief. It should be dismissed on both grounds.

*First*, the SAC comes nowhere near meeting the exacting standard for pleading demand futility under Rule 23.1 and Nevada law. Marathon's Board had seven directors when the SAC was filed. Plaintiffs allege that demand would have been futile because four of the seven (the "Demand Defendants")—the minimum number needed—purportedly could not impartially consider a pre-suit demand because they either (i) received a material personal benefit from the alleged misconduct, (ii) faced a substantial likelihood of liability on the claims in this action, or (iii) lacked independence from someone conflicted under prongs (i) and (ii). The SAC fails to satisfy Plaintiffs' heavy pleading burden.

The SAC adds no new facts about the Demand Defendants' compensation, but instead purports to show that it constituted a "material personal benefit" because it was higher than the "average" compensation for directors at United States companies, and for directors at three of Marathon's "competitors." This allegation fails out of the gate because Plaintiffs once again identify *no link*—as they must—between the Demand Directors' compensation and the Company's alleged accounting errors. The comparison also fails because the SAC provides no context whatsoever about the three competitors, such as the size, operations, and performance of the companies, and the qualifications, experience, and responsibilities of the directors at those companies. Even if Plaintiffs could link the directors' compensation to the accounting judgments they challenge (and they cannot), the mere fact that Marathon's directors earned more than directors at three other companies, selected through no apparent criteria, cannot excuse demand.

Plaintiffs also fail to adequately allege that any Demand Defendant faces a

substantial likelihood of liability for the claims in the SAC, each of which, under Nevada law, requires facts demonstrating "intentional misconduct, fraud or a knowing violation of law." The SAC contains no such facts. Instead, it repeats nearly every failed allegation from the FAC, and adds a section identifying supposed "red flags" that should have alerted Defendants to the purported misconduct: five cherry-picked publications from 2021 and 2022 discussing differing views about cryptocurrency accounting methods. But there are no allegations that the Demand Directors discussed this technical accounting literature in any Board meeting or that the publications reflected any sort of industry consensus. There is not one particularized allegation anywhere in the SAC describing any "red flag" that any Demand Defendant ever learned, read, or discussed concerning cryptocurrency accounting. Plaintiffs' reliance on five publications in a two-year period—each of which reflects uncertainty and debate over cryptocurrency accounting methods—is improper hindsight pleading and falls far short of demonstrating that any Demand Defendant engaged in "intentional misconduct, fraud or a knowing violation of law." The Section 14(a) claim is deficient for the additional reason that there is no causal link between the corporate actions solicited in the challenged proxy statements and the alleged accounting errors.

*Second*, the SAC also should be dismissed under Rule 12(b)(6). For substantially the same reasons it fails to plead a substantial likelihood of liability, including its utter failure to plead facts supporting any Defendant's knowledge or intent, the SAC fails to state a claim against any Defendant for breach of fiduciary duty, unjust enrichment, corporate waste, or under Section 14(a).

## STATEMENT OF FACTS

### A.    The Parties and Marathon's Board

Nominal Defendant Marathon is a bitcoin digital mining company incorporated in Nevada. ¶¶ 2, 37.[1] When the SAC was filed, Marathon's Board had seven directors. ¶

---

[1]    Cites to "¶" are to paragraphs of the SAC. Cites to "Tr." are to the February 20, 2025 hearing transcript. ECF No. 67. Cites to "Ex." are to exhibits to the Stein Declaration, which this court can consider because they are either documents incorporated into the

265. Only four of those directors—the Demand Defendants (Antoun, Leupp, Mellinger, and Thiel)—are Defendants in this action. *Id.* Three of the Demand Defendants—Antoun, Leupp, and Mellinger—are outside, non-employee, non-management directors. *See* Ex. A at 7-8, 13; ¶¶ 51-53, 60-62, 66-68. Antoun and Leupp joined the Board on May 20, 2021, and Mellinger joined ten months later, on March 31, 2022. *Id.* Thiel has served as the chairman of the Board and Marathon's CEO since 2021. ¶ 38. Marathon's other three directors are non-parties and Plaintiffs do not dispute that the three non-party directors could impartially consider a litigation demand. *See* ¶¶ 264-304. The remaining six Defendants are former Marathon directors or officers. ¶¶ 41, 45, 48, 54, 57, 63.

NRS § 78.138(7) and Marathon's charter exculpate Marathon's directors and officers for personal liability to the Company for "any damages as a result of any act or failure to act in his or her capacity as a director or officer" except for breaches of fiduciary duty involving "intentional misconduct, fraud or a knowing violation of law." Ex. B at 6.

## B.    The Alleged Wrongdoing

Plaintiffs allege that Marathon's public filings between May 10, 2021 and February 23, 2023 (the "Relevant Period") contained "false and misleading statements regarding the Company's business, operations, and prospects." ¶ 24. Plaintiffs allege that "the truth" "emerge[d]" on February 28, 2023, when Marathon disclosed that, based on SEC comment letters and consultation with Marathon's independent auditor, it concluded that several previously issued annual and quarterly financial statements for 2021 and 2022 should "no longer be relied upon" "due to certain accounting errors," and that Marathon intended to file corrected financial statements. ¶¶ 18, 210.

Marathon explained that two novel, complex accounting procedures involving digital assets necessitated restatement. First, Marathon disclosed that it had "recently

---

complaint by reference or of which the court can take judicial notice. *See Ferris* v. *Wynn Resorts Ltd.*, 462 F. Supp. 3d 1101, 1117 (D. Nev. 2020) (taking judicial notice of "SEC filings, matters of public record, and news articles"). All emphases are added and internal quotation marks, alterations, and citations are omitted unless noted.

determined that its method of calculated impairment" for its bitcoin holdings "was not in compliance with the ASC 350-30." *Id.* Specifically, Marathon had been calculating the "fair value" of its bitcoin by referring to its trading price on a major crypto exchange at a standard cutoff time each day, rather than by referring to the intraday low price. *Id.* Second, Marathon disclosed that it had "recently determined" that its assessment of whether the company was an agent or principal while operating MaraPool—a bitcoin mining pool that included certain unrelated third-party participants—was incorrect. *Id.* Specifically, Marathon had previously determined that it acted as an agent when operating the pool and that the bitcoin miners themselves were principals, resulting in incorrect recording of revenue. *Id.* Plaintiffs do not allege that there were any established rules for either accounting procedure during the Relevant Period. Indeed, the SAC acknowledges that these issues were subject to different interpretations and judgments. *Infra* at 15.

Plaintiffs allege proxy statements filed June 16, 2021 (the "2021 Proxy") and September 12, 2022 (the "2022 Proxy," together, the "Proxies"), were false and misleading because Marathon failed to disclose that it would "need to restate several financial statements" in the future as a result of these two accounting issues. ¶¶ 150-51, 199. Plaintiffs also allege that the two accounting errors revealed that Marathon had "problems with internal controls" and that its "corporate governance" was not "strong." *Id.*

On August 9, 2024, Defendants moved to dismiss the FAC. ECF No. 50. On February 20, 2025, this Court heard oral argument and dismissed the FAC because it lacked the particularized allegations required to allege demand futility. Tr. 61:10-23. This Court held that Plaintiffs failed to make "very specific" allegations that "go through defendant by defendant and explain why . . . there would be futility as relates to that for each defendant," though even doing so "may still not be enough given the arguments" raised by Defendants. Tr. 62:19-25; 63:1-5. This Court permitted Plaintiffs "one additional opportunity to amend," and noted that Defendants were "free to raise all of the arguments" they raised previously when moving to dismiss the forthcoming SAC. Tr. 63:15.

The SAC repeats verbatim nearly every allegation in the inadequate FAC. *See*

*generally* Ex. C.  It also adds two categories of allegations.  First, the SAC adds two new paragraphs providing figures for the "average" and "median" compensation for directors of United States companies, and compensation information for directors at three of Marathon's competitors.  ¶¶ 270-271.  Plaintiffs do not, however, explain why only these three companies are appropriate comparisons or how they were selected, and ignore competitors that provided their directors with compensation similar to or greater than Marathon.  Second, the SAC adds a section purporting to allege that Defendants "were aware of Marathon's accounting and internal control problems, through the existence of red flags that were readily before them."  ¶¶ 229-254.  Plaintiffs quote from a smattering of technical accounting publications from the Relevant Period about cryptocurrency accounting.  ¶¶ 233-37.  But Plaintiffs do not allege that these articles were discussed by the Board or that any Defendant ever read them or was even aware of them.  Plaintiffs do not explain how they selected these publications, nor allege that the publications represented an industry consensus or controlling view about the accounting judgments at issue.  Plaintiffs' other additions to the SAC are mainly of allegations that are cumulative of their prior allegations, including several instances of expanded block quotations.  Ex. C at 3-7, 46-48, 86, 92-101, 103-104, 115-123, 135-130.

The SAC asserts state law claims for breach of fiduciary duty, unjust enrichment, and waste, and alleges that statements in the Proxies were false and misleading in violation of Section 14(a).  The SAC abandons Plaintiffs' claim under Section 10(b) of the Exchange Act.  *Id.* at 138.  Plaintiffs did not make a pre-suit demand on the Marathon Board.  ¶ 265.  They assert instead that demand is excused because a majority of the Board cannot impartially consider whether to assert their claims on Marathon's behalf.  *Id.*

## ARGUMENT

### I.    THE SAC FAILS TO PLEAD DEMAND FUTILITY

#### A.    Plaintiffs' Burden to Plead Demand Futility Is Exacting

Plaintiffs' burden to establish demand futility is governed by Nevada law because Marathon is incorporated in Nevada.  ¶ 2; *La. Mun. Police Emps.' Ret. Sys.* v. *Wynn,* 829

1   F.3d 1048, 1058 (9th Cir. 2016).  "Nevada, in turn, looks to Delaware law on shareholder

2   demand futility."  *Id*.; *Shoen* v. *SAC Holding Corp.*, 137 P.3d 1171, 1184 (Nev. 2006).

3         A cardinal precept of Nevada and Delaware law is that the "board of directors"—

4   not shareholders—"has full control over the affairs of the corporation."  *Shoen*, 137 P.3d

5   at 1178; N.R.S. § 78.120.   Accordingly, the board "has sole authority" to decide whether

6   to pursue lawsuits on behalf of the company.  *White* v. *Panic*, 783 A.2d 543, 550 (Del.

7   2001).  A plaintiff who fails to make a pre-suit demand bears the heavy burden of pleading

8   "with particularity" facts showing that pre-suit demand would have been futile.  Fed. R.

9   Civ. P. 23.1(b)(3).  "This heightened pleading burden is . . . more onerous than that required

10  to withstand a Rule 12(b)(6) motion." *Jacobi* v. *Ergen*, 2016 WL 1089232, at *3 (D. Nev.

11  Mar. 17, 2016).  Stockholder plaintiffs thus may not usurp the board's authority absent

12  strict compliance with Rule 23.1 and Nevada substantive law.

13        In 2021, the Delaware Supreme Court established a three-part "universal test" for

14  assessing demand futility.  *See United Food & Com. Workers Union* v. *Zuckerberg*, 262

15  A.3d 1034, 1058 (Del. 2021).  The court clarified that the test is "consistent with and

16  enhances" the standards articulated under the court's prior precedents and their progeny,

17  which expressly "remain good law."  *Id.* at 1059.  Accordingly, the *Zuckerberg* standard is

18  consistent with the Delaware law standards for assessing whether a complaint pleads

19  demand futility that have been adopted by the Nevada Supreme Court.  *Parametric Sound

20  Corp.* v. *Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 133 Nev. 417, 424, (2017)

21  ("[B]ecause we have relied on the Delaware court's corporate law in the past, we turn to

22  the development of Delaware law in this area since" previous decision).   Under

23  *Zuckerberg*, courts must consider on a "director-by-director" basis whether each director

24  on the board: (i) "received a material personal benefit from the alleged misconduct that is

25  the subject of the litigation demand"; (ii) "faces a substantial likelihood of [personal]

26  liability on any of the claims that would be the subject of the litigation demand"; or (iii)

27  "lacks independence from someone who" satisfies one of the first two prongs.  *Zuckerberg*,

28  262 A.3d at 1059.  Unless the answer to any of these three questions is "yes" for a majority

of the directors on an odd-numbered board—here, four out of the seven directors—demand is not excused. *Id.*

Under Nevada law, directors are further entitled to a *presumption* that they were faithful to their fiduciary duties. N.R.S. § 78.138(3). Plaintiffs must plead "particularized factual statements" that create a reasonable doubt that a majority of the Board "could have properly exercised its independent and disinterested business judgment in responding to a demand" to overcome this presumption. *Brehm* v. *Eisner*, 746 A.2d 244, 254 (Del. 2000); *Rales* v. *Blasband*, 634 A.2d 927, 934 (Del. 1993).

Because Marathon's Board had seven directors when the SAC was filed, and three are non-parties, the failure to make a pre-suit demand is not excused unless *all four* Demand Defendants are conflicted under *Zuckerberg*. If Plaintiffs fail to satisfy the *Zuckerberg* test for *even one* Demand Defendant, demand is not futile. Plaintiffs' conclusory and otherwise inadequate allegations are insufficient to satisfy their heavy pleading burden.

### B. Plaintiffs Do Not Adequately Plead That Any Of The Four Demand Defendants Received A Material Personal Benefit

In the FAC, Plaintiffs alleged that Defendants' "lucrative compensation" during the Relevant Period, particularly restricted stock unit grants, constituted "material personal benefits" such that demand would be futile. FAC ¶¶ 141, 248-256. The Court correctly rejected this argument (Tr. 61), consistent with the well-established principle that "allegations that defendants are paid for their services as directors do not excuse demand." *La. Mun. Police Emps. Ret. Sys.* v. *Blankfein*, 2009 WL 1422868, at *8 (S.D.N.Y. May 19, 2009); *Ryan v. Gursahaney*, 2015 WL 1915911, at *8 (Del. Ch. Apr. 28, 2015) ("[O]rdinary director compensation alone is not enough to show demand futility"), *aff'd*, 128 A.3d 991 (Del. 2015).

The SAC pleads precisely the same facts about Defendants' ordinary compensation that the Court rejected in the FAC. But Plaintiffs now advance a new theory: that demand is futile as to the Demand Defendants because they supposedly received "far more than what an average director receives in additional pay at comparable companies." ¶ 269. But

8

these new allegations fail to cure the fundamental flaw in the FAC because they do not show that the Demand Defendants' compensation constitutes a benefit "*from the alleged misconduct* that is the subject of the litigation demand." *Zuckerberg*, 262 A.3d at 1058. Plaintiffs rehash their confusing theory that Marathon's directors received "stock awards provided under an incentive plan solicited and approved by means of a false and misleading proxy statement"—namely, the 2021 Proxy. ¶ 269. Plaintiffs offered a full-throated defense of this theory during oral argument, *see* Tr. 41:1-4; 42:24-43:1-7, and the Court rejected it. Tr. 58:2-59:23. Nothing has changed. The alleged misstatements in the 2021 Proxy concerned misstated revenues based on Marathon's accounting judgments and Marathon's representation that it had "strong" corporate governance; none concerned the incentive plan. ¶¶ 145, 150. Plaintiffs also mischaracterize the facts; the 2021 Proxy did not "solicit" an incentive plan, but instead only an amendment to *increase the shares available* in a *preexisting* incentive plan. ¶¶ 147, 152. There is simply no connection between this amendment and the alleged misstatements. Plaintiffs principally rely on *In re Ebix, Inc. Shareholder Litigation*, 2014 WL 3696655 (Del. Ch. July 24, 2014), but that case highlights that their theory is defective. In *Ebix*, plaintiffs alleged that a proxy made false statements about an incentive plan, and that the director defendants' acceptance of compensation awards under that plan constituted a breach of fiduciary duty. *Id.* at *22-23, 25. There are no comparable allegations here.

Plaintiffs' focus on stock awards is misguided for the additional reason that, "[a]s many courts have suggested, an incentive-based compensation plan . . . does not guarantee an award, and thus provides no benefit"; it merely "creates the possibility of the receipt of a material personal benefit at some later time." *Gera* v. *Palihapitiya*, 2024 WL 3818602, at *8 (D. Ariz. Aug. 14, 2024). Courts routinely reject allegations based on "the size of the stock awards eventually awarded to the Director Defendants" where, as here, the complaint offers no analysis of each "director's economic circumstances, or personal wealth." *Id.*; *see Israni* v. *Bittman*, 473 F. App'x 548, 551 (9th Cir. 2012).

And, critically, even if Plaintiffs *could* establish a connection between the

amendment to the incentive plan and the alleged misstatements in the 2021 Proxy, it could not satisfy demand futility for Mellinger—a necessary Demand Defendant—because he was not on Marathon's Board in 2021 and did not solicit the 2021 Proxy Statement. ¶ 66. Plaintiffs *do not allege* that the 2022 Proxy Statement concerned Marathon's incentive plan or director compensation in any way.

Plaintiffs' "comparison" theory fails for additional reasons. The SAC alleges that Marathon's directors earned more than the "average salary for a director" in the United States and the "median compensation provided in the form of equity" for "mid-cap companies." ¶ 270. The Ninth Circuit rejected similar allegations in *Israni*, where it held that demand futility cannot be satisfied under Nevada law by alleging that defendants were paid "higher than the average director compensation paid at nineteen of the top twenty Fortune 500 companies." 473 F. App'x at 551; *Solak on behalf of Ring Energy, Inc.* v. *Rochford*, 2020 WL 1865982, at *4 (D. Nev. Apr. 14, 2020) ("Plaintiff compares Defendants' compensation to that of directors of other microcap companies, but that alone does not show that the other directors do comparable work in the same industry."). Director compensation allegations cannot defeat the presumption of disinterest unless they are "so lavish that a mechanical application of the presumption would be totally at variance with reality." *Israni*, 473 F. App'x at 551. That is not the case here, where the Court already rejected arguments about the size of defendants' compensation in the FAC. Indeed, no court has ever "found a director's fee to be something other than 'usual and customary' based solely on the size of the fee." *Fosbre* v. *Matthews*, 2010 WL 2696615, at *4-5 (D. Nev. July 2, 2010), *aff'd*, 473 F. App'x 548 (9th Cir. 2012).

Plaintiffs also allege that Marathon's directors earned more than directors at three "similar companies" between 2021 and 2023. ¶ 271. Plaintiffs appear to have plucked three "competitors" out of more than a dozen listed in Marathon's 2022 10-K, but provide no explanation for why they cherry-picked these three companies. Ex. D at 11. The SAC ignores other Marathon competitors in the same list that provided their directors with ordinary compensation similar to or greater than Marathon. *See*, *e.g.*, Ex. E at 23 (Riot

Platforms: $100,000 salary and $1,012,267 in stock awards); Ex. F at 156 (Core Scientific: compensation between $400,000-664,000). Moreover, comparison allegations require plaintiffs to "compare the responsibility of [defendant] directors to the responsibilities of directors at the referenced . . . companies." *Israni*, 473 F. App'x at 551. Plaintiffs utterly fail in this respect because the SAC includes no allegations about the size, operations, or financial performance of these three companies, nor about their directors' qualifications, experience, or responsibilities. At most, Plaintiffs have alleged that the compensation of Marathon's directors exceeded three other companies by a few hundred thousand dollars during certain years in the Relevant Period. These sparse allegations do not plead the Demand Defendants received compensation "so lavish that a mechanical application of the presumption [of director disinterest] would be totally at variance with reality." *Id.* at 548.

### C.    Plaintiffs Do Not Adequately Plead That Any Of The Four Demand Defendants Faces A Substantial Likelihood Of Personal Liability

To plead demand futility under the second *Zuckerberg* prong, Plaintiffs must allege with particularity that a majority of directors face "a 'substantial likelihood' of personal liability" "on a claim-by-claim basis." *Taylor* v. *Kissner*, 893 F. Supp. 2d 659, 666 (D. Del. 2012). Here, Plaintiffs assert that the four Demand Defendants face a substantial likelihood of personal liability for allegedly (i) breaching their fiduciary duties; (ii) unjustly enriching themselves at Marathon's expense; (iii) committing corporate waste; and (iv) issuing the purportedly false or misleading Proxies. These allegations fail.

### 1.    No Substantial Likelihood of Personal Liability for Breach of Fiduciary Duty

Plaintiffs allege that Defendants breached their fiduciary duties to Marathon by (i) failing to ensure Marathon had adequate internal controls (¶ 321) and (ii) making or "causing the Company to make" false statements (¶¶ 318-19)—in both instances pointing to Defendants' purported failure to prevent the two accounting errors addressed in the restatement. Under Nevada law, this claim requires Plaintiffs to plead facts showing that Defendants engaged in "intentional misconduct, fraud or a knowing violation of law,"

*supra* at 4, which requires "knowledge of wrongfulness." *In re ZAGG Inc. S'holder Deriv. Action*, 826 F.3d 1222, 1232-33 (10th Cir. 2016).  Plaintiffs plead no such facts.

### a.    Failure to Adequately Allege Lack of Oversight

The main theory of the SAC is that Defendants breached their fiduciary duty of loyalty by failing to maintain effective controls, as demonstrated by Defendants' purported disregard of red flags about Marathon's accounting issues.  Under Delaware law, this type of claim is called a *Caremark* claim, and it "is possibly the most difficult theory [to plead and prove] in corporation law." *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).  To state a *Caremark* claim, a plaintiff must allege with particularity that the directors (i) "utterly failed to implement any reporting or information system or controls"; or (ii) "consciously failed to monitor or oversee" such a system "thus disabling themselves from being informed of risks or problems requiring their attention." *Stone* v. *Ritter*, 911 A.2d 362, 370 (Del. 2006).  Under either scenario, "liability requires a showing that the directors *knew* that they were not discharging their fiduciary obligations." *Id.*

**Failure to plead lack of controls.**  The SAC lacks particularized allegations that any Demand Defendant utterly failed to implement a compliance system.  To the contrary, Plaintiffs concede that the Board had an Audit Committee, ¶¶ 97-98, a Code of Ethics, ¶¶ 85-92, and an Insider Trading Policy, ¶¶ 93-96, all of which are inconsistent with a failure to implement controls. *See TVI Corp. v. Gallagher*, C.A. No. 7798, 2013 WL 5809271, at *15–16 (Del. Ch. Oct. 28, 2013) (plaintiffs failed to state a *Caremark* claim where they did not plead "specific facts to support an inference that Defendant directors utterly failed to implement any reporting or information system or controls" and "acknowledge[d] that the Board maintained an audit committee").

**Failure to plead red flags.**  Plaintiffs have also failed to "plead particularized facts that the board knew of evidence of corporate misconduct—the proverbial 'red flag'—yet acted in bad faith by consciously disregarding its duty to address that misconduct." *Horman* v. *Abney*, 2017 WL 242571, at *10, *12 (Del. Ch. Jan. 19, 2017); *In re AgFeed USA, LLC*, 558 B.R. 116, 127 (Bankr. D. Del. 2016) (applying Nevada law in dismissing

*Caremark* claim where complaint did not allege that red flags were "consciously disregarded" or that directors "disabled [themselves] from being informed of risks or problems requiring [their] attention.")  The FAC raised this theory and the Court rejected it because Plaintiffs failed to plead particularized facts about Defendants' knowledge with the requisite specificity.  Tr. 61-63.  The SAC does not cure this defect because it alleges *nothing* about what the Demand Defendants knew or when.  The SAC repeats, verbatim, nearly every allegation of Defendants' mental state that the Court previously rejected.  *See*, *e.g.*, Ex. C at 131-32 (D&O Insurance); 116 (Thiel as defendant); 99 (Marcum article).  Because those precise allegations were previously briefed and rejected, and because the SAC offers no reason for the Court to reconsider them, this motion does not address them.

The main addition to the SAC is a new section titled "The Individual Defendants' Knowledge and Conscious Disregard of Red Flags."  *See* ¶¶ 229-254.  But there is not *one fact* in this new section, or anywhere in the 337-paragraph SAC, describing what any Defendant, let alone any Demand Defendant, knew, learned, or discussed at Board meetings or otherwise.  Instead, the SAC purports to identify "red flags," particularly five cherry-picked and highly technical accounting articles offering *differing views* about crypto accounting methodology, and asks this Court to infer that the Demand Defendants "would have been aware" of these "red flags that were readily before them" because they were Board members.  *E.g.*, ¶¶ 14, 231-37, 254.  These new allegations cannot satisfy the exacting *Caremark* standard or show that any Demand Defendant engaged in "intentional misconduct, fraud or a knowing violation of law."

Plaintiffs "red flag" allegations fall into five categories, each of which is flawed:

*First*, Plaintiffs point to five publications concerning digital asset accounting between June 2021 and December 2022, and allege that their mere existence supports an inference that Defendants knew Marathon's bitcoin impairment accounting was improper.  ¶¶ 233-37.  But Plaintiffs do not allege that any Defendant, let alone any Demand Defendant, ever reviewed, or was even aware of, this esoteric accounting literature, or that it was "waved in [Defendants'] face[s]."  *In re Facebook, Inc. S'holder Derivative Litig.*,

367 F. Supp. 3d 1108, 1125 (N.D. Cal. 2019). Nor do Plaintiffs plead any facts suggesting these five publications over an 18-month period were authoritative, widely discussed, or reflective of industry consensus. The existence of these articles, without more, cannot establish that the Demand Defendants knowingly or intentionally approved false statements in the Proxies. *See Israni*, 473 F. App'x at 551 (applying Nevada law and affirming dismissal of *Caremark* claim where "the complaint failed to plead facts regarding what information the committee members saw and failed to act on"); *In re Bidz.com, Inc. Derivative Litig.*, 773 F. Supp. 2d 844, 857 (C.D. Cal. 2011) ("Notably absent from the Amended Complaint, however, is any allegation—let alone a particularized allegation—that [directors] ever saw or knew about the existence of" market reports that supposedly constituted "red flags"); *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 134-35 (Del. Ch. 2009) (alleged "red flags" were public documents and market conditions that did "not support a reasonable inference that the director defendants approved or disseminated the financial disclosures knowingly or in bad faith"); *In re Intel Corp. Deriv. Litig.*, 621 F. Supp. 2d 165, 174 (D. Del. 2009) ("Though Plaintiff identifies a number of so-called 'red flags,' Plaintiff fails to identify what the Directors actually knew about the 'red flags' and how they responded to them.").

Additionally, although the SAC alleges that these five publications reflected "certain rules that companies were expected to . . . adhere to regarding how impairment was measured on intangible assets like Bitcoin" (¶ 232), that is not what they show. One publication, an "academic report" from December 2022, does not mention the viability of using a daily cutoff method for impairment, as Marathon did. ¶ 237. Instead, it notes a "shift" towards an impairment trigger of "lowest price since acquisition"—Plaintiffs' preferred method—which represents a "conservative interpretation" of GAAP "in the *absence of an authoritative accounting standard*." *Id.* Another publication, an FASB "Invitation to Comment" seeking feedback about "future standard-setting," says nothing about current accounting standards. ¶ 233. Yet another publication is a PwC guide recommending that "reporting entities should establish and consistently apply a policy for

14

identifying and incorporating events that may affect fair value measurement," but not recommending any particular policy.  ¶ 235.  In other words, the publications Plaintiffs rely on show that, during the Relevant Period, there was a vigorous debate about, and no authoritative accounting standard for, calculating cryptocurrency impairment.  If any Demand Defendant had even read these articles—which is not pleaded—it would not have alerted them to the "wrongfulness" of purported accounting inaccuracies in the Proxies.

*Second*, Plaintiffs purport to identify "red flags" in Marathon's 2021 10-K filings. Plaintiffs point first to Marathon's disclosure on March 1, 2022, that it would delay the filing of its 10-K due to the Company's "increase in amount and complexity of revenues," "transition to large accelerated filer status," and "first year of being audited for internal controls."  ¶ 240.  Plaintiffs then allege that when Marathon filed its 2021 10-K nine days later, it disclosed that its auditor had identified a material weakness concerning its "user access controls" to "ensure that [certain] IT program and data changes" were "identified, tested, authorized and implemented appropriately to validate that data produced by its relevant IT system(s) were complete and accurate."  ¶ 246.  Plaintiffs allege that these issues would have "indicated the need for a more robust investigation into the Company's accounting processes and protocols."  ¶ 244.

This theory also fails to show bad faith or "knowledge of wrongfulness."  As an initial point, these disclosures all occurred before Mellinger joined the Board and therefore cannot show his knowledge, which means this theory applies to less than a majority of Marathon's Board.  This theory is also not new; Plaintiffs cited these same disclosures in the FAC (Ex. C at 55-56), and the fact that Plaintiffs now quote these filings at greater length is no reason for the Court to reconsider them.  In any event, Plaintiffs make no attempt to link the issues in the 2021 10-K—which concerned "user access" and "change management" controls that affected the Company's IT systems and mining equipment—to the cryptocurrency accounting judgments that supposedly made the 2022 Proxy misleading.  Even if three Demand Defendants were aware of the former, there is no reason to infer they were aware of the latter—or any other wholly unrelated issue at the Company.

*See In re Facebook*, 367 F. Supp. 3d at 1125 n.7 ("red flags" about user privacy were not "'sufficiently similar' to the 'corporate trauma' underlying th[e] action," namely, "potential unauthorized *third-party* access to and use of Facebook users' personal data" (emphasis in original)). Moreover, Plaintiffs' new allegations acknowledge that the Company announced remediation steps to address these weaknesses and a commitment from management to report on remediation progress to the Audit Committee. *See* ¶¶ 247-48. This demonstrates a functioning Audit Committee, not one that ignores "red flags." *Ash* v. *McCall*, 2000 WL 1370341, at *15 (Del. Ch. Sept. 15, 2000) (finding no demand futility where "directors became aware of the accounting improprieties . . . and immediately took decisive steps to disclose and cure them").

*Third*, Plaintiffs rehash the allegation that two Demand Defendants (Leupp and Antoun)—less than half of Marathon's seven-member Board—were members of the Audit Committee to imply that they "would have been particularly aware of the required accounting methods for cryptocurrency and the mounting evidence that Marathon's actual accounting practices were not consistent with those requirements." ¶ 242. As discussed *supra* at 14, Plaintiffs' own allegations undermine any suggestion of "required accounting methods" during the Relevant Period. In any event, Plaintiffs previously argued this theory and the Court already rejected it. Tr. 6:2-5 (it is "not enough" to merely allege that a defendant was "on the audit committee"). The SAC merely takes the previously pleaded responsibilities set out in Marathon's Audit Committee Charter, FAC ¶¶ 91, 258, and moves them to individual paragraphs for Leupp and Antoun. ¶¶ 242, 282, 289. Plaintiffs do not describe any actual Audit Committee meeting or what was discussed and do not show any Demand Defendant's awareness of technical crypto accounting issues, much less "knowledge of wrongfulness" or bad faith. Plaintiffs ask the Court to infer liability from the mere existence of an Audit Committee and description of its role, but that is "contrary to well-settled Delaware law." *Wood* v. *Baum*, 953 A.2d 136, 142 (Del. 2008); *South* v. *Baker*, 62 A.3d 1, 17 (Del. Ch. 2012) ("[A]n allegation that the underlying cause of a corporate trauma falls within the delegated authority of a board committee does not support

an inference that the directors on that committee knew of and consciously disregarded the problem"). Board members are not "expected to know the minutiae of SEC regulations" and have "lawyers and accountants for that purpose." *ZAGG*, 826 F.3d at 1234-35.

*Fourth*, Plaintiffs allege that Demand Defendant Mellinger "would have been privy to information and personnel that would have made [him] aware" of the accounting issues simply because he was on the Board for part of 2022. ¶ 243. Again, Plaintiffs do not describe *any* actual Board meeting, much less one where Mellinger "would have been exposed to detailed information regarding Marathon's accounting procedures and the prevailing rules with regard to proper digital asset accounting procedures." *Id.* These allegations are even more attenuated than the "Audit Committee membership" theory and cannot demonstrate demand futility. As the Ninth Circuit has explained, courts "cannot assume that members of the Board had knowledge of the conspiracy simply because other individuals at [the company]—even other Board members—knew. Instead, Plaintiff would need to demonstrate a clear line of communication and knowledge between the implicated officers and the Board." *Towers* v. *Iger*, 912 F.3d 523, 530 (9th Cir. 2018) (rejecting demand futility where plaintiffs alleged that officers communicated with the Board but "did *not* allege with particularity that information regarding the conspiracy was ever transmitted to the Board by these or other officers") (emphasis in original).

*Fifth*, Plaintiffs add vague allegations that Thiel—the CEO—was "highly experienced," possessed strong "pedigree," and was "in a position to not only oversee, but to interact with the nuances of the Company's accounting and auditing apparatus." ¶¶ 229–230. Plaintiffs also reallege that two unrelated companies—Tesla and MicroStrategy—calculated bitcoin impairment using a different method than Marathon, ¶ 230, and therefore that Thiel "would have been aware" of cryptocurrency accounting issues "from discussions with auditors and other personnel prior to certifying Marathon's financial reports." ¶ 231. Again, Plaintiffs plead no factual support: there are no descriptions of "discussions with auditors and other personnel" or "interact[ions]" with Marathon's "accounting and auditing apparatus." ¶¶ 231, 275. Plaintiffs rely entirely on Thiel's "position" as CEO,

1    but that is not enough to impute "knowledge of wrongfulness" or bad faith.  *In re Accuray,*
2    *Inc. S'holder Derivative Litig.*, 757 F. Supp. 2d 919, 933 (N.D. Cal. 2010).

3                    **b.    Failure to Adequately Allege False Statements**

4            Plaintiffs scarcely try to plead a false statement claim, which requires particularized
5    facts showing that the Demand Directors (i) "knowingly disseminat[ed] materially false
6    information" and (ii) were "deliberately misinforming shareholders."  *Malone v. Brincat*,
7    722 A.2d 5, 14 (Del. 1998).  There are no allegations describing any Demand Defendant's
8    involvement in preparing, reviewing, or disseminating *any* purportedly false statements
9    beyond simply signing one or more SEC filings, which is insufficient as a matter of law.
10   *See Seminaris* v. *Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995).  And, as discussed *supra* at
11   11-17, Plaintiffs plead no facts showing that any Defendant "knew" the challenged
12   statements were false and "deliberately misinform[ed] shareholders."  *See Metro Commc'n*
13   *Corp. BVI* v. *Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 158 n.88 (Del. Ch. 2004).

14                   **2.    No Substantial Likelihood of Personal Liability for Unjust**
                            **Enrichment or Corporate Waste**
15

16           The SAC alleges that the Demand Defendants' purported breaches of fiduciary duty
17   led to their unjust enrichment by virtue of their director compensation, and, similarly, that
18   the same breaches caused or will cause waste in the form of legal costs and "excessive
19   compensation."  ¶¶ 328, 333-334; *see* ¶¶ 39, 52, 61, 67.  Plaintiffs are not substantially
20   likely to succeed on either claim against the Demand Defendants because, again, they have
21   not established any "intentional misconduct, fraud or a knowing violation of law."  NRS §
22   78.138(7); *supra* at 11-17.  The claims also fail because they are premised on the same
23   theory as the breach of fiduciary duty claim, which the SAC fails to adequately plead.  *See,*
24   *e.g.*, *Frank* v. *Elgamal*, 2014 WL 957550, at *31-32 (Del. Ch. Mar. 10, 2014) (dismissing
25   unjust enrichment claim because it was "duplicative" of inadequately pleaded fiduciary
26   duty claim).  Additionally, claims for unjust enrichment and waste cannot be premised on
27   "defendants' salaries, benefits, and unspecified bonuses."  *Steinberg* v. *Dimon*, 2014 WL
28   3512848, at *4 (S.D.N.Y. July 16, 2014) (applying Delaware law and dismissing unjust

                                        18

enrichment claim); *Kandell ex rel. FXCM, Inc.* v. *Niv*, 2017 WL 4334149, at *15 (Del. Ch. Sept. 29, 2017) ("[A]llegations that compensation is excessive or even lavish are insufficient as a matter of law to meet the standard required for a claim of waste."). Plaintiffs' waste theory, premised on alleged legal liability and costs, also fails because the SAC fails to plead that "the amounts [the corporation] agreed to pay were so enormous by comparison to the company's potential liability that no one of sound mind would have agreed" to pay. *Boeing Co.* v. *Shrontz*, 1992 WL 81228, at *4 (Del. Ch. Apr. 20, 1992).

### 3. No Substantial Likelihood of Personal Liability for Section 14(a) Claim

Section 14(a) prohibits false or misleading statements in proxy solicitations. Specifically, a plaintiff must allege: (1) that defendants made a material misrepresentation or omission in a proxy statement; (2) with the requisite state of mind; and (3) that the proxy statement was the transactional cause of harm of which plaintiff complains. *In re Diamond Foods, Inc. Derivative Litig.*, 2012 WL 1945814, at *4 (N.D. Cal. May 29, 2012), *aff'd*, 575 F. App'x 716 (9th Cir. 2014).

Plaintiffs challenge the solicitations in Marathon's Proxies of votes to (i) elect or re-elect Marathon directors and the non-binding vote to ratify Marathon's independent auditor (both Proxies), (ii) increase the number of shares of Marathon common stock in Marathon's equity incentive plan (2021 Proxy), and (iii) increase the number of authorized shares of Marathon's stock (2022 Proxy). ¶¶ 147, 197. Plaintiffs do not allege that the Demand Defendants made any material misstatements or omissions about the corporate actions solicited by the Proxies; instead, they allege that the Proxies were otherwise misleading because they failed to disclose the two cryptocurrency accounting errors underlying this action, and because they purportedly overstated the Company's "strong" corporate governance. ¶¶ 150, 195, 199. As a result, Plaintiffs allege, "shareholders elected and reelected Board members who were violating their fiduciary duties, thereby enabling the Individual Defendants to perpetuate their misconduct." ¶¶ 152, 200, 310.

Plaintiffs cannot show that a majority of Marathon's Board faces a substantial

likelihood of liability with respect to the 2021 Proxy because only *three* of Marathon's seven directors were on the Board at the time it was solicited and signed it. Mellinger—one of the four Demand Defendants—did not join the Marathon Board until March 31, 2022 (¶ 66), over nine months after the 2021 Proxy, and cannot be liable under Section 14(a) with respect to the 2021 Proxy. Plaintiffs also fail to plead a substantial likelihood that the remaining Demand Defendants are liable under Section 14(a) for the 2021 Proxy, or that any Demand Defendant is liable for the 2022 Proxy, because they fail to plead facts satisfying every element of a 14(a) claim.

### a.    Plaintiffs Fail to Allege Knowledge of Wrongfulness

Plaintiffs previously argued that "negligence is all that's required" to satisfy the state of mind element of Section 14(a). Tr. 5:3-7. They are wrong. Nevada law, and Marathon's charter, exculpate directors for monetary liability to the corporation unless they engage in "intentional misconduct, fraud or a knowing violation of law." *Supra* at 4. The Tenth Circuit considered this issue in *In re ZAGG*, where plaintiffs alleged that demand was excused because directors of a Nevada corporation faced a substantial likelihood of liability for violations of Section 14(a). 826 F.3d at 1232. The appellate court held that demand was not excused because the directors were "protected by" Nevada's exculpation statute and plaintiffs failed to plead facts showing that "the Director Defendants *knew their conduct to be wrongful*." *Id.* at 1233. Numerous courts within this Circuit have applied similar exculpation provisions under Delaware law to Section 14(a) claims and rejected demand futility allegations where plaintiffs failed to plead particularized facts showing knowledge or intentional wrongdoing. *See, e.g.*, *In re Wells Fargo & Co. S'holder Derivative Litig.*, 2022 WL 345066, at *5 (N.D. Cal. Feb. 4, 2022) (rejecting demand futility allegations where plaintiffs failed to plead non-exculpated misconduct and explaining: "numerous courts, in considering federal securities claims, including claims brought under section 14(a), have upheld application of exculpation clauses"); *City of Birmingham Relief & Ret. Sys.* v. *Hastings*, 2019 WL 3815722, at *9 (N.D. Cal. Feb. 13, 2019) (similar). As discussed *supra* at 11-17, the SAC pleads no facts demonstrating that

1   any Demand Defendant knew about the two esoteric accounting methods at issue or acted
2   with "knowledge of wrongfulness."  Accordingly, the Section 14(a) claims fail.

3                     **b.        Plaintiffs Fail to Allege Causation**

4           Section 14(a) requires plaintiffs to allege both transaction causation and loss
5   causation.  To allege transaction causation, the plaintiff must plead that the challenged
6   "proxy solicitation itself, rather than the particular defect in the solicitation materials, was
7   an essential link in the accomplishment of the transaction."  *Mills* v. *Elec. Auto-Lite Co*.,
8   396 U.S. 375, 385 (1970); *Desaigoudar* v. *Meyercord*, 223 F.3d 1020, 1022 (9th Cir. 2000).
9   To allege loss causation, the plaintiff "must plead both economic loss and proximate
10  causation" from the challenged proxy.  *Kuebler* v. *Vectren Corp.*, 13 F.4th 631, 645 (7th
11  Cir. 2021).  This means that "damages are recoverable under Section 14(a) only when the
12  votes for a specific corporate transaction requiring shareholder authorization, such as a
13  corporate merger, are obtained by a false proxy statement, and that transaction was the
14  direct cause of the pecuniary injury for which recovery is sought."  *Gen. Elec. Co. by Levit*
15  v. *Cathcart*, 980 F.2d 927, 933 (3d Cir. 1992).  Plaintiffs have not satisfied this standard.

16          Plaintiffs allege that the Proxies were false and misleading because Defendants
17  failed to report violations of the Company's Code of Ethics, falsely stated that Marathon
18  had "strong" governance, and reported revenue figures that the Company later restated.  ¶¶
19  150-51, 198-99.  But the Proxies did not solicit votes involving any of those issues.  Rather,
20  the Proxies solicited shareholder votes only with respect to (i) election or reelection of
21  directors, (ii) non-binding ratification of Marathon's independent auditor (both Proxies),
22  (iii), increasing the shares of stock in Marathon's equity incentive plan (2021 Proxy), and
23  (iv) increasing the number of authorized shares of stock (2022 Proxy).  These votes did not
24  "directly authorize the loss-generating corporate action," *i.e.*, the accounting errors
25  resulting in misstated revenue, *In re Paypal Holdings, Inc. S'holder Derivative Litig.*, 2018
26  WL 466527, at *4 (N.D. Cal. Jan. 18, 2018), and were not the "direct cause" of Plaintiffs'
27  purported pecuniary injury, *Gen. Elec.*, 980 F.2d at 933.

28          Numerous courts have rejected nearly identical theories.  In *Edward J. Goodman*

21

*Life Income Trust* v. *Jabil Circuit, Inc.*, 594 F.3d 783 (11th Cir. 2010), plaintiffs asserted a Section 14(a) claim following disclosure of "accounting errors" and a restatement, alleging misstatements in a proxy solicitation about a compensation policy that purportedly caused shareholders to approve the policy and reelect certain directors. *Id.* at 788-89, 796-97. The court affirmed dismissal on causation grounds, holding that shareholders' damages "were caused not by the policies that they approved via proxy, but by management's failure to follow those policies," and "[t]he adoption of a compensation scheme and reelection of directors was not an essential link to the losses of which the shareholders complain; the insiders' decision to violate company policies was not accomplished or endorsed by any proxy solicitation materials." *Id.* at 797. Similarly, the court in *Paypal* dismissed Section 14(a) claims challenging a proxy soliciting votes to elect directors because there was no "essential link" between that vote and the alleged "deceptive practices." 2018 WL 466527, at *4; *see Diamond Foods,* 2012 WL 1945814 at *7 (dismissing Section 14(a) claim challenging proxy soliciting votes to reelect directors and appoint auditor without disclosing deferred payments because neither "was an essential link to loss-generating corporate action"); *Gen. Elec.*, 980 F.2d at 933 ("[T]he mere fact that omissions in proxy materials, by permitting directors to win re-election, *indirectly* lead to financial loss through mismanagement will not create a sufficient nexus with the alleged monetary loss").

Plaintiffs' Section 14(a) claim fails for the same reason: the votes solicited in the Proxies did not "directly authorize the loss-generating corporate action," *i.e.*, the alleged accounting errors that led to restatement. There is no "essential link" between the solicited corporate actions—election of directors, approval of an accountant, and authorization of new shares—and the purported accounting errors. This is "precisely the sort of claim that courts have repeatedly found insufficient." *Gen. Elec.*, 980 F.2d at 933.

### c.    Plaintiffs Fail to Allege Falsity

Plaintiffs' Section 14(a) claim fails for certain challenged statements for the additional reason that the SAC fails to plead the statements were misleading. The challenged statements concerning Marathon's commitment "to maintaining strong

corporate governance practices," ¶¶ 145, 150, 195, are classic examples of inactionable puffery. *See, e.g.*, *In re Meta Materials Inc. Sec. Litig.*, 2023 WL 6385563, at *11 (E.D.N.Y. Sept. 29, 2023). Plaintiffs also fail to identify any purported violation of Marathon's Code of Ethics (¶ 150), nor any duty for Defendants to disclose such violations. *In re Teledyne Defense Contracting Derivative Litig.*, 849 F. Supp. 1369, 1382 (C.D. Cal. 1993) (dismissing a Section 14(a) claim because directors need not disclose alleged wrongdoing "when such charges have not yet been brought, let alone proven").

### D.    Plaintiffs Do Not Plead a Lack of Independence

Under the third *Zuckerberg* prong, directors lack independence if they are "beholden" to an interested director or stockholder or "so under their influence that their discretion would be sterilized." *Rales*, 634 A.2d at 936. The SAC alleges in passing that Marathon's outside directors are "beholden to each other" and have "longstanding business and personal relationships with each other." ¶ 28. This conclusory allegation fails because it simply parrots the legal standard and is supported by no facts. The SAC also alleges—again with no facts—that Thiel is "beholden to the Company and certain Defendants on the Board who authorized his lofty salary." ¶ 279. But "[t]he blanket assertion that [Thiel] lacks independence because he is beholden to the members of the Compensation Committee is too conclusory to establish that demand would have been futile." *Durgin* v. *Sharer*, 2017 WL 2214618, at *9 (C.D. Cal. Jan. 10, 2017). And the allegation that Thiel is "beholden" to *Marathon* shows, at most, that his "interests are aligned with the company and presumably []he is able to make decisions in the best interests of the company." *In re Dow Chem. Co. Derivative Litig.*, 2010 WL 66769, at *8 (Del. Ch. Jan. 11, 2010).

*        *        *

Plaintiffs have thus failed to allege that at least four of the seven directors on Marathon's Board were conflicted under *Zuckerberg*. Demand therefore is not excused.

## II.    THE SAC FAILS TO STATE A CLAIM UNDER FEDERAL RULE 12(b)(6)

The SAC also should be dismissed because it fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, Plaintiffs

must plead every claim with sufficient detail to be "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft* v. *Iqbal,* 556 U.S. 662, 678 (2009). Further, as already discussed, Nevada law, and Marathon's charter, exculpate directors for monetary liability to the corporation unless they engage in "intentional misconduct, fraud or a knowing violation of law." *Supra* at 4.

### A. Plaintiffs Fail to State Any State Law Claim

Plaintiffs fail to state a claim for their state law claims against all Defendants for substantially the same reasons Plaintiffs fail to plead a substantial likelihood of liability for those claims, including their failure to plead facts demonstrating that *any* Defendant engaged in "intentional misconduct, fraud or a knowing violation of law." *See, e.g.*, *City of Birmingham*, 2019 WL 3815722 at *16 (dismissing state law claims "[f]or the same reason" demand was not futile).

### B. Plaintiffs Fail to State a Claim Under Section 14(a)

"Section 14(a) applies to those who 'solicit' or 'permit the use of [their] name to solicit' stockholder votes." *Mehedi* v. *View, Inc.*, 2023 WL 3592098, at *15 (N.D. Cal. May 22, 2023). Plaintiffs do not allege that Gallagher, Mellinger, Ouissal, Saltzman, or James signed the 2021 Proxy or that their names were used in soliciting that proxy, ¶ 144, nor that Gallagher, Okamoto, or Saltzman signed the 2022 Proxy or that their names were used in soliciting that proxy, ¶ 194. Plaintiffs' Section 14(a) claims must be dismissed against Defendants who neither signed nor permitted the use of their names to solicit each Proxy. Plaintiffs fail to plausibly state a Section 14(a) claim against the remaining Defendants for the same reasons discussed *supra* at 11-17, namely, the failure to allege "knowledge of wrongfulness," a causal link between the alleged accounting errors and the corporate actions solicited by the Proxies, or that the challenged statements were materially misleading. *See Foote* v. *Mehrotra*, 2023 WL 7214728, at *10 (D. Del. Nov. 2, 2023).

### <u>CONCLUSION</u>

The Court should dismiss the SAC with prejudice. *See* Tr. 63:13-17.

1   Dated this 20th day of May 2025.

2                                                      **FLANGAS LAW GROUP**

3                                                      */s/Kimberly P. Stein*
                                                       Kimberly P. Stein
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**CERTIFICATE OF SERVICE**</u>

I, the undersigned, do hereby certify that on May 20, 2025, that I electronically filed the above and foregoing document entitled **MOTION TO DISMISS PLAINTIFFS' SECOND VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT** using the CM/ECF system which will send a notice of electronic filing to all CM/ECF registrants.

*/s/Ronnielyn Abrera*
An employee of Flangas Law Group

26